**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| JOHN DOE, | Case No. 6:20-cv-01220-WWB-LRH |
| Plaintiff, | Judge:  BERGER |
| v. | MOTION FOR PRELIMINARY INJUNCTION |
| EMBRY-RIDDLE AERONAUTICAL UNIVERSITY, INC. | |
| Defendant | |

Plaintiff John Doe, respectfully submits this Motion for a Preliminary Injunction.[1]  In accordance with ¶3 of the Court's December 4, 2020 Order Governing Discovery (Doc#63), Exhibits will be filed separately after Defendant is provided an opportunity to review proposed redactions and, if Defendant believes redactions are insufficient, seek leave to have the exhibits filed under seal.

Plaintiff originally filed a Motion for Preliminary Injunction on July 9, 2020.  (Doc#4.)  As a result of a "Status Quo Agreement" between the parties that permitted Plaintiff to attend school on-line, Plaintiff withdrew the Motion.  (Doc#36, Doc#41.)  The Status Quo Agreement was extended for classes in Spring 2021.   As part of the Status Quo

---

[1] Local Rule 3.01(a) statement of the precise relief requested and basis for the request: Pursuant to Fed. R. Civ. P. 65 and the equitable "judicial power" vested in Article III courts, Plaintiff seeks a preliminary injunction as follows:

> Defendant is prohibited from imposing any disciplinary sanctions against Plaintiff related to the alleged sexual misconduct described in the Complaint pending the completion of trial and the consideration of permanent injunctive relief.  Defendant shall restore Plaintiff as a student in good standing and Plaintiff shall continue to receive any scholarships and/or financial aid he was receiving prior to the imposition of disciplinary sanctions.

Agreement, the parties anticipated that Plaintiff "may refile the withdrawn motions" if necessary.[2]  The Parties have been unable to reach a resolution of this case and Plaintiff believes that on-line classes for the 2021-2022 academic year will be inadequate to permit him to continue his education.

## FACTS

Plaintiff John Doe is a student at Embry-Riddle Aeronautical University ("ERAU"). ERAU is a private university in Daytona Beach, Florida.  John Doe is training to be a pilot. He is also a student-athlete who received a scholarship.

**A.     The ERAU Sexual Misconduct Policy**

ERAU has adopted a "Civil Rights Equity & Sex / Gender Based Harassment, Discrimination, and Sexual Misconduct Policy."  (Doc#1-5.)  This is referred to as the "Sexual Misconduct Policy. The Sexual Misconduct Policy states that it was adopted, in part to comply with various guidance from the Department of Education, including the 2011 Dear Colleagues Letter.  Allegations of sexual misconduct are reported to and investigated by the school's Title IX Coordinator.[3]

ERAU has adopted a "Civil Rights Equity & Sex/Gender-Based Harassment, Discrimination, and Sexual Misconduct Resolution Process."  This is referred to as the "Resolution Process."  (Doc#1-6.)   The Resolution Process sets forth procedures ERAU

---

[2] As part of the Status Quo Agreement, the parties agreed that "Defendant is precluded from arguing that any delay as a result of this Agreement in seeking injunctive relief from the Court by Plaintiff is evidence that Plaintiff will not suffer irreparable harm…".

[3] The Sexual Misconduct Policy requires that "there must be clear, knowing, and voluntary consent prior to and during sexual activity."  The Sexual Misconduct Policy prohibits sexual activity with "someone you know to be or should know to be incapacitated."  The definition of "incapacitated" in the Sexual Misconduct Policy is complicated and confusing but, in regard to alcohol use, provides that "incapacitation is a state beyond drunkenness or intoxication." (Doc#1-5, PageID#50-51)

employs to investigate and adjudicate allegations of violations of the Sexual Misconduct Policy.   The Resolution Process provides that allegations of sexual misconduct are handled by what is referred to as the "single investigator model."  The Title IX Coordinator assigns an investigator to interview witnesses, gather evidence, and determine if a violation of the Sexual Misconduct Policy has occurred.   (Doc#1-6, PageID#87-89.) ERAU promises as "a fundamentally fair resolution" and a decision based solely on evidence presented during the resolution process that is "credible, relevant, based on fact, and without prejudice." [4]  (Doc#1-6, PageID#100-101.)   The Resolution Process provides for a limited appeal.

## B.    The Allegations Against John Doe

John Doe was accused of sexual misconduct arising out of events that occurred on October 26-27, 2019 (the "Incident").[5]  Simply:  John Doe and Jane Roe engaged in sexual activity after drinking at a Halloween party.  Both John Doe and Jane Roe claim to have been intoxicated.

