

Re: Doe v. Embry-Riddle Aeronautical University, Case No. 6:20-cv-01220
2 January 2021

Mr. Engel,

Thank you for the opportunity to comment on the history of Title IX as it relates to peer-on-peer allegations of campus sexual assault. I have not been asked to offer an opinion about whether the school in this case acted in violation of the law. Instead, I intend to offer testimony on industry standards under Title IX and to generally describe the history and purposes of Title IX. I believe that this testimony would help the trier of fact determine if the College's responses and investigation were appropriate. My opinions are based on my academic research on Title IX issues.[1]

To review my career regarding this issue: I received a B.A. and Ph.D. in History from Harvard University, and my M.A. came from the University of Chicago; my scholarly background focuses on the history of Congress and procedure. I have been writing on how colleges and universities respond to sexual assault allegations for nearly 15 years. My experience began in 2006-2007, when I wrote a daily blog on the Duke lacrosse case (the blog continued with periodic posts until 2014).[2] The blog received a media credential from the North Carolina State Bar to cover the Mike Nifong ethics trial, was named the best ethics bloc by *ABA Journal* in 2007, and received favorable coverage from numerous other publications, including *New York*, *Sports Illustrated*, and *Slate*. Along with lawyer and journalist Stuart Taylor, Jr., I co-authored a book

---

[1] Roohbakhsh v. Bd. of Trustees of the Nebraska State Colleges, D.Neb. No. 8:17CV31, 2019 U.S. Dist. LEXIS 190266, at *16 (Oct. 31, 2019) (expert testimony describing
"the history and purposes of Title IX . . . could help the trier of fact determine if the College's responses and investigation were appropriate"); Stevens v. Brigham Young Univ., D.Idaho No. 4:16-cv-00530-BLW, 2020 U.S. Dist. LEXIS 21689, at *5 (Feb. 3, 2020) ("testimony about general Title IX policies and procedures does not violate Rule 403 where it is confined to discussions of Title IX's history and purpose, as well as general industry practices and standards").

[2] Durham-in-Wonderland, http://durhamwonderland.blogspot.com/.

Department of History
Brooklyn College of The City University of New York
2900 Bedford Avenue • Brooklyn, New York 11210-2889 • Telephone (718) 951-5303 • Fax (718) 951-4504

on the lacrosse case; I also served as a consultant to ABC's Law & Justice Unit for the final five months of the case.[3]

A decade later, Stuart Taylor and I teamed for another book, examining due process and fairness in Title IX adjudications.[4] I have addressed this topic as an invited speaker before the State Risk and Insurance Management Association annual conference, before various groups of lawyers, and before college and university audiences at Columbia, Princeton, Williams, Lafayette, Ohio University, and Bucknell. Samantha Harris and I co-authored a *New York University Journal of Legislation & Public Policy* article examining changes in the legal framework surrounding Title IX and campus sexual assault.[5] I also have written two reported articles,[6] two legal commentaries,[7] and op-eds in publications including the *Washington Post*, the *Wall Street Journal*, the *Los Angeles Times*, *Real Clear Politics,* and *USA Today*. I provided an expert report in *Doe v. Rollins College*, No. 6:18-cv-01069.

---------------------

Since Title IX became law in 1972, federal policy has proceeded through four distinct periods in terms of how the Department of Education (or its predecessor) responded to the issue of campus sexual assault. Between 1972 and 1997, there was no mandated relationship between Title IX and student-on-student allegations of assault. In 1997, the Office for Civil Rights (OCR), the Education Department office that has enforcement responsibilities for Title IX, required colleges to adjudicate such claims, but did not dictate specific procedures that needed to be used and stressed that colleges needed to respect the rights of accused students as well. With the 2011 Dear Colleague letter, OCR changed course and (under threat of loss of federal funds) mandated new procedures, each of which increased the chances of a finding of responsibility.

---

[3] Stuart Taylor Jr. & KC Johnson, *Until Proven Innocent: Political Correctness and the Shameful Injustices of the Duke Lacrosse Rape Case* (New York: Thomas Dunne Books, St. Martin's Press, 2007).
[4] KC Johnson & Stuart Taylor Jr., *Campus Rape Frenzy: The Attack on Due Process at America's Universities* (New York: Encounter Books, 2017).
[5] Samantha Harris & KC Johnson, "Campus Courts in Court," *NYU Journal of Legislation and Public Policy* 22 (2019), pp. 49-127.
[6] KC Johnson, "The Campus Sex Crimes Tribunals Are Losing," *Commentary*, Sept. 2017, https://www.commentarymagazine.com/articles/campus-sex-crime-tribunals-losing/; KC Johnson and Stuart Taylor, "The Title IX Training Travesty," *Weekly Standard*, Nov. 10, 2017, https://www.weeklystandard.com/kc-johnson-and-stuart-taylor-jr/the-title-ix-training-travesty.
[7] KC Johnson, *"How American College Campuses Have Become Anti-Due Process," Backgrounder on Legal Issues, Heritage Foundation* (August 2016); KC Johnson and Mike Adams, *"The Student Right to Counsel," The Federalist Society Review* 19 (2018), pp. 42-49, https://fedsoc-cms-public.s3.amazonaws.com/update/pdf/1sgbrv0yJnicBhi7sAW5mr6NAIhyoZ4Zs01p1cNx.pdf.

This move, supplemented by 2014 guidance, was part of a broader move to interpret Title IX as ensuring the rights of *complainants*, regardless of gender. In 2017, the Education Department reversed course, and instead championed a more balanced approach to Title IX, interpreting the law as requiring fair treatment of accused students, regardless of gender, as well as complainants. That principle formed the bedrock of the recently issued Title IX regulations.

**I. Legal and Policy Background (1972-1997)**

In 1972, Congress passed Title IX, which states that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." The bill enjoyed bipartisan support, including from the Nixon administration.[8] At no point during the floor debate did any member of Congress suggest that Title IX would apply to college disciplinary issues of any kind, much less to sexual assault.[9] As a result, there is no "legislative intent" to determine on the question of how the federal government should regulate campus sexual assault. Since the text of the statute also doesn't mention sexual assault, historical perspective is helpful.

