**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| JOHN DOE, | Case No. 6:20-cv-01220-WWB-LRH |
| Plaintiff, | Judge: BERGER |
| v. | MOTION FOR PARTIAL SUMMARY JUDGMENT |
| EMBRY-RIDDLE AERONAUTICAL UNIVERSITY, INC. | |
| Defendant | |

Pursuant to Fed. R. Civ. P. 56, Plaintiff John Doe, respectfully submits this Motion for a Partial Summary Judgment.[1]

**MATERIAL FACTS AS TO WHICH PLAINTIFF
CONTENDS THERE IS NO GENUINE ISSUE FOR TRIAL**

Plaintiff John Doe is a student at Embry-Riddle Aeronautical University ("ERAU"). ERAU is a private university in Daytona Beach, Florida. (Verified Complaint, Doc#1, PageID#2.) John Doe is training to be a pilot. He is also a student-athlete who received a scholarship. (Verified Complaint, Doc#1, PageID#1-2.)

**A.      The Influence Of The Department Of Education**

This case did not arise in a vacuum. This is one of many amidst a continuing national controversy about the responses of colleges and universities to alleged sexual assaults on campuses. After years of criticism for being too lax on campus sexual assault,

---

[1] Local Rule 3.01(a) statement of the precise relief requested and basis for the request:

Pursuant to Fed. R. Civ. P. 56, Plaintiff requests that the Court (i) enter Judgment in Favor of Plaintiff on Counts I and II of the Complaint on liability; and (ii) set a briefing schedule for consideration of permanent injunctive relief and fees pursuant to 42 U.S.C. §1988; and (iii) set this matter for a trial on the issue of damages.

on April 11, 2011, the U.S. Education Department's Office of Civil Rights ("OCR") sent a Dear Colleague Letter (the "DCL") to colleges and universities. Letter from Office for Civil Rights, U.S. Dep't of Educ. (April 11, 2011). The Seventh Circuit, in an opinion by Judge (now Justice) Barrett, found that the DCL and accompanying pressure from the Department of Education is relevant to this type of case because it gives accused students "a story about why [a school] might have been motivated to discriminate against males accused of sexual assault." *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019). The Seventh Circuit is not alone in this view. The Third Circuit in *Doe v. Univ. of the Sciences*, 961 F.3d 203, 214 (3d Cir. 2020), noted that courts have considered claims by students that schools "were allegedly intimidated by the 2011 DCL and associated threats of litigation or [Department of Education] scrutiny." The *USciences* court further held that, while not conclusive, the DCL and related enforcement efforts "is relevant to alleging a plausible Title IX discrimination claim." 961 F.3d at 210.[2] *See also Doe v. Miami University*, 882 F.3d at 594 (treating as relevant allegations that pressure from the

---

[2] On September 22, 2017, the Department of Education withdrew the DCL. Letter from Office for Civil Rights, U.S. Dep't of Educ. (September 22, 2017). In May 2020, the Department of Education issued final rules. 34 CFR 106.30 *et seq.* In withdrawing the DCL, OCR observed that prior actions may have been well-intentioned, but... led to the deprivation of rights for many students — both accused students denied fair process and victims denied an adequate resolution of their complaints. Id. at 1-2. OCR further said:

> Legal commentators have criticized the [DCL]... for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness." [As a result, many schools have established procedures for resolving allegations that] lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation.

*Id.*, quoting Open Letter From Members Of The Penn Law School Faculty: Sexual Assault Complaints: Protecting Complainants And The Accused Students At Universities, Feb. 8, 2015; Rethink Harvard's Sexual Harassment Policy, *Boston Globe* (Oct. 15, 2014).

government led school to discriminate against men in its sexual-assault adjudication process).

The story is not complicated. Judge Martinez, in commenting on the "wave" of litigation about this issue, observed that the DCL, in part, "generally signaled that OCR had adopted a 'get tough' approach, thus prompting colleges and universities to devote more attention to sexual assault accusations." *Doe v. Univ. of Colorado*, 255 F. Supp. 3d 1064, 1067 (D.Colo. 2017). This pressure, as Professor Johnson explains in an expert report submitted in this case, was exerted through investigations and the threat to pull all federal funding and led to one-sided and biased campus Title IX adjudications.

> Each major procedural change demanded by the [OCR] guidance increased the chances that accused students would be found responsible for sexual misconduct. Schools were told to use the preponderance of evidence standard, and to allow complainants to appeal in cases where the accused were found not responsible...

(Johnson Report, Doc.#91-2, PageID#974 (citations omitted).) The procedures adopted by schools have also received substantial criticism from federal courts. Judge Graham:

> Sexual assault is a deplorable act of violence… Universities have perhaps, in their zeal to end the scourge of campus sexual assaults, turned a blind eye to the rights of accused students. Put another way, the snake might be eating its own tail. Joe Dryden et. al., Title IX Violations Arising from Title IX Investigations: The Snake Is Eating Its Own Tail, 53 Idaho L. Rev. 639 (2017).

*Doe v. Ohio State Univ.*, 311 F. Supp. 3d 881, 892-893 (S.D.Ohio 2018).

**B.     The ERAU Sexual Misconduct Policy**

ERAU has adopted a "Civil Rights Equity & Sex/Gender Based Harassment, Discrimination, and Sexual Misconduct Policy." (the "Sexual Misconduct Policy"; Doc#1-5.) Allegations of sexual misconduct are reported to and investigated by the school's Title

IX Coordinator.[3]   (Doc#1-5.)   The Sexual Misconduct Policy was adopted, in part to comply with various guidance from the Department of Education, including the DCL. (Doc#1-5, PageID#47.)   The Title IX Coordinator testified:

> Q … are you aware of the 2011 DCL?
> A Yes.
> Q Okay. And I assume Embry-Riddle attempted to comply with the instructions in the 2011 DCL?
> A Yes.
> Q And that its policies and procedures were enacted in order to comply with the instructions of the Department of Education in that letter?
> A Yes, I would assume.