Jane Roe submitted a complaint to the ERAU Title IX Office alleging that she was the victim of a sexual assault.  (Report at 4.)  The basis for Jane Roe's complaint was,

---

[4] Many traditional due process-type protections are not present.  The accused student is not permitted to remain silent and is not presumed innocent.   There is no hearing. Students accused of sexual misconduct are not given an opportunity to question their accusers or any adverse witnesses.  The investigator literally serves as the police, judge, and jury in a secret process.

[5] John Doe unequivocally denies engaging in any misconduct or violation of the Sexual Misconduct Policy.  John Doe is *not* asking the Court to issue an opinion on the merits of the allegations against Jane Roe.  John Doe's claims focus on the actions of Defendant and are independent of his underlying "guilt" or "innocence."  *Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 313 (D.R.I. 2016) ("It is not the Court's role to . . . to evaluate whether the Court would have made the same judgment calls on evidence and other issues as [the school] did; or to determine whether the procedure John [Doe] received was optimal.").

essentially, that she was too intoxicated to consent to sexual activity.[6] (*See e.g.* Report at 47.)  During an initial meeting with the ERAU Title IX Coordinator, John Doe informed the Title IX Coordinator that he was very intoxicated when he engaged in sexual activity with Jane Roe. (Dammer Depo. at 78.)    The Title IX Coordinator did not act on this statement or initiate an investigation into possible misconduct by Jane Roe.  (Doc#4-1, PageID#127-129.)    After a 'mediation' was unsuccessful, on January 8, 2020, John Doe was informed that Jane Roe had "requested to move forward with a formal Title IX investigation."  (Report at 4-5.)

On January 10, 2020, John Doe submitted a report to the Title IX Office alleging that he, too, was the victim of sexual misconduct.    In this report, John Doe indicated that on the night of the incident, he was "too intoxicated to consent to the sexual acts of [Jane Roe.]" (Doc#4-1, PageID#129;  January 10, 2020 Complaint.)   ERAU did not respond to John Doe's complaint against Jane Roe.  (Doc#4-1, PageID#129-130; Dammer Depo. at 54-58.)  Instead, ERAU conducted an investigation solely into the allegations *against* John Doe.  During the investigation, John Doe again indicated that he was too intoxicated to engage in consensual sexual activity with Jane Roe.   John Doe also provided the investigator with sworn statements supporting his version of events.   (Doc#4-2, PageID#133.)

---

[6] The conclusion of the Report makes clear that incapacitation due to intoxication is the basis for the conclusion that she did not consent to sexual activity:

> The evidence shows that the respondent should have known that the reporter could not make rational, reasonable decisions and lack the capacity to give knowing consent.

(Report at 55.)

On March 24, 2020, John Doe was informed that the Title IX investigation was completed and that he had been found responsible for "Non-Consensual Sexual Intercourse" because Jane Roe was incapacitated when she consented to sexual activity with John Doe.  The Outcome Letter did not address John Doe's claim that he was a victim of sexual misconduct because he, too, was intoxicated.  (Doc#1-2.)

On April 1, 2020 John Doe submitted an appeal, referred to by ERAU as a "Request for Reconsideration."  John Doe noted that he had submitted a claim that he was a victim of sexual misconduct which had not been addressed.  John Doe also noted various procedural irregularities.  (*See* Appeal.)   The Appeal was reviewed by the Associate Dean of Students & Title IX Coordinator for the ERAU campus in Arizona.  She identified concerns about bias, granted John Doe's appeal, and ordered that case to be reviewed by a new investigator.  (Doc#1-3.)  The new investigator only read the report  - - he did not conduct any new investigative work or speak to any witnesses.  On June 10, 2020 the new investigator issued an Outcome Letter.  This letter is substantially similar to the Outcome Letter and summarily dismissed John Doe's claim that he was also incapacitated.  (Doc#1-4.)   John Doe was dismissed from ERAU.  He faces, *inter alia,* damage to his academic and professional reputations.  He will be limited in his ability to enroll at other institutions of higher education and to pursue a career.    (Doc#4-1, PageID#130-131.)

### ARGUMENT

### A.    The Standard For Resolution Of This Motion

To justify a preliminary injunction the movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the

injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Clewiston Commons Ltd. Liab. Co. v. City of Clewiston*, M.D.Fla. No. 2:18-cv-339, 2019 U.S. Dist. LEXIS 19923, at *7 (Feb. 7, 2019), *quoting Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

**B.       Recent Cases Granting Preliminary Injunctions To Students**

Federal courts have granted preliminary injunctive relief prohibiting private universities from implementing discipline against students accused of sexual misconduct. *See e.g. Doe v. Univ. of Notre Dame*, N.D.Ind. No. 3:17CV298, 2017 U.S. Dist. LEXIS 69645 (May 8, 2017) (court concluded that a student facing discipline for an allegation of sexual misconduct has demonstrated "at least some likelihood of success on the merits of his breach of contract claim and of irreparable harm"); *Doe v. Middlebury College,* D.Vt. No. 1:15-cv-192-jgm, 2015 U.S. Dist. LEXIS 124540 (Sep. 16, 2015) (court found that a student accused of sexual misconduct had "demonstrated a sufficiently serious question regarding whether [the school] violated its policies"); *King v. DePauw Univ*., No. 2:14-cv-70, 2014 U.S. Dist. LEXIS 117075 (S.D. Ind. Aug. 22, 2014) (court found that a student accused of sexual misconduct had demonstrated likely success on breach of contract claims against the school).