Title IX was initially known mainly as a force for gender equality in athletics, and the early years after its passage provided scant reason to anticipate a later focus on adjudicating student-on-student sexual assault allegations. A 1981 memorandum from OCR's director of litigation confined the office's definition of sexual harassment to acts committed "by an employee or agent" of the school, not peer behavior.[11] Terry Pell, who headed the agency from 1985 through 1988, said in a 2014 interview that OCR never did "anything on the topic of sexual assault." "While schools were thought to be liable for offensive classroom behavior by professors," Pell recalled, "they were not thought to be liable for offensive behavior by male students outside of the classroom."[12]

---

[8] John David Skrentny, *The Minority Rights Revolution* (Cambridge: Belknap Press, 2004), pp. 235, 246-7; Susan Tolchin, *Women in Congress* (Washington, D.C.: Government Printing Office, 1976), p. 32.

[9] Skrentny, *The Minority Rights Revolution*, pp. 246–47.

[11] OCR Policy Memorandum from Antonio J. Califa, Director of Litigation, Enforcement, and Policy Service, to Regional Civil Rights Directors (Aug. 31, 1981), cited in Stephen Henrick, "A Hostile Environment for Student Defendants: Title IX and Sexual Assault on College Campuses," *Northern Kentucky Law Review* 40 (2013), p. 51.

[12] David Wilezol, "How the Education Department Warped Title IX," *Minding the Campus* (blog), October 22, 2014, http://www.mindingthecampus.org/2014/10/how-the-education-department-warped-title-ix/.

Some marginal changes occurred in the early 1990s. In the 1992 Higher Education Amendments, Congress required all colleges and universities that received federal funds to "develop and distribute a statement of policy regarding [both] campus sexual assault programs, which shall be aimed at prevention of sex offenses; and procedures followed once a sex offense has occurred."[13] The law did not, however, require colleges to use specific procedures in handling the issue. As with the passage of Title IX, neither floor nor committee debate offered any insight as to why Congress included this provision, making it difficult to determine legislative intent.

During Bill Clinton's first term, one of OCR's twelve regional branches (acting, it seems, on its own initiative) connected Title IX to student-on-student allegations in a way that previewed later developments. In a 1994 resolution letter, the California OCR office held that sexist criticism in an online forum hosted by Santa Rosa Junior College created "a sexually hostile educational environment" for two of its female students. The resolution letter added the false claim that the forum participants who made sexist remarks were unprotected by the First Amendment because "the Supreme Court has repeatedly asserted that the First Amendment does not protect expression that is invidious private discrimination."[14] The same year, in a case at Sonoma State University, the California OCR branch claimed that allegations of sexual assault by one student against another fell within the agency's jurisdiction, even though no legal or regulatory guidance at that time justified this stance.[15]

These resolution letters, however, applied only to the campuses in question and did not reflect broader policy. During Clinton's first term, the Education Department did not issue any national guidance on the issue of campus sexual assault.

In short, from 1972 through 1997, the Education Department never issued regulations or guidance suggesting that Title IX gave it the authority to oversee how (or even if) colleges should respond when one student accused another of sexual assault. This situation would change, of course, first in 1997 and then in 2011. Given the initial quarter-century record, it might have been expected that OCR would clearly explain its rationale when the office changed course. That didn't happen, either in 1997 or 2011.

---

[13] 102nd Congress, S. 1150 (102nd): Higher Education Amendments of 1992, https://web.archive.org/web/20150510065915/https://www.govtrack.us/congress/bills/102/s1150#summary.
[14] Eugene Volokh, "Freedom of Speech, Cyberspace, Harassment Law, and the Clinton Administration," *Law and Contemporary Problems* 63 (2000), pp. 299, 315.
[15] Henrick, "A Hostile Environment for Student Defendants," p. 70.

Department of History
Brooklyn College of The City University of New York
2900 Bedford Avenue • Brooklyn, New York 11210-2889 • Telephone (718) 951-5303 • Fax (718) 951-4504

**II. Establishing Jurisdiction: 1997-2011**

In 1997, the Clinton-era OCR issued a "Sexual Harassment Guidance" document that, for the first time, linked Title IX to allegations of student-on-student sexual assault. In a section on interim measures in harassment cases, the office said that if "a student alleges that he or she has been sexually assaulted by another student, the school may decide to immediately place the students in separate classes or in different housing arrangements on a campus, pending the results of the school's investigation." The guidance also directly commented on adjudication procedures, holding that "[i]n some cases, such as alleged sexual assaults, mediation will not be appropriate even on a voluntary basis."[16] The guidance did not explain why OCR considered voluntary mediation inappropriate to address *any* sexual assault allegation. Nor did it provide any suggestions on what specific procedures colleges should use when adjudicating the question.

Four years later, on the final full day of the Clinton administration, OCR issued follow-up guidance making clear that "a single or isolated incident of sexual harassment may, if sufficiently severe, create a hostile environment." As with the 1997 guidance, however, the 2001 guidance did not dictate specific procedures colleges needed to use when adjudicating peer-on-peer claims. Moreover, in a commitment that future OCR guidance would seek to undermine, the 2001 letter affirmed that "the rights established under Title IX must be interpreted consistent with any federally guaranteed due process rights involved in a complaint proceeding." The 2001 guidance also made clear that despite Title IX, even private institutions "should be aware of these rights and their legal responsibilities to individuals accused of harassment"—including rights created "by State law [or] institutional regulations and policies, such as faculty or student handbooks."[17]

During the eight years of George W. Bush's presidency, OCR did not issue any meaningful new guidance on campus sexual assault. And two regional-office compliance documents reflected a limited scope of the institution's Title IX obligations. In 2004, an OCR regional office informed Oklahoma State University that "a university does not have a duty under Title IX to address an incidence of alleged harassment where the incident occurs off-campus and does not involve a

---

[16] U.S. Dept. of Education, Office for Civil Rights, *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (March 1997), http://www2.ed.gov/about/offices/list/ocr/docs/sexhar01.html.