(Dammer Depo., Doc#87-1, PageID#702.) ERAU has also adopted a "Civil Rights Equity & Sex/Gender-Based Harassment, Discrimination, and Sexual Misconduct Resolution Process."   (the "Resolution Process"; Doc#1-6.)   The Resolution Process sets forth procedures ERAU employs to investigate and adjudicate allegations of violations of the Sexual Misconduct Policy.   The Resolution Process provides that allegations of sexual misconduct are handled by what is referred to as the "single investigator model."   The Title IX Coordinator assigns an investigator to interview witnesses, gather evidence, and determine if a violation of the Sexual Misconduct Policy has occurred. [4] (Doc#1-6, PageID#87-89.)   ERAU promises as "a fundamentally fair resolution" and a decision

---

[3] The Sexual Misconduct Policy requires that "there must be clear, knowing, and voluntary consent prior to and during sexual activity."   The Sexual Misconduct Policy prohibits sexual activity with "someone you know to be or should know to be incapacitated."   The definition of "incapacitated" in the Sexual Misconduct Policy is complicated and confusing but, in regard to alcohol use, provides that "incapacitation is a state beyond drunkenness or intoxication." (Doc#1-5, PageID#50-51.)

[4] There is no opportunity for a hearing, and no opportunity for students accused of misconduct to question their accusers.   (Dammer Depo., Doc#87-1, PageID#702.)   Many other traditional due process-type protections are not present.   The accused student is not permitted to remain silent and is not presumed innocent.   The investigator and Title IX Coordinator literally serve as the police, judge, and jury in a secret process.

based solely on evidence presented during the resolution process that is "credible, relevant, based on fact, and without prejudice." (Doc#1-6, PageID#100-101.) The Resolution Process provides for a limited appeal. (*Id.*)

## B. The Allegations Against John Doe

John Doe was accused of sexual misconduct arising out of events that occurred on October 26-27, 2019 (the "Incident").[5] John Doe and Jane Roe engaged in sexual activity after drinking at a Halloween party. Both John Doe and Jane Roe claim to have been intoxicated and told the ERAU Title IX Coordinator that they were unable to provide consent to the sexual activity. (*See, generally*, Verified Complaint, Doc#1.) In this litigation, John Doe claims that the decision of ERAU to not investigate his claim is consistent with stereotypical views of gender. (*See, generally,* Expert Report of Aya Gruber, Doc#91-3; Affidavit of Gruber, Doc#4-3.)

On October 19, 2018 Jane Roe submitted a complaint to the ERAU Title IX Office alleging that she was the victim of a sexual assault. (Doc#S-95 at 4.) The factual basis for Jane Roe's complaint in regard to the Sexual Misconduct Policy is not completely clear. She indicated that she was nervous about drinking that night and John Doe "taking advantage of her."[6] (Doc#S-95 at 7.) She told the Title IX Coordinator that she told John

---

[5] John Doe unequivocally denies engaging in any misconduct or violation of the Sexual Misconduct Policy. But as much as he would like to prove his innocence, Plaintiff recognizes that is irrelevant. John Doe is *not* asking the Court to issue an opinion on the merits of the allegations against Jane Roe. John Doe's claims focus on the actions of Defendant and are independent of his underlying "guilt" or "innocence." *Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 313 (D.R.I. 2016) ("It is not the Court's role to . . . to evaluate whether the Court would have made the same judgment calls on evidence and other issues as [the school] did; or to determine whether the procedure John [Doe] received was optimal.").

[6] The term "taking advantage of" appears to have a talismanic quality for the Investigator, even though it is not used in the Sexual Misconduct Policy. She testified that John Doe's

Doe that intercourse hurt; she said that John Doe stopped intercourse and she engaged in oral sex. (Doc#S-95 at 8.) During the course of the investigation, the basis for Jane Roe's complaint became, essentially, that she was too intoxicated to consent to sexual activity.[7] (*See e.g.* Doc#S-95 at 47.) Jane Roe told the Title IX Coordinator that John Doe was also drunk. (Doc#S-95 at 7.) Jane Roe requested that John Doe be suspended from the track team. The Title IX coordinator, prior to conducting any investigation, agreed to prohibited John Doe from practicing or competing with his team. (Dammer Depo., Doc#87-1, PageID#709 ("Q …So when you imposed the interim measure in this case you had not conducted any  investigation; right? A Correct.").[8]

On November 13, 2019, the Title IX Coordinator met with John Doe about Jane Roe's allegations.  John Doe informed the Title IX Coordinator that he was very intoxicated when he engaged in sexual activity with Jane Roe. (Doc#S-95 at 11; Dammer Depo., Doc#87-1, PageID#718.) John Doe informed the Title IX Coordinator that Jane Roe had initiated some sexual activity and verbally indicated her consent to intercourse. (Doc#S-95 at 11-12)  The Title IX Coordinator did not act on this statement or initiate an

---

[7] The conclusion of the Report makes clear that incapacitation due to intoxication is the basis for the conclusion that Jane Roe did not consent to sexual activity: "The evidence shows that the respondent should have known that the reporter could not make rational, reasonable decisions and lack the capacity to give knowing consent."  (Doc#S-95 at 55.)

complaint was not investigated because he "had not submitted his complaint saying that he was taken advantage of."  (Meyers-Parker Depo., Doc#87-2, PageID#780. See also Meyers-Parker Depo., Doc#87-2, PageID#784 ("Q …Didn't he say he was very drunk and she initiated sexual activity? A But he never said he was being taken advantage of.").)

[8] The Title IX Coordinator admitted that the interim measures were not offered equitably. (Dammer Depo. at 32-34 ("so you could have, for example, suspended both of them from the track team and that would have solved that problem; right? A Yes, I could have.").)

investigation into possible misconduct by Jane Roe.[9]  (Affidavit of John Doe, Doc#4-1, PageID#127-129.)   The Title IX Coordinator discounted John Doe's statements and discouraged John Doe from filing his own complaint against Jane Roe.  (*See* Verified Complaint, Doc#1, PageID#8-9.)

John Doe and Jane Roe attempted to mediate the issue with a campus minister.  Prior to this meeting John Doe requested that the Title IX Office not be involved.  He was told that the mediation would be confidential and that statements made in the meeting would not be used in the investigation.[10]  (Verified Complaint, Doc#1, PageID#8.)