Courts have similarly granted injunctive relief against public colleges and universities, finding that students faced irreparable harm from the imposition of school discipline. *See e.g. Doe v. Rector & Visitors*, W.D.Va. Civil Action No. 3:19CV00038, 2019 U.S. Dist. LEXIS 108990 (June 28, 2019) (granting preliminary injunction prohibiting university from proceeding with a disciplinary hearing); *Doe v. Univ. of Michigan*, 325 F. Supp. 3d 821, 826 (E.D.Mich. 2018) (granting preliminary injunction prohibiting university

from continuing with unconstitutional disciplinary process); *Nokes v. Miami Univ.*, S.D.Ohio No. 1:17-cv-482, 2017 U.S. Dist. LEXIS 136880 (Aug. 25, 2017) (granting preliminary injunction prohibiting university from suspending a student); *Ritter v. Oklahoma*, W.D.Okla. No. CIV-16-043 8-HE, 2016 U.S. Dist. LEXIS 60193 (May 6, 2016) (ordering school to stay discipline and permit student to complete remaining graduation requirements); *Doe v. Penn. State Univ.*, M.D.Pa. No. 17-CV-01315, 2017 U.S. Dist. LEXIS 132186 (Aug. 18, 2017) (granting preliminary injunction to student who had alleged that a school acted in violation of due process rights); *Doe v. Univ. of Cincinnati,* 223 F. Supp. 3d 704 (S.D. Ohio 2016), *aff'd* 872 F.3d 393 (6th Cir. 2017) (same); *Roe v. Adams-Gaston*, S.D.Ohio No. 2:17-cv-945, 2018 U.S. Dist. LEXIS 185697 (Apr. 17, 2018) (same).

**C.      Plaintiff Has A Substantial Likelihood of Success**

**1.      Selective Enforcement Claim**

**a.      Standard**

To prevail on a Title IX Selective Enforcement claim, Plaintiff must demonstrate that a similarly-situated member of the opposite sex was treated more favorably. *Doe v. Rollins College*, 352 F. Supp. 3d 1205, 1211 (M.D.Fla. 2019), *citing Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016).  In a selective enforcement claim, a plaintiff alleges that the decision to initiate proceedings or the penalty imposed was affected by plaintiff's gender. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).  Plaintiff succeeds if he can demonstrate that a person of the opposite sex was in similar circumstances and was treated more favorably. *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 756 (E.D. Tenn. 2009).

**b.    Plaintiff Has A Substantial Likelihood Of Succeed On His Selective Enforcement Claim**

Jane Roe was in circumstances sufficiently similar to John Doe's and was treated more favorably by ERAU.  ERAU officials failed to initiate an investigation or disciplinary process with respect to Jane Roe after receiving credible information that Jane Roe, in addition to John Doe, may have violated the Sexual Misconduct Policy by engaging in sexual activity with John Doe while John Doe was incapacitated due to alcohol.

On January 10, 2020 John Doe submitted a Complaint of Misconduct against Jane Roe.  (January 10, 2020 Complaint.)  Jane Roe was not investigated for violating the sexual misconduct policy after John Doe's complaint.  Jane Roe was never even informed about the allegation.  (Dammer Depo. at 88.)  No outcome letter was ever produced.  The Title IX Coordinator admitted in her deposition that there should have been a clear and unambiguous finding in the Report on John Doe's complaint:

> Q …Would that report include a clear statement of the allegation by the -- by the complainant?
> A A full report, yes.
> Q And would that report then include a finding about whether the accused student was responsible or not responsible for that allegation?
> A Yes.
> Q Okay. In other words, there shouldn't be any ambiguity? If there's a complaint there should be some document out there that says, "This is the allegation that Embry-Riddle looked at. This is the result of our investigation"?
> A Yes.

(Dammer Depo. at 46-47 (objection omitted).)[7]   The Report does not contain such a statement describing the result of John Doe's complaint.