[17] U.S. Dept. of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* ("2001 OCR Guidance") (Jan. 19, 2001), http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.

university-related event."[18] A 2005 letter to Buffalo State University, meanwhile, confirmed that the university "was under no obligation to conduct an independent investigation" of sexual assault allegations that "involved a possible violation of the penal law, the determination of which is the exclusive province of the police and the office of the district attorney."[19]

The highest-profile campus sexual assault cases during the Bush years involved student-athletes. Each revealed, in different ways, a key factor of Title IX adjudications: that the university's self-interest often conflicts with a dispassionate search for the truth. Cases from the University of Georgia, the University of Colorado, and Arizona State University all featured highly credible sexual assault allegations against college football and basketball players, some of whom also had engaged in sexual misconduct at prior institutions. In each instance, the school looked the other way—in large part because disciplining the accused students might have threatened the well-being of money-making men's basketball or football programs.[20]

By contrast, the Duke lacrosse case featured a clearly false allegation (the accuser variously claimed that anywhere from zero to 20 students assaulted her; two of the three students she ultimately accused could prove they were more than a mile away at the time of the alleged attack) that the district attorney, who ultimately was disbarred, brought charges on the eve of a contested primary election (which he then won). Despite these facts, dozens of Duke faculty, who seemed eager to exploit the case to advance their campus pedagogical goals, issued a joint statement asserting that something "happened" to the accuser. A cowed Duke administration—recognizing the bureaucratic risks in standing up for the rights of students accused of sexual assault, even under these extreme circumstances, in a campus environment that prioritized victims' rights under all circumstances—appeased the faculty.[21]

Ironically, given the policy he would pursue as President, Barack Obama did not challenge this more limited conception of OCR's authority over campus sexual assault during the 2008

---

[18] Sandra Stephens, Compliance Team Leader, Office for Civil Rights, Region VI, to David Schmidly, President, Oklahoma State University, Re: Case No. 06-03-2054, 10 June 2004, https://www.ncherm.org/documents/114-OklahomaStateUniversity--06032054.pdf.

[19] John F. Carroll, Compliance Team Leader, Office for Civil Rights, Region II, to Muriel A. Howard, President, Buffalo State College, State Univ. of N.Y., Re: Case No. 02-05-2008, 30 Aug. 2005, cited in Jacob Gersen and Jeannie Suk Gersen, "The Sex Bureaucracy," *California Law Review* (2016), https://29qish1lqx5q2k5d7b491joo-wpengine.netdna-ssl.com/wp-content/uploads/2016/09/Gersen-and-Suk-37-FINAL.pdf.

[20] *Simpson v. University of Colorado Boulder*, 500 F.3d 1171, 1173 (10th Cir. 2007); *Williams v. Board of Regents of the University System of Georgia*, 477 F.3d 1282 (11th Cir. 2007); *J.K. v. Ariz. Bd. of Regents*, 2008 WL 4446712 (D. Ariz. Sept. 30, 2008).

[21] Taylor and Johnson, *Until Proven Innocent*, pp. 103-151.

presidential campaign. In fact, Obama's only pre-presidential remarks about campus sexual assault came in defense of the rights of *accused* students. In 2007, Obama became the second member of the Senate to (unsuccessfully) urge the Justice Department to open a criminal investigation of Mike Nifong, the Durham County district attorney notorious for violating myriad ethics rules in the Duke lacrosse case.[22] After he defeated John McCain, Obama's transition team's 25-item document outlining its agenda for women continued to reference sexual assault only in the criminal law context.[23]

Between 1997 and 2011, OCR asserted authority over campus sexual assault, but did not proscribe specific procedures that colleges needed to use. Resolution letters respected the due process rights of accused students in critical ways—whether by expressing doubt about the question of Title IX actions applying to off-campus allegations, or by confirming that colleges need not move forward with a Title IX adjudication while a parallel criminal investigation was occurring.

In this respect, the era reflected a view of Title IX that expected colleges and universities to adjudicate peer-on-peer allegations—but, in the words of the 2001 guidance, to also be aware of the rights given to accused students and "their legal responsibilities to individuals accused of harassment."[24]

**III. The Accusers' Rights Era, 2011-2017**

Between 2011 and early 2017, federal concern with due process in the realm of campus sexual assault fell by the wayside—as campuses also came under extraordinary internal pressure to handle sexual assault claims more aggressively.

The 2011 Dear Colleague letter and OCR's 2014 "Questions and Answers" document provided the operative Title IX guidance between April 2011 and September 2017, when Secretary of Education Betsy DeVos rescinded them.[25] In these two documents, the federal government for

---

[22] Lara Setrakian, "Obama: Investigate Duke Lacrosse DA Nifong," ABC News, March 25, 2007, http://abcnews.go.com/Politics/LegalCenter/story?id=2980582.
[23] "Agenda: Women," Change.gov, http://change.gov/agenda/women_agenda; *Barack Obama on Women's Rights*, http://obama.3cdn.net/4ad874dbd8e8eaff7d_71m6btc7j.pdf.
[24] 2001 OCR Guidance.
[25] Letter from Russlynn Ali, Assistant Sec'y, Office for Civil Rights, U.S. Dep't of Educ., to Colleague (Apr. 4, 2011), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf [hereinafter "Ali, Dear Colleague Letter"]; Office for Civil rights, U.S. Dep't of Educ., *Questions and Answers on Title IX and Sexual Violence* (2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

the first time dictated to universities (under penalty of losing funds) the specific procedures they would need to use when adjudicating student-on-student sexual assault allegations.

The guidelines were issued without a period of notice and comment. But President Obama's two OCR heads, Russlynn Ali and Catherine Lhamon, expected colleges and universities to follow them.[26] Harvard Law School professors Jacob Gersen and Jeannie Suk Gersen described the altered environment: "The transformation of the Title IX grievance procedure over several decades wrought a corresponding transformation in the OCR's job of oversight. No longer was it simply monitoring whether schools were engaging in discriminatory acts. Rather, OCR's task became specifying . . . schools' policies, procedures, and organizational forms."[27]

Each major procedural change demanded by the 2011 and 2014 guidance increased the chances that accused students would be found responsible for sexual misconduct. Schools were told to use the preponderance of evidence standard, and to allow complainants to appeal in cases where the accused were found not responsible. The guidance "strongly" discouraged allowing accused students to directly cross-examine their accusers (universities remained free to allow *lawyers* for accused students to engage in cross-examination, or allow accused students to cross-examine other witnesses—but virtually no schools allowed these procedural protections).[28] The Obama-era OCR also urged schools to complete all adjudications within 60 days, which had the effect of complicating the accused student's defense, since the student often would not receive school's evidence (or, occasionally, even notice) until well within the 60-day window. And the newly mandatory training of adjudicators—which no school appears to have shared with accused students as a matter of course—often prompted disciplinary investigators and panelists to presume guilt.[29]

---

[26] Letter from Catherine E. Lhamon, Assistant Sec'y for Civil Rights, to Sen. James Lankford, Chair, Subcomm. on Regulatory Affairs & Fed. Mgmt. (Feb. 17, 2016), http://www.chronicle.com/items/biz/pdf/DEPT.%20of%20EDUCATION%20RESPONSE%20TO%20LANKFORD%20LETTER%202-17-16.pdf.