On January 8, 2020, Jane Roe "requested to move forward with a formal Title IX investigation."  (Doc#S-95 at 4-5.)    On January 10, 2020, John Doe submitted a report to the Title IX Office alleging that he, too, was the victim of sexual misconduct.   (Doc#4-1, PageID#129;  Jan. 10, 2020 Complaint, Doc#87-7, PageID#883.)  John Doe indicated that on the night of the incident, he was "too intoxicated to consent to the sexual acts of [Jane Roe.]"  (Jan. 10, 2020 Complaint, Doc#87-7, PageID#883.) The Title IX Coordinator acknowledged that the January 10, 2020 report is a complaint by John Doe alleging misconduct by Jane Roe.  (Dammer Depo., Doc#87-1, PageID#736.)

ERAU did not respond to John Doe's complaint against Jane Roe.  (Aff. of John Doe, Doc#4-1, PageID#129-130; Dammer Depo., Doc#87-1, PageID#712-713.)   Jane Roe was never informed about the allegations against her.  (Dammer Depo., Doc#87-1,

_____

[9] The Resolution Process does not require ERAU to wait for a formal complaint to initiate an investigation.  (Doc#1-6, PageID#85 (authorizing investigation "if the University, based on the alleged policy violation(s), wishes to pursue a resolution").)

[10] The mediator wrote in an email, "our conversation was not intended to be used outside our meeting." (Feb. 11, 2020 Email, Doc#87-8, PageID#884.)

PageID#714.)  No investigation of his claims was opened. [11]    (Dammer Depo., Doc#87-1, PageID#712.)  There was no resolution of his allegation or finding about whether John Doe is incapacitated. (Dammer Depo., Doc#87-1, PageID#712, 714.)  Further:

> Q So when you did the report is there a specific section that says, "This is the allegation from John Doe against Jane Roe and Jane Roe is responsible or not responsible"?
> A No.

(Dammer Depo., Doc#87-1, PageID#712.)  The Investigator similarly admitted that there were no findings on John Doe's claims:

> Q We now get to the [allegations against] John Doe -- It's set out very clearly -- "Here's the allegation. Here's the evidence. Here's the conclusion"?
> A Correct.
> Q We don't have that same thing for his allegations against her; right?
> A I guess not.

(Meyers-Parker Depo., Doc#87-2, PageID#783.)  This testimony is consistent with a document submitted by the investigator to the appeal officer stating that John Doe's complaint "could be perceived as retaliation" and that "no further action was taken besides a discussion with [John Doe] and his attorney."[12]  (Undated Response to Frost at 2.)

---

[11] The Title IX Coordinator claimed in her deposition that the school "merged the case" based on advice received from an outside source.  (Dammer Depo., Doc#87-1, PageID#712.)  The Report does not indicate any "merger and she admitted that no documentation supports this claim. (*See e.g.* Dammer Depo., Doc#87-1, PageID#721.)  Moreover… the Title IX Coordinator clearly lied about this.  She said she "checked with" a representative of an organization that provides advice and training to schools on Title IX, "ATIXA," about this issue.  This representative, according to her deposition testimony, "recommended that we just merge or hold off" on the investigation of John Doe's allegations "and do this after the other case was done."  (Dammer Depo., Doc#87-1, PageID#712.)  The representative has submitted an Affidavit denying that she provided advice to ERAU and stating, further, that she would have advised the school that the claim by John Doe could *not* be summarily rejected and ignored.  (Affidavit of Sandra Shuster, Doc#87-12, PageID#894-897.)

[12] The response also suggests that the investigator received advice from Shuster.  Shuster denies speaking with the investigator.  (Shuster Aff., Doc#87-12, PageID#896.)

ERAU conducted an investigation solely into the allegations *against* John Doe. Jane Roe was interviewed on at least two more occasions. (Doc#S-95 at 8-10.) During these interviews, Jane Roe provided additional information and identified persons who might be witnesses. The Investigator did not seek to verify any of the information provided[13] or speak to any of the witnesses mentioned by Jane Roe,[14] even though this information was cited as important to the conclusions. On February 23, 2020 John Doe told the Investigator that he was "drunk" when he engaged in sexual activity with Jane Roe (Doc#S-95 at 12-13.) According to the Investigator:

> [John Doe] claims that [Jane Roe] knew that he was drunk and how drunk he was that night. That while they were in the room, they started kissing. Then [Jane Roe] allegedly said that she wanted to feel him inside of her. He said that she instructed him on what to do and what she wanted sexually. He said that he was so drunk that he did what she said at the time. He also said that he was "so intoxicated" that he was doing what she said he wanted him to do.

(Doc#S-95 at 13.) John Doe also provided the investigator with sworn statements supporting his version of events. (Doe Aff., Doc#4-2, PageID#133.) One of the witnesses indicated in his statement that he saw Jane Roe at the party "and she seemed fine." (Witness Statement 1 at 5). Another witness had spoken extensively with Jane Roe about

---

[13] The Title IX Coordinator concluded that Jane Roe was credible, in part, because she "sought out and received counseling services" after the Incident. (Doc#S-95 at 55.) Nobody requested these records or made any effort to verify this claim. (Dammer Depo., Doc#87-1, PageID#726.)

[14] The Title IX Coordinator concluded that Jane Roe was credible, in part, because she "confided in her sister" the day after the Incident. (Doc#S-95 at 55.) Nobody interviewed the sister to verify the claims – even though she was in the room with the Investigator. (Dammer Depo. at 107.) Similarly, Jane Roe identified her roommate as a potential witness; Jane Roe discouraged the Investigator from contacting this witness because they "no longer get along." (Doc#S-95 at 9.) The Title IX Coordinator testified that this witness was never interviewed because of Jane Roe's request. (Dammer Depo., Doc#87-1, PageID#736 ("Q How was this person not interviewed? A [Jane Roe] said there is no reason, that she didn't want us to interview her.").)

the Incident. Jane Roe acknowledged that she initially consented to sexual activity with John Doe, including oral sex. and she never indicated lack of consent to sexual activity. (Witness 2 Statement at 9.) Another witness indicated in a sworn statement that John Doe and Jane Roe were "very loud," so he knocked on the door to interrupt them and overheard Jane Roe giving John Doe instructions on what she "liked" sexually. (Witness 3 Statement at 8-9.)