_____

[7] The Title IX Coordinator claimed in her deposition that the school "basically merged the case."  No documentation supports this claim. (*See e.g.* Dammer Depo. at 91.)  And we now know that the Title IX Coordinator blatantly lied about this.  She said she "checked with" a representative of an organization that provides advice and training to schools on Title IX matters about this issue.  This representative, according to her deposition

John Doe's claim fits squarely within existing case law.  Courts have held that a student states a viable Title IX Selective Enforcement claim where the school only investigates one party when both allege that they engaged in sexual activity while intoxicated. "An accused student and his or her accuser can be compared to show selective enforcement if the parties allege misconduct against each other." *Rossley v. Drake Univ*., 342 F. Supp. 3d 904, 933 (S.D.Iowa 2018), *citing Stenzel v. Peterson,* D.Minn. No. 17-580, 2017 U.S. Dist. LEXIS 148467 (Sep. 13, 2017).  In *Rossley*, a court found that a viable Title IX claim existed where the male student, as in this case, told a school official he might be the victim of a sexual assault.[8]  The school official declined to initiate an investigation into the allegations of the female student.  Notably, in *Rossley,* the knowledge of the school officials alone was sufficient to create an inference that sex was a motivating factor in a school's decision to discipline a student.  The court said,

> Although Defendants claim Plaintiff cannot allege facts to show any possible disparate treatment was motivated by gender, the disputed facts themselves— whether an arguably similarly situated man and woman were treated differently—raise the specter of gender bias…

*Rossley*, 342 F. Supp. 3d at 934-935.

John Doe and Jane Roe are similarly situated in that their conduct was nearly identical: (i) they both engaged in the exact same sexual conduct; (ii) they both admitted

---

testimony, "recommended that we just merge or hold off" on the investigation of John Doe's allegations "and do this after the other case was done."  (Dammer Depo. at 55.) The representative has submitted an Affidavit denying that she provided advice to ERAU and stating, further, that she would have advised the school that the claim by John Doe could *not* be summarily rejected and ignored.  (Affidavit of Sandra Shuster.)

[8] The Third Circuit in *Doe v. Univ. of the Sciences,* 961 F.3d 203 (3d Cir.2020), held that a Plaintiff could maintain a selective enforcement claim even though the accused student had told the investigator that the sexual activity was consensual and never submitted a complaint.

to drinking; (iii) they both claimed the other initiated sexual activity; and (iii) they both submitted formal complaints alleging that the they were incapable of providing consent. (*See e.g.* Doc#4-1, PageID#129.)   They both should have received the same initial treatment or, at a minimum, be subject to investigation.[9]   Tellingly, John Doe was suspended from his athletics team on the basis of only an allegation prior to any investigation; Jane Roe was not suspended from her athletics team after John Doe lodged a similar accusation.[10]   (*Id.*)   This type of disparate treatment, courts have recognized, demonstrates gender bias and a selective enforcement violation under Title IX.   In *Doe v. Brown Univ.*, 327 F. Supp. 3d 397 (D.R.I. 2018), the court indicated that this was sufficient to create a Title IX selective enforcement issue.   The court said:

> Both [the male student] and [the female student] were students at Brown. Both brought complaints of sexual assault. Both complaints of sexual assault occurred, at most, within six months of each other. Brown investigated [the female student's] complaint; it ignored [the male student's] complaint. While the two are not exactly identical, the allegations as pleaded present [the male student] and [the female student]  as similarly situated.

---

[9] John Doe and Jane Roe did not have to ultimately receive the same sanctions.  The Sixth Circuit has noted that if a school "had initiated disciplinary proceedings against [the female accuser], this process may have led to a finding of not responsible or the imposition of a lesser sanction."  *Cf. Doe v. Miami Univ.*, 882 F.3d 579, 597 (6th Cir. 2018) (discussing equal protection claim).

[10] Jane Roe requested that John Doe be suspended form his athletics team; the Title IX Coordinator agreed even though there has been no investigation.  (Doe Aff. ¶3; Dammer Depo. at 84-85.)  John Doe's faculty advisor believed this was evidence of bias.  She testified at her deposition:

> One of the things that John Doe brought up in every meeting that I attended was his request for clarification as to why he had been removed from the track team and he was not allowed to train with the team, and he had -- he requested clarification on that and he had offered several potential options or solutions that would allow himself and the Reporter to train where they would not overlap or other options, and the Title IX Coordinator's responses to these requests just didn't seem authentic.

(Steinhauer Depo. at 49.)

227 F. Supp. 3d at 413. Other courts have reached a similar conclusion.  *See Doe v. Syracuse Univ.*, N.D.N.Y. No. 5:17-cv-787 (TJM/ATB), 2020 U.S. Dist. LEXIS 75995, at *33-35 (Apr. 30, 2020) (denying cross motions for summary judgment where both male and female engaged in sexual activity when intoxicated; "there are questions of fact about whether gender bias motivated the fact that [the male student] received a penalty for the incident and [the female student] did not."); *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 223 (D. Mass. 2017) ("when the College learned [the female student] may have initiated sexual activity with [plaintiff] while he was... incapable of consenting, the College did not encourage him to file a complaint, consider the information, or otherwise investigate").