[27] Jacob Gersen and Jeannie Suk, *The Sex Bureaucracy*, 104 CAL. L. REV. 881, 902 (2016), http://www.californialawreview.org/wp-content/uploads/2016/09/Gersen-and-Suk-37-FINAL.pdf.

[28] For an overview of university denial of basic rights, see Foundation for Individual Rights in Education, "Spotlight on Due Process, 2019-2020," https://www.thefire.org/resources/spotlight/due-process-reports/due-process-report-2019-2020/.

[29] Johnson and Taylor, "The Title IX Training Travesty."

Ali justified revolutionizing the Title IX disciplinary process on grounds that "we've had hundreds of institutions across the country that just didn't know what to do."[30] (Many college administrators disagreed.[31]) Not until 2016 did OCR cite a specific precedent for even one of the polices it mandated (the preponderance standard): two obscure resolution agreements, with Georgetown and Evergreen State University, only one of which (Georgetown) involved peer-on-peer harassment.[32] The 2016 explanatory letter offered no comment on why OCR had sought to impose accuser appeals or was so skeptical of the value of cross-examination.

One federal court astutely observed that the Dear Colleague letter "generally signaled that OCR had adopted a 'get tough' approach, thus prompting colleges and universities to devote more attention to sexual assault accusations."[33]

OCR intensified the pressure through Title IX investigations of individual schools.[34] In a critical move that she did not reveal to the public, Lhamon altered OCR policy from one based on investigating only the case that generated an initial complaint to one that reviewed all sexual assault adjudications at the school for a three-year span. This move dramatically increased the burden (financial and otherwise) for a university under investigation, even if the school had done nothing wrong, and therefore dramatically increased the incentive on colleges to handle individual cases in such a way that would minimize any risk of a complainant going to OCR in the first place.[35]

Even though OCR was using a gender discrimination law to address sexual assault policy, the office recognized that men and women fell on *both* sides of the issue—that is, that male and

---

[30] Cynthia Gordy, "The Root: The Far-Reaching Teachings of Russlynn Ali," NPR.org, April 20, 2011, http://www.npr.org/2011/04/20/135568364/the-root-the-far-reaching-teachings-of-russlynn-ali.

[31] Anonymous, "An Open Letter to OCR," *Inside Higher Ed*, October 28, 2011, https://www.insidehighered.com/views/2011/10/28/essay-ocr-guidelines-sexual-assault-hurt-colleges-and-students; Lee Burdette Williams, "The Dean of Sexual Assault," *Inside Higher Ed*, August 7, 2015, https://www.insidehighered.com/views/2015/08/07/how-sexual-assault-campaign-drove-one-student-affairs-administrator-her-job-essay.

[32] Catherine Lhamon, "Dept. of Education Response to Lankford Letter," February 17, 2016, http://chronicle.com/items/biz/pdf/DEPT.%20of%20EDUCATION%20RESPONSE%20TO%20LANKFORD%20LETTER%202-17-16.pdf.

[33] *Doe v. Univ. of Colo.*, 255 F. Supp. 3d 1064, 1067 (D. Colo. May 26, 2017).

[34] "Title IX: Tracking Sexual Assault Investigations," *Chronicle of Higher Education,* https://projects.chronicle.com/titleix.

[35] Tyler Kingkade, "The Trump Administration Inherited Hundreds of Unresolved Title IX Complaints," *BuzzFeed*, Mar. 6, 2017, https://www.buzzfeed.com/tylerkingkade/heres-why-so-many-title-ix-complaints-are-taking-years-to-be.

female students were both victims and perpetrators. The Dear Colleague letter, for instance, asserted that 6.1 percent of male college students would be victims or attempted victims of sexual assault.[36]

In effect, Obama-era guidance used the status of *complainant* as a proxy for gender, reasoning that campus procedures insufficiently protective of the interests of student complainants violated Title IX—even though not all victims of campus sexual assault were female. (This reasoning, of course, would imply that policies found too tilted toward the rights of accusers also could violate Title IX—as recognized in the regulations the department eventually adopted in 2020.[37]) A 2014 resolution letter from OCR to Harvard Law School provided perhaps the clearest articulation of the line of argument that procedures insufficiently protective of complainants (of either gender), rather than discrimination against women, violated Title IX in this context.[38]

Some Obama officials and initiatives removed all pretense and used gender and complainant status interchangeably when discussing Title IX matters. Shortly before she issued the Dear Colleague letter, OCR's Ali promised to "use all of the tools at our disposal . . . to ensure that *women* are free from sexual violence."[39] The White House "It's On Us" initiative maintained, "Most *men* are not comfortable with violence against *women*, but often don't speak out because they believe that other *men* accept this behavior. By getting *men* involved, we can change this way of thinking and create new social norms."[40] [emphasis added throughout]

The most prominent Obama official to adopt this explicitly gendered lens was then-Vice President Joe Biden, who in multiple 2017 interviews recalling the administration's Title IX

---

[36] Ali, Dear Colleague letter, p. 2.
[37] Office for Civil Rights, Department of Education, "Notice of Proposed Rulemaking, Docket ID ED-2018-OCR-0064" (Nov. 16, 2018), https://www2.ed.gov/about/offices/list/ocr/docs/title-ix-nprm.pdf.
[38] Joel Berner to Dean Martha Minow, re: OCR Complaint No. 01-11-2002, Dec. 30, 2014, https://www2.ed.gov/documents/press-releases/harvard-law-letter.pdf.
[39] Jackie Jones, "Freedom from Assault: Colleges Act after Office for Civil Rights Warns That Title IX Requires Protections against Sexual Violence," *Convergence: Diversity and Inclusion*, March 8, 2013, http://mydigimag.rrd.com/display_article.php?id=1323531.
[40] Office of the Press Secretary, Fact Sheet: Launch of the "It's on Us" Public Awareness Campaign to Help Prevent Campus Sexual Assault (2014), https://obamawhitehouse.archives.gov/the-press-office/2014/09/19/fact-sheet-launch-it-s-us-public-awareness-campaign-help-prevent-campus-.