On March 24, 2020, John Doe was informed that the Title IX investigation was completed and that he had been found responsible for "Non-Consensual Sexual Intercourse" because Jane Roe was incapacitated when she consented to sexual activity with John Doe. (March 24, 2020 Letter, Doc#87-9). The Outcome Letter concluded

> [John Doe] never stated that he asked [Jane Roe] at any time for consent or if she was OK with what they were doing.[15] Even when [Jane Roe] told him her vagina was broken, he did not ask her if she wanted to continue, to stop, or if he was hurting her.[16] Her laughing did not preclude him from asking for consent.[17] The evidence shows that [John Doe] should have known that [Jane Roe] could not make rational, reasonable decisions and lacked the capacity to give knowing consent.

---

[15] But, according to the Report, John Doe stated to the Title IX Coordinator that Jane Roe "told him she wanted to feel him inside her" and that he "asked her what she wanted and she would direct him." (Doc#S-95 at 11.)

[16] But, according to the Report, John Doe indicated that Jane Roe was "laughing through the whole comment and it did not appear that she wanted him to stop." (Doc#S-95 at 17.) This is consistent with the description of the statement Jane Roe gave to Witness 2, *supra*. (*Compare* Doc#S-95 at 32-33.)

[17] This sentence is a gross misrepresentation of the Sexual Misconduct Policy and suggests the gender stereotype described by Professor Gruber, *infra*. The Policy does not require a male student to "ask" for consent. Instead, consent is defined as "mutually understandable affirmative words or behavior" and explains that "Consent can be given by words or actions, as long as those words or actions create mutually understandable permission regarding willingness to engage in… sexual activity." (Doc#1-5, PageID#50.)

(*Id.* at PageID#886.) The Outcome Letter did not address John Doe's claim that he was a victim of sexual misconduct because he, too, was intoxicated. (*Id.*) No similar letter was sent describing the outcome of the investigation into John Doe's complaint. (Dammer Depo., Doc#87-1, PageID#724.)

On April 1, 2020 John Doe submitted an appeal, referred to by ERAU as a "Request for Reconsideration." (Appeal, Doc#87-11.) John Doe noted that he had submitted a claim that he was a victim of sexual misconduct which had not been addressed. John Doe also noted various procedural irregularities. (*Id.* at PageID#891-893.) The Appeal was reviewed by the Associate Dean of Students & Title IX Coordinator for the ERAU campus in Arizona. She identified concerns about bias, granted John Doe's appeal, and ordered that case to be reviewed by a new investigator. (April 16, 2020 Letter., Doc#1-3, PageID#40.) The new investigator only read the report; he did not conduct any new investigative work or, even, speak to John Doe, Jane Roe, or any witnesses. (Langston Depo. at 35-36.)

On June 10, 2020 the new investigator issued an Outcome Letter. This letter is substantially similar to the Outcome Letter and summarily dismissed John Doe's claim that he was also incapacitated. (Doc#1-4.) John Doe was dismissed from ERAU.

## ARGUMENT

### A.      The Standard For Resolution Of This Motion

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict." *Kernel*

*Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

**B.    Plaintiff Is Entitled To Partial Summary Judgment On Count I, Title IX Selective Enforcement**

**1.    Standard**

To prevail on a Title IX Selective Enforcement claim, Plaintiff must demonstrate that a similarly-situated member of the opposite sex was treated more favorably. *Doe v. Rollins College*, 352 F. Supp. 3d 1205, 1211 (M.D.Fla. 2019), *citing Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016).  In a selective enforcement claim, a plaintiff alleges that the decision to initiate proceedings or the penalty imposed was affected by plaintiff's gender. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).[18]  Plaintiff succeeds if he can demonstrate that a person of the opposite sex was in similar circumstances and was treated more favorably. *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 756 (E.D. Tenn. 2009).

---

[18] Recent circuit court decisions seem to question *Yusuf's* strict categorization of Title IX claims as either erroneous outcome or selective enforcement.  *See Purdue Univ.*, 928 F.3d at667 ("All of these categories simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student."); *USciences*, 961 F.3d at 209-11 (rejecting *Yusuf's* "doctrinal framework" and following *Purdue*).  However, in *Doe v. Valencia Coll.*, 903 F.3d 1220, 1236 (11th Cir. 2018), the Eleventh Circuit recognized the impact of *Yusuf* in establishing a framework to analyze Title IX claims.  And district courts in this Circuit have continued to apply the *Yusuf* framework. *Rollins College, supra; Jia v. Univ. of Miami*, S.D.Fla. No. 17-cv-20018, 2019 U.S. Dist. LEXIS 23587, at *13 (Feb. 12, 2019); *Doe v. Univ. of S. Alabama*, S.D.Ala. No. 17-0394, 2020 U.S. Dist. LEXIS 25961, at *39 (Feb. 14, 2020); *Lynn Univ.*, , 224 F. Supp.3d at 1291.

## 2. ERAU Violated Title IX

ERAU officials failed to initiate an investigation or disciplinary process with respect to Jane Roe after receiving credible information that Jane Roe, in addition to John Doe, may have violated the Sexual Misconduct Policy by engaging in sexual activity with John Doe while John Doe was incapacitated due to alcohol. This Court has found that an accused student may, for selective enforcement purposes, identify his accuser as a comparator in two circumstances: (i) the accused student initiated a complaint against his or her accuser; or (ii) the accused student was discouraged or dissuaded from formalizing a complaint." *Doe v. Rollins College*, M.D.Fla. No. 6:18-cv-1069-Orl-37LRH, 2020 U.S. Dist. LEXIS 249574, at *28 (July 13, 2020), *citing Rossley v. Drake Univ.*, 342 F. Supp. 3d 904, 933 (S.D.Iowa 2018).

The record shows no issue of fact that John Doe satisfies both possible circumstances. On January 10, 2020 John Doe submitted a Complaint of Misconduct against Jane Roe. (Doe Aff., Doc#4-1, PageID#129; Jan. 10, 2020 Complaint, Doc#87-7, PageID#883.) And John Doe was discouraged from filing his own complaint against Jane Roe by the Title IX Coordinator; he was told that such a complaint would be rejected as retaliatory. (Verified Complaint, Doc#1, PageID#8-9; Dammer Depo., Doc#87-1, PageID#734.)