ERAU's conduct demonstrates favoritism toward women and shows that ERAU operates according to a stereotypical view of males as sexual aggressors and females as passive, a view that men are responsible for obtaining consent from women but not the other way around.[11]  This gender stereotype, sometimes known as "traditional sexual scripts," governs women and men's behavior during sexual encounters.   According to this stereotype, men are perceived as  "willing and at all times ready for sex" while women are perceived to desire sex only within the context of a stable, monogamous relationship. The failure of ERAU to conduct an investigation into Jane Roe, thus, is not accidental. Professor Gruber, an expert in the relationship between gender stereotypes and the legal rules, principles, and practices governing gender violence, has examined the facts of this case.   She explains the influence of gender stereotypes and sexual scripts on ERAU's actions:

---

[11] ERAU has only ever investigated allegations of sexual misconduct against male students.  (*See* Table, Response to Interrogatory; Meyers-Parker Depo. at 35.)

…ERAU acted in a manner consistent with the application of the traditional sexual script and the gender stereotypes therein.  The decision of ERAU to not investigate John Doe's claim that he was experienced a nonconsensual sexual assault by Jane Roe was consistent with the stereotypical view of men as sexual aggressors and women as passive gatekeepers. The failure to investigate John Doe's claim that he was too incapacitated to consent to sex, despite evidence of his intoxication, is indicative of a presumption that John Doe, a man, could not have been the victim of sexual assault by Jane Roe, that he was "willing and at all times able" to have sex, and that his intoxication did not matter because, regardless of his level of drunkenness, he was a pursuer who benefitted from the "achievement" of sexual intercourse.

(Doc#4-3, PageID#140-141.)[12]

The ERAU investigation also relied on other stereotypes.  The ERAU investigation relied on the stereotypical claim that a man cannot be incapacitated if he is able to maintain an erection and engage in intercourse. (Report at 52.)  However:  the Title IX Coordinator and Investigator admitted in their depositions that this stereotype is not accurate.  (Dammer Depo. at 62; Meyers-Parker Depo. at 70-71.)  Even worse: the investigative file contained a medical paper indicating that this was untrue – but this was

---

[12] ERAU's Sexual Misconduct Policy acknowledges that it was adopted to comply with directives from the Department of Education.  *See e.g. Doe v. Purdue Univ.,* 928 F.3d 652, 668 (7th Cir. 2019) (observing that the DOE guidance letter "ushered in a more rigorous approach to campus sexual misconduct allegations").  Professor Gruber explains that this likely encouraged ERAU to rely upon gender stereotypes in reaching a conclusion in this case:

> ERAU like other schools nationwide faced the risk that a process favorable to the respondent or a finding of nonresponsibility would invite federal investigation and sanction, which could result in loss of eligibility for federal funding. Importantly, adherence to the entrenched gender stereotypes… generally makes it easier to find male respondents responsible for incapacitated and nonconsensual sex in a mutual intoxication situation because the man is necessarily the sexual pursuer responsible for obtaining sober consent and the woman is necessarily the passive gatekeeper. The stereotypes thus aligned with ERAU's interest in avoiding federal investigation and sanction.

(Doc4-3, PageID#141.)

also ignored.  (Dammer Depo. at 66-67.)  John Doe, thus, has a substantial likelihood of success on his claim that he was unfairly investigated or disciplined where a similarly-situated female, Jane Roe, was not.[13]  *Cf. Rolph v. Hobart & William Smith Colleges*, 271 F. Supp. 3d 386, 402 (W.D.N.Y. 2017) (student alleged gender bias, in part, on the fact that school "panel questioned him extensively about whether he was intoxicated… but failed to question her about whether he appeared intoxicated; this, according to Plaintiff, 'is consistent with a view of men as predators and women as guardians of virtue'").

**2.      Breach of Contract Claim**

      **a.      Standard**

A student and a private university in Florida have a contractual relationship. *John B. Stetson Univ. v. Hunt*, 88 Fla. 510, 102 So. 637 (1924); *Sharick v. Southeastern University of Health Science*s, Inc., 780 So.2d 136, 138 (Fla. 3rd DCA 2000). The terms of this relationship are generally set forth in university catalogs, student manuals, student handbooks, and other university policies and procedures. *Ali v. Stetson Univ.*, *Inc.*, 340 F.Supp.2d 1320, 1328 (M.D. Fla. 2004), *quoting Univ. of Miami v. Militana*, 184 So.2d 701, 704 (Fla. 3d DCA 1966).