policies framed campus sexual assault as an issue in which perpetrators were solely male and victims solely female.[41]

April 2016 remarks at the University of Colorado typified Biden's explicitly gendered approach: "Guys, look in the mirror and ask yourself, 'Are you being the man you think you are? . . .. I know it takes courage. You're worried about being socially ostracized by your *fraternity brothers* or the team or whatever. We have to change the dynamic and socially ostracize the abusers . . . No one has a right to put a hand on a *woman* for any reason." All of this, the Vice President asserted, reflected a legacy of unfair treatment of women. His voice rising, he attacked a system in which "prosecutors were able to ask, 'How short was your *skirt*? Were you *wearing a bra*? What did you say to *him*?'" This situation was unsurprising, since "deep buried in the psyche of our culture was the idea that if it wasn't someone leaping out of an alley, unknown and brutally raping a *woman*, somehow the *woman* must have done something wrong—an idea that still lingers today." Colleges, Biden concluded, needed to change the culture so that "no *woman* asks the question, 'What did I do?'" He envisioned a new campus environment would be created—one in which "it is never, never, never the *woman's* fault."[42] [emphasis added throughout]

The Biden/"It's On Us" language came very close to relying on improper sex stereotypes—that most male college students were either potential rapists or were indifferent to this horrifying offense.

This federal pressure alone doubtless would have stimulated a greater number of one-sided campus Title IX adjudications—especially since, as Sen. James Lankford (R-Oklahoma) observed in early 2016, "on its own terms, the Dear Colleague letter does not provide many essential protections defendants in a court of law enjoy."[43] But three additional factors intensified this emerging tendency toward one-sided Title IX cases.

---

[41] Chelsea Bailey, "Joe Biden Speaks Bluntly About Rape on College Campus," *NBCNews.com*, Apr. 27, 2017, https://www.nbcnews.com/news/us-news/joe-biden-speaks-bluntly-about-rape-college-campus-n751956. https://www.teenvogue.com/story/vice-president-joe-biden-interview; Vera Papisova, "Joe Biden Interview on Rape Culture and Campus Sexual Assault," *Teen Vogue*, Apr. 14, 2017, https://www.teenvogue.com/story/vice-president-joe-biden-interview, (emphasis in original).
[42] Sarah Kuta, "In CU Visit, Joe Biden Delivers Forceful Plea to End Campus Sexual Assault*," Daily Camera*, Apr. 8, 2016, https://www.dailycamera.com/2016/04/08/in-cu-visit-joe-biden-delivers-forceful-plea-to-end-campus-sexual-assault/. This video excerpt, which is available at https://www.youtube.com/watch?v=kGhQMRVD0i8, provides a sample of the Vice President's gendered language.
[43] Letter from Sen. James Lankford to John King Jr., Acting Secretary of Education, March 4, 2016, copy in author's possession.

Department of History
Brooklyn College of The City University of New York
2900 Bedford Avenue • Brooklyn, New York 11210-2889 • Telephone (718) 951-5303 • Fax (718) 951-4504

First: The growth of social media helped to birth powerful campus movements of student complainants, such as Know Your IX and End Rape on Campus, generally received highly favorable media coverage. Accused students had no such comparable social media presence, and their position received virtually no favorable coverage from the media.[44]

Second: Adjudications of sexual assault claims by and large did not occur before a randomly-selected ideological sample of the campus. Instead, as CU-Boulder Law Professor Aya Gruber has noted, "Most investigators in college Title IX offices are not sexist lay persons whose prejudices against loose women must be strictly policed by unique evidentiary and substantive rules. Rather, they are self-selecting women's rights advocates, former civil rights enforcers, and others deeply concerned with student safety and gender equality."[45] Universities rarely look for former criminal defense attorneys or civil liberties activists to head their Title IX offices. And all of this was occurring, as the Duke lacrosse case had shown, in campus environments where guilt-presuming constituencies enjoyed considerable sway.

Third: The politics of campus sexual assault was uniquely one-sided during the Obama years. Congressional Republicans rarely engaged on the issue, while those Democrats who spoke on the issue uniformly adopted a pro-accuser perspective.[46] In a stunningly candid statement capturing the Obama-era consensus, then-U.S. Representative Jared Polis argued, "If there are 10 people who have been accused, and under a reasonable likelihood standard [which he defined as a 20-30 percent chance of guilt] maybe one or two did it, it seems better to get rid of all 10 people. We're not talking about depriving them of life or liberty, we're talking about them being transferred to another university, for crying out loud."[47] Falsely accused students, the congressman asserted, should decline to contest the allegation, and instead should "do their best to put it behind them and move on."[48]

---

[44] Tyler Kingkade, *The Trump Administration Inherited Hundreds of Unresolved Title IX Complaints*, BUZZFEED, Mar. 6, 2017, https://www.buzzfeed.com/tylerkingkade/heres-why-so-many-title-ix-complaints-are-taking-years-to-be.

[45] Aya Gruber, *Rape Law Revisited*, 13 Ohio St. J. of Crim. Law 279 (2016), https://kb.osu.edu/bitstream/handle/1811/77943/OSJCL_V13N2_279.pdf

[46] Stuart Taylor and KC Johnson**,** "The New Standard for Campus Sexual Assault: Guilty until Proven Innocent," *National Review*, https://www.nationalreview.com/2015/12/campus-rape-courts-republicans-resisting/.

[47] https://www.c-span.org/video/?c4550506/jared-polis-campus-sexual-assault-hearing.