The record also shows no issue of fact that Jane Roe was not investigated for violating the sexual misconduct policy after John Doe's complaint. The Title IX Coordinator admitted in her deposition that there should have been a clear and unambiguous finding in the Report on John Doe's complaint:

> Q …Would that report include a clear statement of the allegation by the -- by the complainant?

A A full report, yes.
Q And would that report then include a finding about whether the accused
student was responsible or not responsible for that allegation?
A Yes.
Q Okay. In other words, there shouldn't be any ambiguity? If there's a complaint
there should be some document out there that says, "This is the allegation that
Embry-Riddle looked at. This is the result of our investigation"?
A Yes.

(Dammer Depo., Doc#87-1, PageID#710 (objection omitted).)   The Report does not

contain a clear and unambiguous statement describing the result of John Doe's

complaint.  (There is not even a murky and indefinite statement that suggests a result.)

Even though John Doe made a formal complaint that he was incapacitated when he

engaged in sexual intercourse with Jane Roe, the Title IX Coordinator never made any

findings about this.  Her testimony could not be more clear:

Q …So where within those findings and rationale do you have a discussion about
whether John Doe was incapacitated?
A I do not.
Q It's not in there at all?
A No. I talk about his abilities to function on that night.
Q Do you ever make a finding about whether John Doe is incapacitated or not?
A No.

(Dammer Depo., Doc#87-1, PageID#714 (objection omitted).)

John Doe's claim fits squarely within *Yusuf* and existing Title IX case law.  Courts

have held that a student states a Title IX Selective Enforcement claim where the school

only investigates one party when both allege that they engaged in sexual activity while

intoxicated. "An accused student and his or her accuser can be compared to show

selective enforcement if the parties allege misconduct against each other."  *Rossley*, 342

at 933, *citing Stenzel v. Peterson,* D.Minn. No. 17-580, 2017 U.S. Dist. LEXIS 148467

(Sep. 13, 2017).  In *Rossley*, a court found that a viable Title IX claim existed where the

male student, as in this case, told a school official he might be the victim of a sexual

assault.[19]  The school official declined to initiate an investigation into the allegations of the female student.  Notably, in *Rossley,* the knowledge of the school officials alone was sufficient to create an inference that sex was a motivating factor in a school's decision to discipline a student.  The court said,

> Although Defendants claim Plaintiff cannot allege facts to show any possible disparate treatment was motivated by gender, the disputed facts themselves— whether an arguably similarly situated man and woman were treated differently—raise the specter of gender bias…

342 F. Supp. 3d at 934-935.

John Doe and Jane Roe are similarly situated in that their conduct was nearly identical: (i) they both engaged in the exact same sexual conduct; (ii) they both admitted to drinking; (iii) they both claimed the other initiated sexual activity; and (iii) they both submitted formal complaints alleging that they were incapable of providing consent.  (*See e.g.* Doe Aff., Doc#4-1, PageID#129.)  They both should have received the same initial treatment or, at a minimum, be subject to investigation.[20]  Instead, only John Doe was

---

[19] The Third Circuit in *USciences,* 961 F.3d at 203, held that a Plaintiff could maintain a selective enforcement claim even if the accused student (unlike in this case) told the investigator that the sexual activity was consensual and never submitted a complaint.

[20] John Doe and Jane Roe did not have to ultimately receive the same sanctions.  The Sixth Circuit has noted that if a school "had initiated disciplinary proceedings against [the female accuser], this process may have led to a finding of not responsible or the imposition of a lesser sanction."  *Cf. Miami Univ.*, 882 F.3d at 597 (discussing equal protection claim). Recent cases have illustrated that schools can avoid Title IX selective enforcement claims by doing what ERAU failed to do – conduct an investigation into the cross-claims by the male student.  *See Doe v. Princeton Univ.*, D.N.J. No. 3:20-cv-4352 (BRM)(TJB), 2020 U.S. Dist. LEXIS 247940, at *8 (Dec. 31, 2020) (rejecting selective enforcement claim where school investigated and made specific findings on cross-complaint by male student); *Doe v. Texas A&M Univ.*, S.D.Tex. No. H-20-4332, 2021 U.S. Dist. LEXIS 14114, at *21 (Jan. 26, 2021) (dismissing selective enforcement claim because male student's "formal complaint is now under investigation").

suspended from the track team on an interim basis and only John Doe's conduct was investigated for possible violation of school policies.

This type of disparate treatment, courts have recognized, demonstrates gender bias and a selective enforcement violation under Title IX. In *Doe v. Brown Univ.*, 327 F. Supp. 3d 397 (D.R.I. 2018), the court indicated that this was sufficient to create a Title IX selective enforcement issue. The court said:

> Both [the male student] and [the female student] were students at Brown. Both brought complaints of sexual assault. Both complaints of sexual assault occurred, at most, within six months of each other. Brown investigated [the female student's] complaint; it ignored [the male student's] complaint. While the two are not exactly identical, the allegations as pleaded present [the male student] and [the female student] as similarly situated.

227 F. Supp. 3d at 413. Other courts have reached a similar conclusion. *Doe v. Syracuse Univ.*, N.D.N.Y. No. 5:17-cv-787 (TJM/ATB), 2020 U.S. Dist. LEXIS 75995, at *33-35 (Apr. 30, 2020) (denying cross motions for summary judgment where both male and female engaged in sexual activity when intoxicated; "there are questions of fact about whether gender bias motivated the fact that [the male student] received a penalty for the incident and [the female student] did not."); *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 223 (D. Mass. 2017) ("when the College learned [the female student] may have initiated sexual activity with [plaintiff] while he was... incapable of consenting, the College did not encourage him to file a complaint, consider the information, or otherwise investigate").[21]

---

[21] *Doe v. Univ. of Nebraska*, D.Neb. No. 4:18CV3142, 2021 U.S. Dist. LEXIS 22999 (Feb. 8, 2021), is not to the contrary. In *Univ. of Nebraska*, the court suggested that the original female complainant cannot be a comparator when "a Title IX respondent makes accusations against the complainant defensively." 2021 U.S. Dist. LEXIS 22999, at *19. That is not this case. In this case, Plaintiff raised the issue at his initial meeting with the Title IX Coordinator. He also presented evidence that the Title IX Coordinator discouraged him from submitting a cross-complaint. Moreover, to the extent that *Univ. of Nebraska* can be read as endorsing a blanket rule prohibiting selective enforcement