      **b.      Plaintiff Has A Substantial Likelihood Of Success On His Breach of Contract Claim**

         **i.      The Conduct Occurred Off Campus**

The Sexual Misconduct Policy cannot be applied to John Doe's alleged conduct. The Sexual Misconduct Policy unambiguously states that the "jurisdiction" of the policy is

---

[13] A selective enforcement claim is viable regardless of the plaintiff's underlying guilt or innocence.  *Yusuf v. Vassar Coll.*, 35 F.3d at 715.

limited to "activities on University owned and or operated property."   (Doc#1-5, PageID#49.)  The alleged conduct in this case occurred at a private party at private house off campus.  (Doc#4-1, PageID#128.)   As a result, the school did not act in accordance with the express terms and conditions of its policy.[14]

### ii.    ERAU Did Not Provide A Fair Process

The Sexual Misconduct Policy and Resolution Process contain a number of guarantees of fundamental fairness.   The Resolution Process provides that "all investigations will be thorough, reliable, and impartial" and that a Responding Party has the "right to a fundamentally fair resolution, as defined in these processes."  (Doc#1-6.) For purposes of this Motion, the Court should consider three violations of this guarantee. *See Doe v. Rollins College,* 352 F. Supp. 3d 1205, 1212 (M.D.Fla. 2019) (denying motion to dismiss where student "identified specific provisions of the Sexual Misconduct Policy that Rollins purportedly breached and facts alleging how the breach occurred").

<u>First</u>, the Report contained significant errors.[15]  The most notable example is that the Report improperly relied upon medical records provided by Jane Roe.   The investigator credited a claim by Jane Roe that she had genital tearing – yet the medical records do not show this.  The Investigator testified at her deposition:

> Q But you weren't able to validate other things she said like the fact that she had tearing on her vagina? That's not noted in the medical records; is it?

---

[14] The Title IX Coordinator sought to apply other sections of the Policy, such as the introduction, to modify the jurisdiction language.  (Dammer Depo. at 72-74.)  This is strained and, at best, creates an ambiguity that should be construed against the school as the drafter.  *See Key v. Allstate Ins. Co.,* 90 F.3d 1546 (11th Cir. 1996) ("In general, ambiguities in contracts are construed against their drafters.").

[15] Additional flaws in the investigation will be developed at trial  Example: the Investigator never interviewed key witnesses, such as Jane Roe's roommate, sister, and boyfriend, simply because Jane Roe requested that they not be interviewed.  (*See e.g.* Dammer Depo. at 108-109.)

A No, it's not noted in the medical records.

(Meyers-Parker Depo. at 163.)  The investigator also credited an alleged "diagnosis" in the report of sexual assault – but this was just a reason given by Jane Roe for the examination, and not a conclusion by the medical personnel.  The ERAU employee who granted the appeal explained the error:

> Q So why was it problematic that the medical records were used in this particular case?
> A The medical records that were utilized came from a center that typically advocates for the complainant. Therefore, the diagnosis on the medical documentation was not necessarily a medical diagnosis but what the complainant went in to see the medical provider for.

(Frost Depo. at 51.)  The ERAU employee added, "I would say that there's concerns about potential bias for using the [medical] report."[16]

Second, the ERAU Title IX Coordinator and Investigator were biased.  The ERAU employee who granted the appeal indicated her belief that the Report was biased, in part, based on gender.  She testified at her deposition:

> Q Did you tell [John Doe] that along with gender bias you would also like to add procedural bias to your report?
> A I do remember that.
> Q Why do you say that?
> A Because I had concerns about what was written in the investigative report…

---

[16] Relatedly, the report relied on statements allegedly made in a mediation even though John Doe had been promised that the mediation would be confidential.  The person who conducted the mediation, upon hearing about this, wrote in an email, "our conversation was not intended to be used outside" the mediation.  (Feb. 11, 2020 Email.)

(Frost Depo. at 44.)  She set forth five different sources of error/bias in an April 14, 2020 email and testified about her concerns "about failure to follow procedures."  (Frost Depo. at 50-52, 81; April 14, 2020 Email.)[17]

Discovery revealed that the source of this bias was a desire by the Investigator and Title IX Coordinator to "believe the victim."  Training materials produced by ERAU indicate that the Title IX Coordinator and Investigator teach others in the ERAU community that "We need to believe survivors *because it is their truth* they are speaking." (Training at ERAU_002683 (emphasis in original).)[18]  The Title IX Coordinator testified at her deposition:

> Q Do you believe that all victims should be believed?
> A Yes. When they come in it's their truth.
> Q And what does that mean?
> A It means that when they come in and make a statement I am going to believe what they're telling me is the truth at that time when they first come in.