[48] *Id.*

Department of History
Brooklyn College of The City University of New York
2900 Bedford Avenue • Brooklyn, New York 11210-2889 • Telephone (718) 951-5303 • Fax (718) 951-4504

In 2014, Harvard Law professor Elizabeth Bartholet, director of Harvard's Child Advocacy Program, predicted that "history will demonstrate the federal government's position to be wrong [and] our society will look back on this time as a moment of madness."[49]

**IV. Title IX, Equity, and Due Process, 2017-2020**

Shortly after the Dear Colleague letter's release, Brett Sokolow, president of NCHERM (an organization that provides training and investigative services for campus Title IX adjudications), predicted that with the Obama-era changes, "the number of expelled students is going to go way up."[50] Three years later, University of Maine Dean Robert Dana, asked whether federal pressure increased the chances of universities rushing to judgment, replied, "[T]hat can't help but be true. Colleges and universities are getting very jittery about it."[51] Jackie Gharapour Wernz, who worked as an OCR lawyer during the Obama years, recently admitted, "We did see some bad cases in the Obama era, cases where it basically didn't matter what evidence there was. The college was going to find against the defendant, the male defendant, no matter what. I think the schools felt pressure under the Obama guidance."[52]

These conditions produced a flood of litigation from accused students. After an average of one or two lawsuits annually in the two decades before the Dear Colleague letter, 610 lawsuits (430 at the federal level) have been filed since the 2011 policy change. (Almost 90 percent of those filings came between 2015 and 2020.) U.S. District Judge F. Dennis Saylor captured one principle underlying many of the court decisions favorable to accused students in a 2016

---

[49] Joe Palazzolo, "Harvard Law Professor: Feds' Position on Sexual-Assault Policies Is 'Madness,'" *Law Blog*, *Wall Street Journal*, December 31, 2014, http://blogs.wsj.com/law/2014/12/31/harvard-law-professor-feds-position-on-sexual-assault-policies-is-madness.

[50] Sandy Hingston, "The New Rules of College Sex: How the Federal Government and a Malvern Lawyer Are Rewriting the Rules on Campus Hookups—and Tagging Young Men as Dangerous Predators," *Philadelphia*, August 22, 2011, http://www.phillymag.com/articles/the-new-rules-of-college-sex/#DzO22ZQA7gQ4ogEb.99.

[51] Tovia Smith, *Some Accused of Sexual Assault on Campus Say System Works Against Them*, NPR, Sept. 3, 2014, https://www.npr.org/2014/09/03/345312997/some-accused-of-campus-assault-say-the-system-works-against-them. For more on the effects of this atmosphere, see Stephen Henrick, *A Hostile Environment for Student Defendants: Title IX and Sexual Assault on College Campuses*, 40 N. KY. L. REV. 49 (2013), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2126340.

[52] Richard Bernstein, "Biden's Pushing Ahead to the Obama Past on Campus Rape. He'll Need Good Luck with That," *Real Clear Investigations,* https://www.realclearinvestigations.com/articles/2020/12/15/bidens_pushing_ahead_to_the_obama_past_on_campus_rape_hell_need_good_luck_with_that_126353.html

opinion from involving a lawsuit filed by a Brandeis University student. "Whether someone is a 'victim' is a conclusion to be reached at the end of a fair process," the *Brandeis* opinion noted, "not an assumption to be made at the beginning."[53]

In April 2016, Gary Pavela, a longtime educational consultant and fellow for the National Association of College and University Attorneys (NACUA), observed, "In over 20 years of reviewing higher education law cases, I've never seen such a string of legal setbacks for universities, both public and private, in student conduct cases. Something is going seriously wrong. These precedents are unprecedented."[54] Six Appeals Courts, covering colleges and universities in 30 states, have issued rulings unfavorable to universities on Title IX claims in accused-student lawsuits.[55]

These rulings demonstrated, as Pavela observed, how "university sexual misconduct policies are losing legitimacy in the eyes of the courts."[56] But they also formed the underpinning of the new Title IX regulations, which went into effect in August 2020.

In September 2017, President Trump's Education Secretary, Betsy DeVos, rescinded the Obama-era guidance documents, denounced what she called "rule by letter," and promised to issue new regulations after giving the public a chance to comment on them. DeVos also issued interim guidance that gave schools an opportunity to provide more procedural protections for accused students.[57] (Almost none did so.)

In 2018, the Department of Education opened draft regulations for comment. The final regulations were revealed in spring 2020. The new rules, DeVos argued, would make it possible to "continue to combat sexual misconduct without abandoning our core values of fairness, presumption of innocence, and due process."[58]

---

[53] *Doe v. Brandeis Univ.,* 177 F. Supp. 3d 561, 573 (D. Mass. March 31, 2016).
[54] Jake New, "Out of Balance," *Inside Higher Ed* (Apr. 14, 2016), https://www.insidehighered.com/news/2016/04/14/several-students-win-recent-lawsuits-againstcolleges-punished-them-sexual-assault.
[55] *Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. July 29, 2016); *Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. June 28, 2019); *Doe v. Univ. of the Sciences*, 961 F.3d 203 (3d Cir. May 29, 2020); *Doe v. Oberlin Coll.*, 963 F.3d 580 (6th Cir. June 29, 2020); *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940 (9th Cir. July 29, 2020); *Doe v. Univ. of Ark.-Fayetteville*, 974 F.3d 858 (8th Cir. September 4, 2020).
[56] New, "Out of Balance," *Inside Higher Ed*.
[57] U.S. Dept. of Education, "Q&A on Campus Sexual Misconduct," Sept. 2017, https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.
[58] "DeVos's Rules Bolster Rights of Students Accused of Sexual Misconduct," *New York Times,* 6

The DeVos regulations outlined a Title IX process in which both accuser and accused receive a fair shake. Perhaps the regulations' most important provision requires schools to allow both accuser and accused to present their versions of events in a hearing that includes cross-examination conducted by the student's lawyer or advocate. Cross-examination is especially relevant in campus sexual-assault cases, which generally turn on the credibility of the two students. And, as courts long have acknowledged, cross-examination is "beyond any doubt the greatest legal engine ever invented for the discovery of truth."[59] The regulations also require universities to give the accused student specific notice of the allegations, share all relevant evidence with each of the student parties, and reveal on their websites the previously secret training that Title IX adjudicators have received since 2015.[60]

In a video address announcing the regulations, DeVos argued that "the way to a better Title IX justice process is not to undermine rights, but to uphold them . . . The way to put an end to the crisis of confidence on too many campuses is to rediscover the fundamentals of our Founding on which our Framers staked their futures for the sake of ours."[61]

The DeVos regulations, obviously, departed from the Obama-era guidance by interpreting Title IX as requiring colleges to treat *both* parties fairly in a campus adjudication, rather than as a tool primarily to vindicate the aims of the complainant. But, like her predecessor, DeVos essentially adopted the status of complainants and respondents as proxies for (respectively) female and male students. The rule states that "a recipient's treatment of a complainant or a respondent in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under title IX."[62] This provision made clear that unfair

---

May 2020, https://www.nytimes.com/2020/05/06/us/politics/campus-sexual-misconduct-betsy-devos.html.