ERAU's conduct demonstrates favoritism toward women and shows that ERAU operates according to a stereotypical view of males as sexual aggressors and females as passive, a view that men are responsible for obtaining consent from women but not the other way around.[22]  This gender stereotype, sometimes known as "traditional sexual scripts," governs women and men's behavior during sexual encounters.   According to this stereotype, men are perceived as  "willing and at all times ready for sex" while women are perceived to desire sex only within the context of a stable, monogamous relationship. Professor Gruber, an expert in the relationship between gender stereotypes and the legal rules, principles, and practices governing gender violence, has examined the facts of this case.  She explains the influence of gender stereotypes and sexual scripts on ERAU's actions:

> …ERAU acted in a manner consistent with the application of the traditional sexual script and the gender stereotypes therein.  The decision of ERAU to not investigate John Doe's claim that he was experienced a nonconsensual sexual assault by Jane Roe was consistent with the stereotypical view of men as sexual aggressors and women as passive gatekeepers. The failure to investigate John Doe's claim that he was too incapacitated to consent to sex, despite evidence of his intoxication, is indicative of a presumption that John Doe, a man, could not have been the victim of sexual assault by Jane Roe, that

---

claims based on cross-complaints, it is contrary to the weight of authority and has not been cited by any other court.  The decision is contrary to other decisions by other district courts in the same circuit.  *See Rossley, supra.* The decision is also contrary to this Court's decision in *Doe v. Rollins College*, M.D.Fla. No. 6:18-cv-1069-Orl-37LRH, 2020 U.S. Dist. LEXIS 249574, at *28 (July 13, 2020).  Finally, the *Univ. of Nebraska* rule should be rejected as bad policy since it would serve only to encourage a "race to the Title IX Office."

[22] "It is undisputed that Title IX forbids discrimination on the basis of gender stereotypes. Gender stereotyping is a concept that sweeps broadly."  *Videckis v. Perpperdine Univ.*, C.D.Cal. No. CV 15-00298, 2015 U.S. Dist. LEXIS 169187, at *19 (Dec. 14, 2015), *citing Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (prohibiting discrimination based on animus toward an exhibition of gender-nonconforming behavior); *Los Angeles Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978) ("Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.").

he was "willing and at all times able" to have sex, and that his intoxication did not matter because, regardless of his level of drunkenness, he was a pursuer who benefitted from the "achievement" of sexual intercourse.

(Doc#4-3, PageID#140-141.)[23]  ERAU's expert does not provide a contrary opinion on this issue.  (*See, generally,* Catanzano Report, Doc#91-1.)

The ERAU investigation also relied on other stereotypes, particularly a stereotype about male alcohol use and sexual performance.  The ERAU investigation relied on the stereotypical claim that a man cannot be incapacitated if he is able to maintain an erection and engage in intercourse. (Doc#S-95 at 52.) The Report states, "Although [John Doe] was drinking, he was able to have an erection…"  (*Id*.)  Elsewhere the Report is even more explicit.  The Report suggests that although it is "unclear how much [John Doe] drank… he was able to get an erection when he was sexually active with [Jane Roe]." (Doc#S-95 at 49.)  And, lest there be any confusion about the view of the Investigator, in a response to the appeal being granted, the investigator wrote,

> although [John Doe] may have been intoxicated and/or previously incapacitated earlier in the evening, at the time of the sexual encounter, [John Doe] could NOT have been incapacitated in order to have sexual intercourse both vaginally and orally…

---

[23] ERAU's Sexual Misconduct Policy acknowledges that it was adopted to comply with directives from the Department of Education.  (Doc#1-5, PageID#47.)  Professor Gruber explains that this likely encouraged ERAU to rely upon gender stereotypes in reaching a conclusion in this case:

> ERAU like other schools nationwide faced the risk that a process favorable to the respondent or a finding of nonresponsibility would invite federal investigation and sanction, which could result in loss of eligibility for federal funding. Importantly, adherence to the entrenched gender stereotypes… generally makes it easier to find male respondents responsible for incapacitated and nonconsensual sex in a mutual intoxication situation because the man is necessarily the sexual pursuer responsible for obtaining sober consent and the woman is necessarily the passive gatekeeper. The stereotypes thus aligned with ERAU's interest in avoiding federal investigation and sanction.

(Gruber Aff., Doc#4-3, PageID#141.)

(Undated Response to Frost at 1.)  This, alone, may be sufficient to demonstrate gender bias because such views would have naturally infected the outcome of the Title IX disciplinary proceedings.  *See Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 586 (E.D.Va.2018) (finding possible gender bias where Title IX administrator "possessed… outdated and discriminatory views of gender and sexuality").

The failure of ERAU to conduct an investigation into Jane Roe is not accidental. ERAU has only ever investigated allegations of sexual misconduct against male students. (*See* Table, Response to Interrogatory, Doc#87-6, PageID#881-882; Meyers-Parker Depo. at 35; 30(b)(6) Deposition at 9.).   A review of other investigations conducted by ERAU confirms that John Doe is not unique.   ERAU's administrators are simply not interested in investigating *any* situations where males – even using their own flawed gender stereotype[24] – may have been the victims of sexual misconduct.   A 30(b)(6) witness was asked to testify about other ERAU investigations.  One of the investigations, like this case, involved a male student who had been drinking.  The school did not pursue an investigation into whether the male student was incapacitated even though the student

---

[24] Professor Gruber explains this stereotype:

> One of the most prevalent myths regarding male victims is that an erection or ejaculation means that the sex was not assaultive. The gender stereotype is that the man who ejaculates must have "enjoyed it," rendering the sex "consensual." Experts have shown that male rape victims, like female victims whose bodies showed signs of arousal, can and do become aroused and ejaculate during assaults. In this case, ERAU presumed that Doe's erection and ability to engage in intercourse was presumptively incompatible with incapacity.