(Dammer Depo. at 44.) Yet, when John Doe submitted a complaint, he was not treated as a victim.  Instead, Dammer admitted she "did not believe him."  (Dammer Depo. at 53.)[19] Bryan Lambert, an experienced attorney who served as John Doe's advisor, confirms this disparate treatment:

> I believe that ERAU officials were biased against John Doe.  I have been involved in numerous investigations of sexual misconduct and, as a result, I believe that I can tell when an investigator has reached a conclusion before the investigation even started.  This is how ERAU treated John Doe.

---

[17] John Doe's faculty advisor initially claimed that the process was fair and unbiased. However, she later admitted that she told Plaintiff "there was bias in some of what I saw." (Steinhauer Depo. at 46.  *See also Id.* at 49 ("the Coordinator was showing some bias").)

[18] In contrast, those accused of misconduct are told mere that ERAU is "non-judgmental" and "is looking to gather the facts." (Training at ERAU_002682 (emphasis removed).)

[19]Dammer later changed her testimony on this point, but admitted that she never opened an investigation into John Doe's claim against Jane Roe or made specific findings on John Doe's claim.  (Dammer Depo. at 55-55.)

(Doc#4-2, PageID#132-133.)

Perhaps the most egregious example of bias is the fact that ERAU declined to consider sworn statements provided by John Doe to the Investigator.  John Doe's counsel writes:

> I assisted John Doe in obtaining sworn statements from witnesses who supported John Doe's version of events and undermined the credibility of Jane Roe.  ERAU officials initially declined to accept the statements, then, upon John Doe's objection, relented…

(Doc#4-2, PageID#133.)  Disturbingly, the Report explains that the statements would not be given full consideration, in part, because they came from an attorney; the investigator then falsely accused John Doe and his counsel of "coaching the witnesses."  All witnesses specifically denied being coached, yet the Report states:

> Since [the witnesses] had met with the attorney and his staff before they came to meet the title IX Investigator, it is likely they had been coached or told what to focus on in their statements by either the attorney or the respondent.

(Report at 51.)  *This impertinent accusation was based on zero evidence;* the Investigator admitted at her deposition that she could not support this claim!  She first testified a number of times that she could not "recall" what evidence she had to support this allegation.  (Meyers-Parker Depo. at 195-203.)  For example:

> Q ...So do you believe that they were coached when they gave these statements under oath and, therefore, committed perjury?
> A I do not know.

(Meyers Parker Depo. at 196.)  Finally, when confronted with the seriousness of the accusation, she admitted her error:  "I do not think I should have used the term 'likely.'" (Meyers-Parker Depo. at 203.)  The Title IX Coordinator also testified that she was not aware of any such coaching:

17

> Q ...Are you aware of any evidence as you review this report that any of these witnesses had been coached?
> A No.

(Dammer Depo. at 129.)  The Title IX Coordinator, perhaps realizing the highly improper nature of the accusation, refused to defend this aspect of the Report:

> Q So you believe it was totally appropriate for your investigator in this case to write that the witnesses had likely been coached?
> A I am not saying I agree with what she wrote.

(Dammer Depo. at 132.)

**D.    Irreparable Harm**

The previously filed Affidavit of John Doe describes the irreparable harm Plaintiff will suffer if a temporary restraining order and preliminary injunction are not granted. (Doc#4-1; PageID#130-131.)  The imposition of discipline by ERAU would deny Plaintiff the benefits of education at his chosen school, would damage his academic and professional reputation, would prevent him from competing athletically, and would result in the loss of a scholarship.  The discipline also may affect his ability to enroll at other institutions of higher education and to pursue a career.   This has been found to constitute irreparable harm.   In *Doe v. Univ. of Cincinnati,* the Sixth Circuit observed that a suspended student would "suffer reputational harm both on and off campus based on a finding rendered after an unfair hearing."   872 F.3d 393 at *29.   The Fifth Circuit in *Plummer* observed that sanctions imposed by a university could have a "substantial lasting impact on [students'] personal lives, educational and employment opportunities, and reputations in the community."  860 F.3d at  773, *citing Doe v. Cummins*, 662 F. App'x 437, 446 (6th Cir. 2016).  Another court observes that this satisfies the irreparable harm prong of the preliminary injunction inquiry:

The court concludes plaintiff has also demonstrated that he will suffer irreparable harm if the injunction is denied. The loss of educational and career opportunities he will encounter if not reinstated and allowed to graduate is not readily compensable in money damages.

*Ritter*, 2016 U.S. Dist. LEXIS 60193, at *8.[20]

## E.   Harm to Third Parties and Public Interest

An injunction will not cause any harm to third parties or Defendant.  Defendant remains able to enforce its rules and regulations in a manner consistent with its policies and student handbook.  On the other hand, the failure to grant an injunction would harm the public because it would permit Defendant to ignore both Title IX and its policies with respect to all current and future students on an ongoing basis while this case is resolved, which necessarily would cause substantial, irreparable harm to those students.