[59] *United States v. Hough*, 803 F.3d 1181, 1199 (11th Cir. September 9, 2015).

[60] The regulations also provide important protections for student complainants. They require colleges to handle not merely sexual-assault allegations but also (unlike the Obama policies) claims of stalking, dating violence, and domestic violence. Schools must offer supportive measures to all complainants, including academic, medical, and residential accommodations. The rule allows accusers who wish to pursue college-sponsored mediation to do so, an option previously forbidden. Responding to the public comments on the draft regulations, the Education Department also modified the final version to ensure it would cover offenses committed off-campus at fraternities and sororities, among other university-related settings.

[61] DeVos transcript, https://www.americanrhetoric.com/speeches/betsydevostitleIXnewrule.htm.

[62] 34 CFR § 106.45 (a).

treatment of an accused student (male or female) could constitute gender discrimination in violation of Title IX.

College and university leaders responded to the DeVos regulations much differently than they did the Obama-era guidance. While schools rushed to implement the Dear Colleague letter in 2011 (even though it technically was only guidance), colleges basically ignored DeVos' 2017 guidance, which urged a more balanced approach to Title IX adjudications. University leaders then used the comment period for the new regulations to criticize fairer treatment for accused students.[63] And, since adoption of the new regulations, many colleges have created two-tiered Title IX adjudication procedures that—if the incoming President sets aside the DeVos regulations—would allow them to return to more one-sided campus policies as quickly as possible.[64]

**Conclusion**

Congress provided no clear guidance about how (or if) Title IX applied to campus sexual assault when it passed the law in 1972. For 25 years, the Education Department (or, before 1980, HEW) did not require colleges to do anything regarding peer-on-peer allegations. Changing course in 1997, it nonetheless did so in a way suggesting that colleges respect the due process rights of accused students as well—an approach to which Secretary DeVos returned after 2017, even as powerful campus and political constituencies remained for implementing Title IX in a more one-sided fashion.

Respectfully submitted,

*KC Johnson*

KC Johnson
Professor of History

---

[63] KC Johnson and Stuart Taylor, "Colleges Bristle as Judges, DeVos Push Protections for the Accused," *Real Clear Politics,* https://www.realclearpolitics.com/articles/2019/12/04/colleges_bristle_as_judges_devos_push_protections_for_the_accused_141877.html.

[64] Samantha Harris and Michael Thad Allen, "Universities Circumvent New Title IX Regulations," *National Review,* https://www.nationalreview.com/2020/09/title-ix-universities-circumventing-new-rules/.

KC Johnson
Professor of History
Brooklyn College/CUNY Graduate Center
kcjohnson9@gmail.com

**EXPERIENCE**

| | |
|---|---|
| 2003-present | Professor of History, Brooklyn College & CUNY Graduate Center |
| 2007-2008 | Fulbright Distinguished Professor of the Humanities, Tel Aviv University |
| 2005 | Visiting Professor of History, Harvard University |
| 1999-2002 | Associate Professor of History, Brooklyn College |
| 1995-1999 | Assistant Professor of History, Williams College |
| 1994-1995 | Assistant Professor of History, Arizona State University |
| 1993-1994 | Lecturer, Harvard University |

**EDUCATION**

| | |
|---|---|
| Ph.D. | Harvard University, 1993 |
| M.A. | University of Chicago, 1989 |
| B.A. | Harvard University, 1988 |

**BOOKS**

- *The Campus Rape Frenzy: The Attack on Due Process at America's Universities*, with Stuart Taylor, Jr., Encounter, 2017.
- Editor, *Asia Pacific in the Age of Globalization*, Palgrave/Macmillan, 2014.
- *"All the Way with LBJ": The 1964 Presidential Election*, Cambridge University Press, 2009.
- *Until Proven Innocent: Political Correctness and the Shameful Injustices of the Duke Lacrosse Rape Case*, with Stuart Taylor, Jr., Thomas Dunne/St. Martin's, 2007; revised & extended 2nd edition, 2008; revised & extended 3rd edition (Gryphon Books), 2014.
- co-editor, *The Presidential Recordings: Lyndon B. Johnson*, vol. 5, W.W. Norton, 2007.
- co-editor, *The Presidential Recordings: Lyndon B. Johnson*, vol. 4, W.W. Norton, 2007.
- *Congress and the Cold War*, Cambridge University Press, 2006.
- co-editor (with Kent Germany), *The Presidential Recordings: Lyndon B. Johnson*, vol. 3, W.W. Norton, 2005.
- co-editor (with David Shreve), *The Presidential Recordings: Lyndon B. Johnson*, vol. 2, W.W. Norton, 2005.
- *20 January 1961: The American Dream*, DTV Publishers, 1999.
- *Ernest Gruening and the American Dissenting Tradition*, Harvard University Press, 1998.
- *The Peace Progressives and American Foreign Relations*, Harvard University Press, 1995.
- Editor, *On Cultural Ground: Essays in International History*, Imprint Publications, 1994.

**EXTENDED RESEARCH PAPER**

- *Lyndon Johnson and Israel: The Secret Presidential Recordings* (S. Daniel Abraham Center, Research Paper Series, 2008); audio clips can be listened to here.