(Gruber Report, Doc#91-3, PageID#992 (citations omitted).) The Title IX Coordinator and Investigator admitted in their depositions that this stereotype is not accurate.  (Dammer Depo., Doc#87-1, PageID#714; Meyers-Parker Depo. PageID#756.)  Even worse: the investigative actually file contained a medical paper indicating that this was untrue – but this was also ignored.  (Dammer Depo., Doc#87-1, PageID#715.)

"explained… that he could not get an erection because of his drinking alcohol." (30(b)(6)

Deposition at 87.) The testimony about this other investigation, in light of the facts of this

case, creates a stunning contrast that illustrates the reliance on gender stereotypes:

> Q So [the male student in the other investigation] made a statement that he drank so much that he was unable to obtain an erection?
> A Yes.
> Q And in that state when he drank so much that he was unable to obtain an erection he engaged in oral sex with the female student?
> A Yes, he did.
> Q Did you make any inquiry about whether he was able to knowingly consent to sexual activity with the female student?
> A He said, "When she got up to go to the bathroom when she came back we were both naked and rubbing against each other, went to get a condom but realized that due to my alcohol consumption I was not going to be able to have consensual intercourse."
> Q So did you make any inquiry about whether the female student committed misconduct by engaging with -- engaging in sexual activity with a male student who was incapacitated?
> A No.
> Q Did you attempt to determine the blood alcohol level of the male student?
> A No.
> Q Did you ask the female student what she did to obtain consent from the male student?
> A No, I did not….

(30(b)(6) Deposition at 93-95 (objections omitted).) The 30(b)(6) witness admitted that

different standards were applied in that investigation and John Doe's matter:

> Q …Isn't it true that in John Doe's case one of the factors in concluding that he was not incapacitated was his ability to achieve an erection?
> A … In [John Doe's] case I was using a case[25] that just said that it was likely if a student male could have an erection that they were not incapacitated.

---

[25] The is referring to *Mallory v. Ohio Univ.*, 76 F.App'x 634 (6th Cir. 2003). The Investigator and Title IX Coordinator relied on this case for the proposition that "if a man is able to engage in and complete the act of sexual intercourse he is not incapacitated." (*Compare* Response to Frost at 2 (referring to ATIXA Whitepaper that cited to *Mallory;* Meyers-Parker Depo., Doc#87-2, PageID#755.) The Title IX Coordinator and Investigator acknowledged in their depositions that *Mallory* contains no such holding. (Dammer Depo., Doc#87-1, PageID#715; Meyers-Parker Depo, Doc#87-2, PageID#756.)

(30(b)(6) Deposition at 89.)

This reliance on gender stereotypes is consistent with the pressure from the Department of Education identified by the *Purdue*, *USciences*, and *Miami Univ*. courts. *See supra.* Professor Johnson explains:

> In effect, Obama-era guidance used the status of complainant as a proxy for gender, reasoning that campus procedures insufficiently protective of the interests of student complainants violated Title IX—even though not all victims of campus sexual assault were female….
>
> Some Obama officials and initiatives removed all pretense and used gender and complainant status interchangeably when discussing Title IX matters.

(Johnson Doc#S-95 at 10.) *Cf. Rolph v. Hobart & William Smith Colleges*, 271 F. Supp. 3d 386, 402 (W.D.N.Y. 2017) (student alleged gender bias, in part, on the fact that school "panel questioned him extensively about whether he was intoxicated… but failed to question her about whether he appeared intoxicated; this, according to Plaintiff, 'is consistent with a view of men as predators and women as guardians of virtue'"). This is consistent with the holdings of circuit courts that have addressed this issue.[26]   In *USciences, supra,* the Third Circuit found gender bias when the school did not investigate three females alleged to have violated the school's policy. 961 F.3d at 210. And in *Doe v. Miami Univ*., *supra,* an inference of gender discrimination was drawn, in part, from evidence describing a pattern of the University pursuing investigations concerning male

---

[26] *Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 74 (1st Cir.2019, is not to the contrary.  In *Haidak*, a student declined to initiate a charge against his accuser when given the chance.  *See also Doe v. Brown Univ., D.R.I. No. 17-191-JJM-LDA, 2020 U.S. Dist. LEXIS 175102, at *26 (Sep. 24, 2020) (following *Haidak*; holding that student could not pursue selective enforcement claim identifying accuser as comparator where he "did not lodge a formal complaint against her."

students, but not female students. 882 F.3d at 593. The evidence produced in discovery by ERAU, showing that every sexual misconduct investigation involved accusations against a male student, supports a similar inference. (Table of Investigations, Doc#87-6, PageID#881-882.) The school's 30(b)(6) deponent confirmed:

> Q … so during the relevant time period… did Embry-Riddle investigate any allegations of sexual misconduct against females?
> A No.
> Q During the relevant time period did Embry-Riddle investigate any allegations of sexual misconduct brought by male students?
> A We did not on nonconsensual sexual intercourse or nonconsensual sexual contact...

(Dammer II Depo. at 24-25 (objections omitted). John Doe, thus, is entitled to partial summary judgment on his selective enforcement claim that he was investigated or disciplined where a similarly-situated female, Jane Roe, was not.[27]

## 2. Breach of Contract Claim

### a. Standard

A student and a private university in Florida have a contractual relationship. *John B. Stetson Univ. v. Hunt*, 88 Fla. 510, 102 So. 637 (1924); *Sharick v. Southeastern University of Health Science*s, Inc., 780 So.2d 136, 138 (Fla. 3rd DCA 2000). The terms of this relationship are generally set forth in university catalogs, student manuals, student handbooks, and other university policies and procedures. *Ali v. Stetson Univ*., *Inc*., 340 F.Supp.2d 1320, 1328 (M.D. Fla. 2004), *quoting Univ. of Miami v. Militana*, 184 So.2d 701, 704 (Fla. 3d DCA 1966).

---

[27] Plaintiff anticipates that Defendant will argue that John Doe was "guilty anyway." But this represents a basic misunderstanding of Title IX law. A selective enforcement claim is viable regardless of the plaintiff's underlying guilt or innocence. *Yusuf v. Vassar Coll.*, 35 F.3d at 715.