Plaintiff has a substantial likelihood of success on his Title IX claim.  *See supra.* Courts have observed that the enforcement of Title IX, like other civil rights statutes, is in the public interest.  *Dodds v. United States Dept. of Edn.*, 845 F.3d 217, 222 (6th Cir. 2016) ("The district court issued the injunction to protect Doe's… civil rights [under Title IX], a purpose that is always in the public interest."), *citing Cohen v. Brown Univ.*, 991 F.2d 888, 906 (1st Cir.1993) ("the overriding public interest lay in the firm enforcement of Title IX").

---

[20] Plaintiff's claims cannot be fully compensated with money damages. *Doe v. Univ. of Michigan*, 325 F. Supp. 3d at 829 ("Money damages cannot compensate Plaintiff for the reputational harm he has already suffered and will continue to suffer as a consequence of sexual assault allegations."); *Haney v. W. Chester Univ.*, E.D.Pa. No. 18-02456, 2018 U.S. Dist. LEXIS 138639, at *28 (Aug. 16, 2018) ("Expulsion also is likely to affect Plaintiff's ability to enroll at other institutions of higher education and to pursue a career. Neither money damages nor any other legal remedy can compensate for these injuries.").

Plaintiff also has a substantial likelihood of success on his breach of contract claim. *See supra*. Enforcement of contracts is in the public interest, generally – but more so when there is a disparity in power and resources between students and an educational institution. *See Talk Fusion, Inc. v. Ulrich,* M.D.Fla. No. 8:11-CV-1134, 2011 U.S. Dist. LEXIS 74549, at *16 (June 21, 2011) ("a preliminary injunction would affirmatively serve the public interest by… upholding the terms of enforceable contracts"); *Internatl. Hair & Beauty Sys., LLC v. Simply Organic, Inc.*, M.D.Fla. No. 8:11-cv-1883, 2011 U.S. Dist. LEXIS 127336, at *29 (Sep. 26, 2011) ("a preliminary injunction would affirmatively serve the public interest by preserving faith in the contractual agreements that businesses routinely make with their employees [and] by upholding the terms of enforceable contracts…"); *TRO. Variable Annuity Life Ins. Co. v. Antoniadis*, M.D.Fla. No. 8:12-cv-1980, 2012 U.S. Dist. LEXIS 124200, at *3 (Aug. 31, 2012) (same).

## F.    Nominal Bond Should Be Imposed

Federal R. Civ. P. 65(C) provides that "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Defendant is an educational institution. Accordingly, because money is not an issue for Defendant and the school is not likely to suffer any potential losses if an injunction is granted, this Court should set surety in the nominal amount of $1. *See Doe v. Cincinnati*, 223 F. Supp. 3d 704 ("The Court sets a bond in the nominal amount of $1."); *Ponce v. Socorro Indep. Sch. Dist.,* 432 F. Supp. 2d 682, 707 (W.D. Tex. 2006) (setting a nominal bond of one hundred dollars because the evidence indicates that Defendant

will suffer little, if any, damage by the issuance of the preliminary injunction), *rev'd on other grounds* 508 F.3d 765 (5th Cir. 2007).

## CONCLUSION

This Court should issue a Preliminary Injunction prohibiting Defendant from imposing any disciplinary sanctions against Plaintiff related to the alleged sexual misconduct described in this Complaint pending the completion of trial and the consideration of permanent injunctive relief.

FOR PLAINTIFF:

/s/ Joshua Engel
Joshua Adam Engel (OH 0075769)
(TRIAL COUNSEL) *Pro hac vice*
Anne Tamashasky (OH 0064393)
        *Pro hac vice*
Scott O'Reilly (OH _____)
ENGEL AND MARTIN, LLC
4660 Duke Drive, Ste. 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

Lori A. Sochin (FL 013048)
LUBELL | ROSEN
1 Alhambra Plaza, Suite 1410
Coral Gables, FL 33134
(305) 655-3425
(305) 442-9047
las@lubellrosen.com

## CERTIFICATE OF SERVICE

This certifies that the foregoing was filed electronically on March 24, 2021.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

        /s/ Joshua Engel
Joshua Adam Engel (Ohio No. 0075769)
        *pro hac vice*

**CERTIFICATION OF COUNSEL**

Pursuant to the Court's January 13, 2021 Standing Order, this document is in 12-point Arial typeface, including all indented quotations, footnotes, and endnotes.

Pursuant to Local Rule 3.01(g), the undersigned counsel certifies that before filing this Motion counsel DID NOT confer with counsel for the opposing party in a good faith effort to resolve the issues raised by the motion and obtain the relief sought without court action.  This Motion is exempt from the applicable Rule.

_____/s/ Joshua Engel _____
Joshua Adam Engel (Ohio No. 0075769)
        *pro hac vice*