**JOURNAL ARTICLES/BOOK CHAPTERS (since 2010)**
- "Anti-Semitism in the Upcountry: The Heller-Campbell 1978 Congressional Race," *American Jewish History* (forthcoming, 2021).
- "Campus Courts in Court" (with Samantha Harris), *NYU Journal of Legislation and Public Policy* 22 (2019), pp. 49-127.
- "A 'Less Pleasant' Election: Bob Michel in the 1982 Midterms," in Frank Mackaman and Sean Kelly, eds., *Robert H. Michel*, University of Kansas Press, 2019, chapter 12.
- "[The Student Right to Counsel](#)," (with Mike Adams), *The Federalist Society Review* 19 (2018), pp. 42-49.
- "Conclusions," in Andrew Johnstone and Andrew Priest, *US Presidential Elections and Foreign Policy: Candidates, Campaigns, and Global Politics from FDR to Bill Clinton,* University Press of Kentucky, 2017.
- "The Title IX Training Travesty," (with Stuart Taylor, Jr.), *Weekly Standard*, 10 Nov. 2017.
- "The Campus Sex-Crime Tribunals Are Losing," *Commentary*, 2017.
- "How American College Campuses Have Become Anti–Due Process," *Backgrounder on Legal Issues*, Heritage Foundation (August 2016).
- "Lyndon B. Johnson and the Fortas Nomination," *Journal of Supreme Court History* 47 (January 2016).
- "Alaska, Hawai'i, and the United States as a Pacific Nation," in Johnson, ed, *Asia Pacific in the Age of Globalization,* Palgrave/MacMillan, 2014.
- "Congress," in Marc Selverstone, ed., *A Companion to John F. Kennedy*, Wiley, 2014.
- "Obama and a Second-Term Foreign Policy," *Passport*, April 2013.
- "Bring the Constitution Back In," *Academic Questions* 25 (Summer 2012).
- "LBJ and the Constitution," in Mitchell Lerner, ed., *A Companion to Lyndon B. Johnson*, Wiley, 2012.
- "Congress and U.S. Foreign Policy before 9/11," in David Aursweld and Colton Campbell, eds., *Congress and the Politics of National Security*, Cambridge University Press, 2011.
- "Truman, Anti-Communism, and Congress," in Donald Ritchie, ed., *Congress and Harry S. Truman: A Conflicted Legacy,* Truman State University Press, 2011.
- "The Reagan-Bush Administrations and the Middle East: Institutional and Bureaucratic Rivalries," in Uzi Rabi, ed., *International Intervention in Local Conflicts: Crisis Management and Conflict Resolution since the Cold War*, I.B. Tauris Publishers, 2010.
- "The Perils of Academic Groupthink," in Howard Wasserman, ed., *Institutional Failures: Duke Lacrosse, Universities, the News Media, and the Legal System*, Ashgate, 2010.

**SCHOLARLY PAPERS AND INVITED PRESENTATIONS (since 2010)**
- "The 2020 Title IX Final Rule "First Look" Review and Analysis," University EEO, Webinar, 2020.
- "The Good, The Bad, and The Ugly of Title IX," NAS Virtual Seminar, 2020.
- "Due Process on Campus: What's Next?," with Samantha Harris, Legal Insurrection Foundation.
- "Capitol Hill Views Jerusalem," Stephen Wise Free Synagogue, 2020.

- "Forthcoming Education Department Rules Governing Title IX Campus Proceedings on Allegations of Sexual Assault and Harassment," Federalist Society Teleforum, 2020.
- "Campus Courts in Court, in Year of the Eighth Circuit," Federalist Society of Minnesota, University of St. Thomas Law School, 2020.
- "Surveying the 2020 Presidential Election & International Political Trends," LUSTRE, New York City, 2019.
- "Lyndon Johnson and the Transformation of the U.S.-Israeli Alliance," Stephen F. Wise Free Synagogue, 2019.
- "The Courts and Title IX Controversies," 2018 State Risk and Insurance Management Association Conference, South Portland, Maine, 2018.
- "The Constitution and Constitutional History," Gilder Lehrman Institute of American History, New York, 2018.
- "Chappaquiddick," Emelin Film Club, Mamaroneck, 2018.
- "The Due Process Decisions," Symposium on Representing Students Accused of Sexual Assault, Washington, DC 2018.
- "Wilsonianism and the U.S. Response to the Balfour Declaration," CUNY Graduate Center, 2017.
- "LBJ," Emelin Film Club, Mamaroneck, 2017.
- "Fairness and Campus Title IX Adjudications," Bucknell University, 2017.
- "Due Process and Title IX," Mill Series, Lafayette College, 2017.
- "Analyzing the 2016 Presidential Election," U.S. Embassy, Israel, 2016.
- "Historical Patterns and the 2016 Presidential Election," Columbia University, 2016.
- "Civil Liberties on Campus," Cardozo Law School, 2016.
- "Fairness, Due Process, and Campus Sexual Assault," Uncomfortable Learning series, Williams College, 2015.
- "Due Process Goes to School," Heritage Foundation, 2015.
- "Congress and US Diplomatic History," SHAFR Summer Institute, Ohio State University, 2015.
- "LBJ, Fortas, and Changing Senate Norms," Schwan Lecture, North Park University, 2015.
- "The Truth About Campus Sexual Assault," Manhattan Institute, 2015.
- "Due Process and the Contemporary Campus," George Washington Forum, Ohio University, 2015.
- "1920s Peace and Anti-Imperialism," Reflections on the New Era Conference, Williams College, 2014.
- "Trustee Accountability," ATHENA Roundtable, Columbia University, 2014.
- "Previewing the 2014 Midterm Elections," Brooklyn College Historical Society, 2014.
- Chair & Commentator, "U.S.-Middle Eastern Relations," SHAFR Conference, University of Kentucky, 2014.
- "The U.S.-Israeli Relationship in Historical Perspective," CUNY Graduate Center, 2014.
- "U.S. History and the Obligations of Citizenship." Global Illusions: Bowdoin's Post-Citizens and the Future of American Higher Education, Brunswick, Maine, 2014.
- "The Transformation of U.S. History," Williams College, 2014.

- "Congress, Vietnam, and the 1963 Foreign Aid Bill," Vietnam Center and Archive Conference, National Archives, 2013.
- "Congress and the Classroom," Dirksen Center for Congressional Research, 2013.
- "Analyzing the 2012 Election" (panel with U.S. ambassador Dan Shapiro), Institute for National Security Studies, Tel Aviv University, 2012.
- "Analyzing the 2012 Election," U.S. consulate, Jerusalem, 2012.
- "Revisiting the 1964 Election," Sarah Lawrence College, 2012.
- "The Role of Federal Historians in Records Management," Hewlett Lectures, Society for History in the Federal Government, 2012.
- "Presidential Tapes & Congressional History," Congress in the Classroom Conference, Dirksen Congressional Research Center, 2012.
- "Congress, the Appropriations Power and Late-TwentiethCentury Foreign Policy," OAH Conference, Milwaukee, 2012.
- "Kangaroo Courts on Campus: Yale, Duke, and Due Process," Manhattan Institute Forum, Harvard Club, 2012.
- "Presidential Tapes & Congressional History," Congress in the Classroom Conference, Dirksen Congressional Research Center, 2011.