**b.** **Plaintiff Is Entitled To Summary Judgment On His Breach of Contract Claim[28]**

The Sexual Misconduct Policy cannot be applied to John Doe's alleged conduct. The Sexual Misconduct Policy unambiguously states that the "jurisdiction" of the policy is limited to "activities on University owned and or operated property." (Doc#1-5, PageID#49.) The undisputed facts are that the alleged conduct in this case occurred at a private party at private house off campus. (Doe Aff., Doc#4-1, PageID#128.) As a result, the school did not act in accordance with the express terms and conditions of its policy.

The Title IX Coordinator and Investigator claimed, in depositions, that other sections of the Policy applied to expand jurisdiction. They pointed to language in the introduction and a separate section entitled "Civil Rights Equity Section." (Doc#1-5, PageID#47; Doc#1-5, PageID#55.) The Investigator testified:

> Q …So let's get to the bottom line here. The conduct that you investigated in this case occurred off campus; correct?
> A Correct.
> Q Okay. So where in this policy does it indicate that the school has jurisdiction over events that occurred off property not related to school activities?
> A I believe it's in the Introduction and then as well on Page 9, [the "Civil Rights Equity Section,"] if I'm remembering correctly.

(Meyers-Parker Depo., Doc#87-2, PageID#759.) Neither of these sections modify the clear and unambiguous language in the "Jurisdiction" section two reasons.

First, both sections cited by the Investigator use permissive, not mandatory, language. Both sections merely state that ERAU "reserves the right" to regulate conduct

---

[28] At trial (if necessary) and in response to a motion for summary judgment by ERAU, Plaintiff will argue that there is a material of issue of fact about whether ERAU breached the guarantees of fundamental fairness in the Sexual Misconduct Policy and Resolution Process.

that occurs off campus. Doc#1-5, PageID#47; Doc#1-5, PageID#55.)  Reserving the right to do something is not the same as actually doing something.  For example, an attorney reserving the right to object is not the same as actually making an objection, for the language used by counsel in that situation simply means that counsel might decide later to make an objection.

Second, separate, general language cannot modify specific sections of a contract. *CWI, Inc. v. LDRV Holdings Corp.*, M.D.Fla. No. 8:13-cv-93, 2014 U.S. Dist. LEXIS 197522, at *12-13 (Mar. 26, 2014) ("When certain provisions of a contract conflict, 'it is a general principle of contract interpretation that a specific provision dealing with a particular subject will control over a different provision dealing only generally with that same subject.'"), *quoting Idearc Media Corp. v. M.R. Friedman & G.A. Friedman, P.A.*, 985 So. 2d 1159, 1161 (Fla. 3d DCA 2008).  The Introduction is just that – this section does not create any substantive rights.  Similarly, the "Civil Rights Equity Section" is a section of the Sexual Misconduct Policy that covers non-discrimination in "employment and in access to education opportunities" and, thus, does not apply to the separate section on Sexual Misconduct (Doc#1-5, PageID#55.)

At best for ERAU, there is some ambiguity in the contract language.  But ERAU still loses in that scenario.  Any ambiguity should be construed against ERAU as the drafter.  *See Key v. Allstate Ins. Co.*, 90 F.3d 1546 (11th Cir. 1996) ("In general, ambiguities in contracts are construed against their drafters.").  The Sexual Misconduct Policy was an adhesion contract.[29]  As an adhesion contract, the terms of the Sexual

---

[29] Plaintiff, and other students at ERAU were required to follow all school policies – had John Doe refused to comply with any of the school's policies and procedures, he would have been unable to attend the school.  The Title IX Coordinator confirmed that there was

Misconduct Policy must be construed strictly against ERAU as the drafter. *See, e.g., Hussmann Corp. v. UPS Truck Leasing, Inc*., 549 So. 2d 215 (Fla. 5th DCA 1989) (truck rental agreement with contradictory provisions must be construed against drafter). If ERAU had intended to include the private conduct of students off campus as within its jurisdiction, the school had every opportunity to say so explicitly. ERAU has no cause now to complain because of its own oversight. *Pasteur Health Plan v. Salazar*, 658 So.2d 543, 545 (Fla.3rd DCA 1995) ("Florida courts have long held that all ambiguities in… contracts of adhesion, should be construed in the light most favorable to the" party without bargaining power).

## CONCLUSION

This Court should (i) enter Judgment in Favor of Plaintiff on Counts I and II of the Complaint on liability; (ii) set a briefing schedule for consideration of permanent injunctive relief and interim fees pursuant to 42 U.S.C. §1988; and (iii) set this matter for a trial on the issue of damages.

---

no negotiation between parties of equal bargaining power. (Dammer Depo., Doc#87-1, PageID#717.) *See Powertel, Inc. v. Bexley*, 743 So.2d 570, 574 (Fla. 1st DCA 1999) (defining adhesion contract as contract offered "on essentially a 'take it or leave it' basis without affording [other party] a realistic opportunity to bargain…"), *citing* Black's Law Dictionary, 6th Ed. (1990).

FOR PLAINTIFF:

/s/ Joshua Engel
Joshua Adam Engel (OH 0075769)
(TRIAL COUNSEL) *Pro hac vice*
Anne Tamashasky (OH 0064393)
        *Pro hac vice*
Scott O'Reilly (OH ____)
ENGEL AND MARTIN, LLC
4660 Duke Drive, Ste. 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

Lori A. Sochin (FL 013048)
LUBELL | ROSEN
1 Alhambra Plaza, Suite 1410
Coral Gables, FL 33134
(305) 655-3425
(305) 442-9047
las@lubellrosen.com

**CERTIFICATE OF SERVICE**

    This certifies that the foregoing was filed electronically on March 31, 2021.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.


        /s/ Joshua Engel
        Joshua Adam Engel (Ohio No. 0075769)
                *pro hac vice*

## CERTIFICATION OF COUNSEL

Pursuant to the Court's January 13, 2021 Standing Order, this document is in 12-point Arial typeface, including all indented quotations, footnotes, and endnotes.

Pursuant to Local Rule 3.01(g), the undersigned counsel certifies that before filing this Motion counsel DID NOT confer with counsel for the opposing party in a good faith effort to resolve the issues raised by the motion and obtain the relief sought without court action.  This Motion is exempt from the applicable Rule.

_____/s/ Joshua Engel _____
Joshua Adam Engel (Ohio No. 0075769)
    *pro hac vice*