**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

JOHN DOE,

       Plaintiff,

                           CASE NO. 6:20-cv-01220-WWB-LRH

vs.

EMBRY-RIDDLE AERONAUTICAL
UNIVERSITY, INC.,

       Defendant.

_____/

**<u>DEFENDANT'S DISPOSITIVE MOTION FOR SUMMARY JUDGMENT</u>**

Defendant Embry-Riddle Aeronautical University, Inc. ("ERAU") moves for summary judgment, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 3.01.

## I.   <u>INTRODUCTION</u>.

Jane Roe accused Plaintiff of raping her on October 26, 2019. Plaintiff seemingly admitted to doing so the next day in text messages he sent to Roe. Both students attended ERAU. Title IX required ERAU to investigate and decide whether it was "more likely than not" had non-consensual sexual intercourse with Roe. Ten weeks after Roe filed her complaint against him, Plaintiff filed a counter-complaint against her, alleging for the first time that he had been too intoxicated to consent to sex with her. During ERAU's investigation, however, Plaintiff admitted he verbally and physically consented.

In this litigation, Plaintiff does not assert that ERAU reached an erroneous outcome in expelling him for "more likely than not" violating school policy by engaging in sexual misconduct. [Doc. 58 at 8.] Rather, Plaintiff only asserts that ERAU "selectively enforced" school policy by not *also* charging Roe with sexually assaulting Plaintiff. To be clear,

ERAU did investigate (and reject) Plaintiff's claims of incapacitation; thus, the only issue is whether Plaintiff's expulsion should be reversed and he should be allowed to attend classes alongside Roe because of a technicality that ERAU may not have issued a charge letter against Roe for Plaintiff's demonstrably-false counterclaim that Roe assaulted him when ERAU's investigation clearly showed Plaintiff was not incapacitated. Plaintiff seeks an egregious miscarriage of justice based on a contrived premise of false incapacitation. The Court should reject Plaintiff's abhorrent position.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS.

### A.   The parties and key individuals.

ERAU is a private university. [Doc. 1 ¶ 4.] During the 2019-2020 school year, Plaintiff John Doe was a male ERAU student who was expelled after ERAU found him responsible for violating school policy by engaging in non-consensual sexual intercourse with Jane Roe, a female ERAU student. [Dammer Decl., attached hereto as **Ex. 1,** ¶¶ 5, 26, 36, 39.] Linda Dammer served as the Title IX Coordinator at ERAU's Daytona Beach, Florida campus. [*Id.* ¶ 3.] Autumn Meyers-Parker served as a Title IX Investigator at ERAU's Daytona Beach campus. [Meyers-Parker Decl., attached hereto as **Ex. 2,** ¶ 3.] Elizabeth Frost served as the Title IX Coordinator at ERAU's Prescott, Arizona campus. [Frost Decl., attached hereto as **Ex. 3,** ¶ 2.] Jason Langston was a staff member at ERAU's Prescott, Arizona campus, who periodically served as an investigator or decisionmaker in Title IX proceedings. [Langston Decl., attached hereto as **Ex. 4,** ¶ 2.]

### B.   Pertinent ERAU policies and procedures relating to sexual misconduct.

#### i.   ERAU's policy against sexual misconduct.

A true and accurate copy of ERAU's Civil Rights Equity & Sex/Gender-Based Harassment, Discrimination, & Sexual Misconduct Policy for the 2019-2020 school year

(the "Sexual Misconduct Policy") is attached to Plaintiff's Complaint as Exhibit E. [Doc. 1-5.] The Sexual Misconduct Policy prohibits non-consensual sexual intercourse, which it defines "as any sexual penetration or intercourse, however slight, with any objection, by a person upon another person that is without consent. . . ." [Doc. 1-5 at 25.] The Sexual Misconduct Policy defines "consent" in pertinent part, as follows:

> Consent is an explicitly communicated, reversible mutual agreement in which all parties are capable of making a decision. Consent is informed, voluntary, and actively given. Consent exists when all parties exchange ***mutually understandable affirmative words or behavior*** indicating their agreement to participate voluntarily in sexual activity. . . . Consent can be given by words or actions, as long as those words or actions create mutually understandable permission regarding willingness to engage in (and the conditions of) sexual activity. . . .Sexual activity with someone you ***know to be or should know to be*** incapacitated constitutes a violation of this policy.

[*Id.* at 6 (emphasis added).]

Under the Sexual Misconduct Policy, "[a]n individual is incapacitated when they are not able to make rational, reasonable judgments and therefore is incapable of giving consent; incapacitation is the inability, temporarily or permanently, to give consent, because the individual is mentally and/or physically impaired. . .by alcohol. . .either voluntarily or involuntarily, . . . or otherwise unaware that the sexual activity is occurring." [*Id.* at 6.] Importantly, though, "incapacitation is a state ***beyond drunkenness or intoxication***." [*Id.* (emphasis added).] Indicators of incapacitation "include, but are not limited to, lack of control over physical movements (such as walking without assistance), being unaware of circumstances or surroundings, or being unable to communicate for any reason." [*Id.* at 6-7.] The Policy provides that, "Use of alcohol or other drugs will ***never*** function to excuse any behavior that violates this policy." [*Id.* at 6 (emphasis added).]

The Sexual Misconduct Policy's Introduction provides that, "The University reserves the right to act on incidents occurring on-campus ***or off-campus*** when the off-

campus conduct could have an on-campus impact or impact on the educational mission of the University." [*Id.* at 3 (emphasis added).]

> ii.    **ERAU's process for resolving reports of sexual misconduct.**

A true and accurate copy of ERAU's Civil Rights Equity & Sex/Gender-Based Harassment, Discrimination, & Sexual Misconduct Resolution Process for the 2019-2020 school year (the "Resolution Process") is attached to Plaintiff's Complaint as Exhibit F. [Doc. 1-6.] The Resolution Process encourages "[a]nyone who believes they have been subjected to . . . sexual misconduct" to "file a report and follow the below process." [*Id.* at 3.] Reporting parties have "[t]he right to an investigation and appropriate resolution of all ***credible*** reports . . . of sexual misconduct . . . made ***in good faith*** to University officials." [*Id.* at 17, § V.1 (emphasis added).] It further provides that, "[a]t any point during the investigation, if it is determined by the Title IX Coordinator that there is ***no reasonable cause*** to believe that University Policy has been violated, the Title IX Coordinator has the authority to terminate the investigation, end resolution proceedings, notifying each party involved." [*Id.* at 8 (emphasis added).] The Sexual Misconduct Policy also prohibits students from intentionally filing false reports of sexual misconduct. [Doc. 1-5 at 17.]

Before conducting a formal investigation, the Title IX Coordinator conducts a "preliminary inquiry to determine if there is reasonable cause to believe . . . the Sexual Misconduct Policy may have been violated." [*Id.* at 6.] If so, ERAU initiates a "thorough, reliable, impartial, prompt, and fair" investigation into the alleged sexual misconduct. [*Id.*] The Resolution Process requires all parties "to ***cooperate*** with and participate in the University's investigation." [*Id.* at 15 (emphasis added).] If a respondent refuses to do so, "interim measures may be issued up to and including suspension during the investigation process." [*Id.*] "At any point during the investigation," upon determining "there is no

reasonable cause to believe that University Policy has been violated," the Title IX Coordinator may "terminate the investigation" and "end resolution proceedings." [*Id.* at 8.]

After completing the investigation, the Title IX Investigator will compile and submit a written investigative report to the Title IX Coordinator. [*Id.*] Based on the final investigative report, the Title IX Coordinator then makes findings of responsibility or non-responsibility, and, if applicable, a determination of appropriate sanctions. [*Id.*] Available sanctions may include anything from a written warning to expulsion. [Doc. 1-5 at 20.]

**C.    The underlying incident.**

On October 26, 2019, Plaintiff hosted a Halloween party at his house. [Doe Dep., attached hereto as **Ex. 5**, at 17:8-18:17.] Before the party, Plaintiff exchanged text messages with Roe. [Doe Dep. at 35:12-22; *see also* text messages attached as Ex. 60 to Doe Dep. and attached hereto as **Ex. 6**.] Roe asked Plaintiff if he would take her safely to her home after the party, but he said no. [Doe Dep. at 38:18-25; Ex. 6 at ERAU_001731.] He told her she could stay in his bed, promising "Nothing will be tried." [*Id.* at 38:23-39:1; Ex. 6 at ERAU_001731.] Roe also asked Plaintiff if he "plan[ned] on taking advantage of" her at the party—*i.e.*, have sex with her while she was drunk—but he reassured her that he "[w]ouldn't dream of it." [*Id.* at 58:23-60:4; Ex. 6 at ERAU_001735.] Plaintiff understood she was concerned about the possibility of getting too drunk at the party and somebody having sex with her against her wishes. [*Id.* at 61:21-62:14.] He also understood she was an inexperienced drinker. [*Id.* at 116:17-24.]

Throughout the night, Plaintiff posed for pictures and took videos of the party with his iPhone 11, which he still has and uses. [Doe Dep. at 68:11-69:3, 69:7-70:8, 74:22-89:18; *see also* cell phone photos attached as Ex. 61 and cell phone videos attached as Exs. 62-65, to Doe Dep.] Plaintiff captioned and posted videos of the party on his

SnapChat stories. [Doe Dep. at 67:15-25, 75:15-2, 78:24-79:14, Exs. 62 and 63.]

Roe arrived at the party between 11:00 pm and midnight. [Doe Dep. at 62:24-63:5.] Plaintiff estimates that he saw Roe consume 3-4 shots of vodka, most of which Plaintiff served her. [Doe Dep. at 64:8-10, 65:4-15.] Toward the end of the night, Plaintiff took a video of Roe while she was sitting down, visibly and severely intoxicated. [Doe Dep. at 68:1-10, 84:9-22, 85:17-23, 88:9-11, 89:17-28, and Ex. 65.] During the video, one bystander proclaims, "Man, girl, you are long gone!" [Doe Dep. at 88:12-17 and Ex. 65.] At the end of the video, Roe declares, "Everything is spinning." [Doe Dep. at 89:5-8 and Ex. 65.] In contrast, Plaintiff is narrating the video. [Doe Dep. at 85:15-16 and Ex. 65.]

At some point after that video, Plaintiff and Roe went to his bedroom, where they engaged in sexual activity. [Doe Dep. at 116:25-117:17, 118:14-119:4, 19:21-25, 123:9-15, 132:3-9.] According to Plaintiff, he had a lucid memory of the events: he initiated oral sex with her, and then he lay down on his bed to receive oral sex from her. [*Id.* at 119:21-25, 121:14-25.] Plaintiff had intercourse with Roe in three positions, including from behind and on top of her. [Doe Dep. at 123:9-14.] Roe never forced him into these positions. [*Id.* at 132:3-9.] During his deposition, Plaintiff admitted that, at the time, he intended and wanted to engage in these sexual acts, and that he gave verbal and physical consent. [*Id.* at 133:1-4, 133:10-16, 206:22-207:16.] The next morning, Plaintiff texted her, apologizing profusely for taking advantage of her the night before:



1/5 I cannot even tell you how I feel right now, you can say it's alright or whatever but it's really not. My heart is literally broken and I'm gonna have to

2/5 live with this forever. I feel so terrible and I don't expect you to forgive me but from the bottom of my heart I am truly sorry. And if you don't wanna

3/5 talk to me anymore I get it. That's what I deserve. I just want you to know that was not my intention last night. I just got caught up in the moment and

4/5 it happened and I regret it so much that was not me last night and that is not who I am. I would do anything to go back because you are an amazing girl

5/5 and like I said before I really do like you and think you have an amazing heart and are a great young woman.

[Doe Dep. at 144:3-13; Ex. 6 at ERAU_001733.] Roe responded that (1) he had taken advantage of her, despite his previous assurances to the contrary, and (2) he was relatively sober, whereas she "could barely walk" at the time he had sex with her:



[Ex. 6 at ERAU_001733.] Rather than disagreeing with Roe's characterization of the events—or suggesting that she had taken advantage of him—Plaintiff said he understood, apologized profusely, admitted he had "fucked up," and said he was "scared because [his] life could be over now":



[*Id.*] Roe responded that Plaintiff "just d[idn't] want [her] to report [him]" and she knew "exactly what [he was] saying." [*Id.*] Plaintiff responded that he "fe[lt] so bad" and "just [didn't] want [his] whole life to be over for one stupid drunk mistake." [*Id.*]

Plaintiff then deleted the text messages in which he apologized and all other text messages with Roe that occurred before 12:47 pm on October 27th, including the pre-party text messages where he promised not to take advantage of her. [Doe Dep. at 151:6-23, 154:25:155:25, 158:5-8; *see also* Plaintiff's post-12:47 pm text messages attached as Ex. 67 to Doe Dep.] According to a statement that Witness 5 provided to ERAU during its

later investigation, Plaintiff told him he was "nervous" that his October 27 text messages with Roe "made him look 'in a guilty way.'" [Final Investigative Report ("Report"), attached to Doe Dep. as Ex. 66, and attached hereto as **Ex. 7,** at ERAU_003920.]

**D.    The underlying Title IX proceeding at ERAU.**

The next day, on October 28, 2019, Roe reported the incident and gave an intake interview with Dammer. [Dammer Decl. ¶ 5.] On November 13, 2019, Dammer conducted an intake interview with Plaintiff and his attorney, Brian Lambert. [Dammer Decl. ¶ 7; Doe Dep. at 94:3-6.] During this interview, Plaintiff lied about not having text messages with Roe, SnapChats, or cell phone photos or videos from the party, claiming he had gotten a new phone and would have to check his old phone. [Doe Depo. at 94:3-95:1.]

Because of the serious nature of the allegations, Dammer had concerns about the safety of the school community, as well as separating Plaintiff and Roe. [Dammer Decl. ¶ 11.] Accordingly, ERAU placed Plaintiff on interim suspension from a sports team,[1] pending resolution of the report, pursuant to ERAU's Sexual Misconduct Policy and Resolution Process. [*Id.*; *see* Docs. 1-5 at 19; 1-6 at 9-10.] Plaintiff did not comply with that interim measure, though, because he continued to visit the sports facilities.  [Dammer Decl. ¶ 12; Dammer Depo., attached hereto as **Ex. 8**, at 85:7-13.]

---

[1] The Title IX Coordinator may place interim measures on the respondent "to address the short-term effects of the alleged . . . sexual misconduct. . . ." [Doc. 1-6 at 9.] Interim measures may include suspension or restricting participation in ERAU-sponsored activities. [Doc. 1-5 at 19.] These measures are taken, "pending the completion of an investigation and resolution, particularly, when in the judgment of the Title IX Coordinator, the safety or well-being of any member(s) of the campus community, may be jeopardized by the presence of the Responding Party on-campus. . . ." [Doc. 1-6 at 9; *see also* Doc. 1-5 at 19, § VII.] "Violation of interim measures . . . may be grounds for additional sanctions," including "suspension or dismissal." [Doc. 1-6 at 9.] "A suspension will only be lifted when compliance is achieved to the satisfaction of the University Official issuing the suspension in conjunction with the Title IX Coordinator." [Doc. 1-5 at 20.]

On December 11, 2019, Plaintiff and Roe attempted informal resolution[2] with ERAU's Chaplain, Reverend Keck, but it was not successful. [Dammer Decl. ¶ 14.] On January 6, 2019, Roe asked Dammer to move forward with a formal investigation. [*Id.* ¶ 15.] Based on the parties' intake statements and other documentary evidence Roe had provided her, including the text message exchange, Dammer found reasonable cause to proceed with a formal investigation of Roe's complaint against Plaintiff. [*Id.* ¶ 16.] Dammer arranged for Autumn Meyers-Parker to conduct a formal investigation on behalf of ERAU. [*Id.* ¶ 17.] On January 8, 2020, ERAU notified Plaintiff it had commenced a formal investigation into Roe's complaint against him. [*Id.* ¶ 18.]

Two days later, Plaintiff filed a report against Roe, alleging he felt "like he was too intoxicated to consent to the sexual acts of" Roe. [Doc. 1-1; Doe Dep. at 182:5-183:13.] Nobody told Plaintiff he was prohibited from filing it. [Doe Dep. at 190:10-16.]

During conversations with two coaches, Plaintiff separately told them the sex with Roe was consensual; *i.e.*, he was able to consent to the sex. [Rosolino Decl. ¶ 3, attached hereto as **Ex. 9**; Ellington Decl. ¶ 4, attached hereto as **Ex. 10**; *see also* Doe Dep. at 168:15-170:6.] In a statement Plaintiff provided to Meyers-Parker on February 17, 2020, Plaintiff said, "The fact of the matter is what happened that night in October was one I regret very much, but it was one that was consensual between two people." [Doe Dep. at 204:24-207:1 and Ex. 82; *see also* Report at ERAU_003950.] During his deposition, Plaintiff also confirmed that he consented to sex with Roe through his words and actions.

---

[2] The Resolution Process allows parties to resolve a report of sexual misconduct through an informal process facilitated by the Title IX Coordinator or other designee. [Doc. 1-6 at 6.] At any time, a reporting party may terminate the informal resolution process and instead pursue resolution under ERAU's formal process. [*Id.* at 7.]

[Doe Dep. at 206:22-207:9.] Regardless, on or about January 14, 2020, ERAU sent Plaintiff a letter confirming receipt of his report. [Doe Dep. at 193:13-22 and Ex. 76.] Meyers-Parker discussed Plaintiff's report with him in a subsequent meeting. [Doe Dep. at 193:23-194:6.] According to Frost, the admission in Plaintiff's impact statement that the sex was consensual, by itself, constituted "reasonable cause" to believe that Roe did not engage in sexual activity with Plaintiff without his consent or his ability to consent. [Frost Decl. ¶¶ 26-27; *see also* Dammer Decl. ¶ 34.]

> **i.    ERAU conducts a full and impartial investigation of the Incident.**

ERAU combined both parties' reports into one incident report and formally investigated them as a single incident. [Dammer Decl. ¶ 22; Doe Dep. at 194:10-195:5; Report at ERAU_003898 n.8 and ERAU_003909 n.9; Dammer Dep. at 55:1-6, 57:1-5, 90:10-91:9; Meyers-Parker Dep., attached hereto as **Ex. 11**, at 177:4-16, 183:12-184:7, 222:7-18.] Meyers-Parker conducted the investigation on behalf of ERAU, without any role by Dammer. [Dammer Decl. ¶ 23; Meyers-Parker Decl. ¶ 6.] Meyers-Parker interviewed the parties and all witnesses Plaintiff identified. [Meyers-Parker Decl. ¶¶ 7-9; Doe Dep. at 197:9-198:4, 201:21-23.] Plaintiff had the opportunity to review and comment on the other evidence Meyers-Parker gathered, including the text message evidence that Roe provided, statements by Roe and Witnesses 1-5, and the investigative report itself. [Doe Dep. at 198:5-20, 200:5-10-201:3, 202:16-21.] When Meyers-Parker asked him about his text message apologies, he said "he knew in his heart that they both had sex together." [Doe Dep. at 208:8-15; Report at ERAU_003903, ERAU_003907.]

On multiple occasions, Meyers-Parker asked Plaintiff to provide any photos or videos from the night of the party, but Plaintiff again denied having any such evidence, falsely claiming he would have to check his old phone for the text messages and denying

that he took any photos or videos at the party. [Doe Dep. at 95:2-96:23, 96:3-100:6;
Meyers-Parker Decl. ¶ 10; Report at ERAU_003897 n.6 and ERAU_003908 n.16.] During
his deposition, Plaintiff acknowledged that he thought his and Roe's level of intoxication
was relevant to ERAU's investigation and that he believed the video depicting Roe was
relevant. [Doe Dep. at 104:18-105:21.] At no point in the investigation did Plaintiff provide
any text messages, photos, videos, or other evidence from his cell phone. [Doe Dep. at
96:17-100:6; Report at ERAU_003897 n.6 and ERAU_003908 n.16.] During his
deposition, Plaintiff acknowledged that he did not cooperate with ERAU's investigation
when he lied about having the cell phone evidence and refused to provide it, as required
under ERAU's Resolution Process. [Doe Dep. at 219:9-221:1; Doc. 1-6 at 15.]

      **ii.**    **After Meyers-Parker completes her investigative report, Dammer independently finds Plaintiff responsible for engaging in non-consensual sexual intercourse with Roe and expels him.**

On or about March 24, 2020, Dammer issued an outcome letter finding Plaintiff
responsible for engaging in non-consensual sexual intercourse with Roe. [Doc. 1-2; Doe
Dep. at 209:3-16.] The rationale in her outcome letter was not exhaustive. [Dammer Decl.
¶ 39.] Her rationale focused heavily on the text message evidence that Roe provided to
ERAU [Doc 1-2 at 1-2; *see also* Doe Dep. at 209:17-4], and she found Plaintiff's
explanation for not providing that evidence to be not credible. [Doc. 1-2 at 3.]

      **iii.**   **After Frost grants Plaintiff's request for reconsideration, Langston conducts the reconsideration on behalf of ERAU, and independently finds Plaintiff responsible.**

After receiving the outcome letter, Plaintiff submitted a request for reconsideration
of Dammer's decision.[3] [Doe Dep. at 214:22-215:18 and Ex. 84.] After reviewing the

---

[3] Parties who contest the Title IX Coordinator's decision may appeal the decision through
a request for reconsideration. [Doc. 1-6 at 12.] "Reconsiderations are not intended to be

request, Frost (the Arizona official) found that Plaintiff had made a threshold showing that warranted reconsideration.[4] [Frost Decl. ¶ 15; Frost Dep., attached hereto as **Ex. 12**, at 48:24-49:10; Doc. 1-3; Doe Dep. at 222:25-223:11.] Frost did not determine that either Dammer or Meyers-Parker were biased. [Frost Decl. ¶ 15; Frost Dep. at 53:23-54:10, 60:2-17.] And nothing she reviewed raised concerns about potential *gender* bias. [Frost Decl. ¶ 16.] Frost then appointed Langston (also in Arizona) to conduct an independent reconsideration of the investigation and outcome. [*Id.* ¶ 17; Doe Dep. at 221:2-10.] Frost had no role in the reconsideration process. [Doe Dep. at 221:8-14; Frost Decl. ¶ 17.]

Langston conducted the reconsideration on behalf of ERAU. [Doe Dep. at 223:23-224:3.] On or about June 10, 2020, Langston issued an outcome letter upholding the finding of responsibility and the expulsion. [Doc. 1-4 at 3; Doe Dep. at 224:19-25.] The rationale in his outcome letter was not exhaustive. [Langston Decl. ¶ 30.] In particular, Langston relied heavily on the text message evidence in reaching his finding. [Doc. 1-4 at 2; Langston Decl. ¶ 23.]

### III.    MEMORANDUM OF LAW.

ERAU is entitled to summary judgment on Plaintiff's claims. His "selective enforcement" claim under Title IX fails because: (1) the undisputed evidence shows that

---

full re-investigations of the allegation (de novo)." [*Id.* at 13.] The Title IX Coordinator at the Arizona campus reviews reconsiderations from Daytona. [*Id.*; Frost Decl. ¶ 12.]

[4] There are only three permissible grounds for seeking reconsideration: (1) new information discovered; (2) evidence of potential bias; (3) a civil rights violation under the Sexual Misconduct Policy. [*Id.*] If the reviewing official determines that the requesting party has made a threshold showing, he/she will grant reconsideration. [*Id.* at 13; Frost Decl. ¶ 13.] The case may then be re-opened for further investigation and reconsideration. [Doc. 1-6 at 13.] If a requesting party makes a threshold showing of evidence of potential bias, ERAU assigns a new investigator "to conduct a review of the investigation." [*Id.* at 13; Frost Decl. ¶ 14.] The reviewing Title IX Coordinator or designee then makes a decision based on the reviewed investigation. [Doc. 1-6 at 13; Frost Decl. ¶ 14.]

ERAU did not treat Roe more favorably; and (2) even if it did, Roe is not a sufficiently similar comparator. His breach-of-contract claim fails because ERAU did not materially breach any provision of the Sexual Misconduct Policy or Resolution Process, and Plaintiff's material breach of those policies excused any alleged non-performance thereunder. His claims for equitable relief are also barred. Finally, his claim for attorney's fees fails along with his Title IX claim.[5]

## A.    Summary judgment standard.

Under Rule 56, a movant is entitled to summary judgment if it shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact only exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The movant "bears the initial responsibility" of identifying record evidence supporting its position. *Celotex Corp.*, 477 U.S. at 323. If the movant discharges this burden, the burden then shifts to the non-moving party to go beyond the pleadings and present specific record evidence showing the existence of genuine, material factual dispute. Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324-26. This evidence must consist of more than mere conclusory allegations or legal conclusions. *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

---

[5] Plaintiff also lacks constitutional standing to seek an injunction of his expulsion because his alleged future injuries are not causally related to any alleged discriminatory treatment forming the basis of his "selective enforcement" claim. This Court should therefore dismiss that claim for lack of subject-matter jurisdiction, pursuant to Rule 12(b)(1). ERAU has previously briefed this issue in its Motion to Dismiss [Doc. 56 at 22-24], still pending. For judicial economy, ERAU incorporates those arguments by reference herein.

**B.    Plaintiff cannot demonstrate a triable issue on selective enforcement.**

Plaintiff's "selective enforcement" claim fails because the undisputed evidence shows that ERAU did not treat Roe more favorably during the investigation, and he and Roe were not similarly situated. Title IX prohibits intentional sex discrimination by universities. 20 U.S.C. § 1681(a)[6]. Two circuits have recognized two doctrinal theories of liability arising out student disciplinary proceedings: (1) where a school selectively enforces its disciplinary policies on the basis of gender (a "selective enforcement" claim); and (2) where a school reaches an erroneous outcome in a student disciplinary proceeding as a result of intentional gender discrimination (an "erroneous outcome" claim). *See, e.g.*, *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994); *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018)[7]. Regardless of the theory, the Supreme Court has made clear that, under Title IX's implied right of action, relief is only available upon a showing of an intentional sex discrimination—whatever form it takes. *Gebser*, 524 U.S. at 287-90; *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992). Since Plaintiff has abandoned any erroneous outcome claim [Doc. 58 at 8], he pursues only a selective enforcement claim under Title IX.

"In a selective enforcement claim, the plaintiff essentially asserts that even if he or she did violate a university policy, the decision to initiate disciplinary proceedings or the severity of the penalty imposed was motivated by gender bias." *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 677 (M.D. Tenn. 2018). To prevail, "the plaintiff must show that a

---

[6] Though Title IX has no express remedial provision, the U.S. Supreme Court has recognized an implied private right of action when schools discriminate against students on the basis of sex. *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 76 (1992); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 716 (1979).

[7] Though neither the Supreme Court nor the Eleventh Circuit has adopted this doctrinal framework, *Doe v. Valencia Coll.*, 903 F.3d 1220, 1236 (11th Cir. 2018), this Court recently applied it in *Doe v. Rollins College*. No. 6:18-cv-1069-Orl-37LRH, 2020 WL 8409325, *6 (M.D. Fla. July 13, 2020) (Dalton, J.).

similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." *Id*. Under his "selective enforcement" claim, Plaintiff does not question ERAU's decision to initiate disciplinary proceedings against him; rather, he simply cries foul that ERAU also should have taken action against Roe. (Doc. 1 at 57.a.) This claim fails because ERAU did not treat Roe more favorably in its investigation, and Roe isnot a sufficiently similar comparator.

### a.    ERAU did not treat Roe more favorably during the investigation.

Despite Plaintiff's argument, the undisputed evidence is that ERAU fully investigated Plaintiff's report against Roe. ERAU combined both parties' reports into one report and investigated them as a single incident. [Dammer Decl. ¶ 22; Frost Decl. ¶ 9; Doe Dep. at 194:10-195:5; Report at ERAU_003898 n.8 and ERAU_003909 n.9; Dammer Dep. at 55:1-6, 57:1-5, 90:10-91:9; Meyers-Parker Dep. at 177:4-16, 183:12-184:7, 222:7-18.] ERAU interviewed both parties and all witnesses they identified during the investigation, and it gave them an opportunity to review and comment on their and others' statements. [Meyers-Parker Decl. ¶¶ 7-9; Doe Dep. at 197:9-198:4, 201:21-23, 198:5-20, 200:5-10-201:3, 202:16-21.] In particular, Meyers-Parker questioned witnesses extensively about both parties' alcohol consumption and their level of intoxication. [*See* Report at ERAU_003910-ERAU_003920.] Given that Plaintiff's voluntary intoxication would not be a defense to Roe's complaint against him [*see* Doc. 1-5 at 6], the purpose of gathering such evidence was to explore Plaintiff's claim against her.

ERAU also asked both parties to provide cell phone evidence which would have been highly relevant to the issue of their intoxication and capacity to consent. Roe provided the only cell phone evidence she had: text messages before and after the party. [Dammer Decl. ¶ 6; Ex. 6.] But rather than producing evidence from his cell phone,

Plaintiff repeatedly lied about having any, frustrating ERAU's attempts to gather the evidence. [Doe Dep. at 95:2-96:23, 96:3-100:6; Meyers-Parker Decl. ¶¶ 10, 14-20; Report at ERAU_003897 n.6 and ERAU_003908 n.16.] Nevertheless, during the investigation, ERAU treated both parties equitably by exhausting all available means to uncover the revealing cell phone evidence.

        **b.**    **Plaintiff and Roe were not similarly situated.**

Even if Plaintiff contends that ERAU treated Roe more favorably, his claim still fails because he and Roe were not similarly situated. The Eleventh Circuit has held that, in intentional discrimination cases, for a person to be valid a valid comparator, she must be similarly situated to the plaintiff ***in all material respects*** yet treated more favorably under the same circumstances. *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1218, 1227-28 (11th Cir. 2019); *Hester v. Univ. of Ala. Birmingham Hosp.*, 798 F. App'x 453, 457 (11th Cir. 2020). This standard applies in Title IX "selective enforcement" cases. *Rollins v. Bd. of Trustees of Univ. of Ala.*, 885 F. Supp. 2d 1239 (S.D. Ala. 2012).

Courts recognize that, for purposes of a selective enforcement claim, a complainant is not a valid comparator simply because she was a party to the sexual activity at issue in the plaintiff's disciplinary proceeding. *See, e.g.*, *Plummer v. Univ. of Houston*, 860 F.3d 767, 778 (5th Cir. 2017); *Salau v. Denton*, 139 F.Supp.3d 989, 999 (W.D. Mo. 2015); *Doe v. Case W. Reserve Univ.*, No. 1:14CV2044, 2015 WL 5522001, *6 (N.D. Ohio Sept. 16, 2015). For instance, in *Plummer v. University of Houston*, the university expelled a male plaintiff (McConnell) after determining he had sex with a female student who was too intoxicated to consent, even though both were found drunk and passed out with no memory of what happened. 860 F.3d at 770-71. McConnell claimed the university violated Title IX by taking disciplinary action against him but not the female

student, arguing they "were *in pari delicto*, in that both had passed out and each engaged in sexual conduct with another extremely intoxicated individual." *Id.* at 778. The Fifth Circuit rejected this theory in part based on photographic evidence that showed McConnell touching the complainant's private areas while she was unresponsive. *Id.* The court reasoned that, because the expulsion was based on what McConnell did, there was "no sound basis for an inference of gender bias." *Id.*

And at the summary judgment stage, the mere fact that a male plaintiff also filed a counter-complaint against his female accuser does not support an inference of gender-biased motivation. *Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 74 (1st Cir. 2019). In *Haidak v. University of Massachusetts-Amherst*, an expelled male student asserted a selective enforcement claim against the school based on "the fact that the university filed charges against him when [the female comparator] accused him of misconduct, yet filed no charges against her when he accused her of misconduct." *Id.* In rejecting that theory, the First Circuit reasoned that they were not "similarly situated as complainants," based largely on the fact that the plaintiff's complaint "came second in time and arose only defensively." *Id.* Even if "the university had an unwritten, race-to-the-dean's office policy," that was "not enough to support an inference of" sex discrimination. *Id.* At most, that fact showed that the school pursued the female comparator's claim instead of his because her allegation came first—"not because [the plaintiff's] sex influenced the university." *Id.*

Plaintiff's "selective enforcement" theory cannot survive summary judgment because Roe is not sufficiently similar to Plaintiff ***in all material respects***. *See Lewis*, 918 F.3d at 1227-28. First, Plaintiff was not incapacitated, as Roe was. Second, unlike Plaintiff, Roe had not admitted to non-consensual sexual intercourse as Plaintiff did with several lengthy

text messages apologizing profusely and expressing remorse for taking advantage of Roe while she was incapacitated. [Ex. 6 at ERAU_001733.] Doe admitted he was terrified that she would report him and that his "life could be over." [*Id.*] He saw the writing on the wall, and, at no point did he accuse Roe of any misconduct or claim that he too "could barely walk." [*See generally* Ex. 6.]

Third, unlike Roe, Plaintiff made numerous admissions showing that his January 10 report had no merit. On January 29, when Meyers-Parker asked him to explain the text messages, Plaintiff told her "he knew in his heart that they both [he and Roe] had sex together"—completely contradicting his report only twelve days prior that he felt "like he was too intoxicated to consent to the sexual acts of" Roe. [Doe Dep. at 208:8-15; *compare* Doc. 1-1 *with* Report at ERAU_003907.] And barely a month after filing his report against Roe, Plaintiff again admitted in his impact statement that, from his standpoint, the sex was consensual, consistent with his admissions to others. [Doe Dep. at 204:24-207:1 and Ex. 82; Report at ERAU_003950; *see also* Rosolino Decl. ¶ 3; Ellington Decl. ¶ 4.] Roe never made any such admissions.

Fourth, if Plaintiff's prior admissions during the investigation were not enough, Plaintiff has since confirmed facts showing that he consented to the sexual activity with Roe. Plaintiff's deposition testimony demonstrates that he actively, knowingly, and voluntarily engaged in sex with Roe. He recalls initiating oral sex with her, and then he laying down to receive oral sex from her. [Doe Dep. at 119:21-25, 121:14-25.] He recalls having intercourse with Roe in three positions, including from behind and on top of her. [*Id.* at 123:9-14.] His active engagement in these sexual acts confirms what Plaintiff eventually admitted: that he consented through his words and actions. [Doe Dep. at 206:22-207:9.] His "mutually understandable affirmative words or behavior" constituted

"consent" under ERAU's Sexual Misconduct Policy. [*See* Doc. 1-5 at 6.]

Fifth, during discovery, Plaintiff, after being compelled, produced a cell phone video depicting Roe in a severely intoxicated state after the party, just before they had sex. [Doe Dep. at Ex. 65.] This video confirms exactly what Roe said in the text messages on October 27: that she "could barely walk" and that Plaintiff was "more sober" and "knew what [he was] doing." [Ex. 6 at ERAU_001733.] This video supports ERAU's decision to take disciplinary action against Plaintiff but not Roe. And as Plaintiff himself acknowledges, Title IX did not require ERAU either to find Roe responsible or to impose the same sanction Plaintiff received. [*See* Doc. 86 at 10 n.9.]

Sixth, Plaintiff and Roe were not similarly situated with respect to the interim suspension. A student's failure to abide by interim measures may result in further sanctions, including suspension. [*See* Docs. 1-6 at 9; 1-5 at 20.] Given the seriousness and recency of Roe's allegations, ERAU placed Plaintiff on an interim track suspension; in contrast, Plaintiff waited more than ten weeks to file his claim against Roe—only after informal resolution of Roe's claim was unsuccessful. During that period, Roe had done nothing to suggest she posed a safety risk, and Plaintiff had repeatedly violated his interim suspension by continuing to hang out at the sport facilities. [Dammer Dep. at 85:7-13.] Hence, for purposes of the interim sports suspension, Plaintiff and Roe were not similarly situated, based on the passage of time and Plaintiff's non-compliance.

Ultimately, in arguing that he and Roe were similarly situated, Plaintiff ignores the undisputed facts. Plaintiff admitted to sexual misconduct; Roe did not. Plaintiff repeatedly admitted the sex was consensual; Roe did not. Newly discovered cell phone evidence confirms that Roe was far more intoxicated than Plaintiff. Plaintiff waited ten weeks to file his report against Roe, and he never complied with the terms of his interim suspension.

Because Plaintiff and Roe were not similarly situated in all these material aspects, his selective enforcement claim cannot succeed on the merits.

**C.    Plaintiff's breach-of-contract claim fails.**

Plaintiff's contract claim fails because the undisputed facts show that ERAU did not breach any terms of the Resolution Process or Sexual Misconduct Policy, and Plaintiff's material breach of the Resolution Process excused any performance by ERAU. To establish a breach-of-contract claim, a plaintiff must prove three essential elements: (1) the existence of a valid contract; (2) a material breach; and (3) damages resulting from the breach. *Sirpal v. Univ. of Miami*, No. 09-226622-CIV, 2011 WL 3101791, *14 (S.D. Fla. July 25, 2011); *Gaines v. Robinson Aviation (RVA), Inc.*, No. 6:14-CV-391-ORL-40, 2014 WL 6882934, at *3 (M.D. Fla. Dec. 4, 2014). "It is a basic tenet of contract law that a party can only advance a claim of breach of contract by identifying and presenting the actual terms of the contract allegedly breached." *Herssein Law Grp. v. Reed Elsevier, Inc.*, 594 F. App'x 606, 608 (11th Cir. 2015).

"Under Florida law, '[t]here is an implied contract between a student and a private university that if the student fully complies with the rules and regulations of the institution, then the university will confer to him a degree.'" *Villard v. Capella Univ.*, No. 6:17-cv-1429-Orl-41GJK, 2017 WL 9253388, at *2 (M.D. Fla. Dec. 21, 2017). "The terms of this relationship are generally set forth in the university catalogs, student manuals, student handbooks, and other university policies and procedures." *Id.* Private universities, however, have "broad discretion in what rules and regulations [they] shall issue and how [they] enforce [their] rules." *Sirpal*, 2011 WL 3101791 at *14; *McCawley v. Universidad Carlos Albizu, Inc.*, 461 F. Supp. 2d 1251, 1257 (S.D. Fla. 2006). To prevail, a student must show that school breached a

specific rule or procedure. *Villard*, 2017 WL 9253388, at *2[8]. Hence, the proper inquiry "is

whether [it] adhered to its misconduct procedure." *Belmont*, 334 F. Supp. 3d at 891; *Pierre*

*v. Univ. of Dayton*, 143 F. Supp. 3d 703, 713 (S.D. Ohio 2015).

      **i.**      **There is no evidence that ERAU breached any policy or procedure.**

Plaintiff's contract claim fails because there is no evidence that ERAU materially

breached any terms of the policies forming the basis of the alleged contract. Because ERAU

is a private university, the only relevant inquiry is whether ERAU materially complied with

the express terms of its Resolution Process and Sexual Misconduct Policy. *See Belmont*,

334 F. Supp. 3d at 891. Under those policies, ERAU had jurisdiction to discipline Plaintiff for

his sexual misconduct, and it provided him a fundamentally fair disciplinary process.

      **a.**      **Plaintiff's sexual misconduct met ERAU's Title IX jurisdiction.**

There is no merit to Plaintiff's pseudo-jurisdictional argument that ERAU could not

discipline him because he sexually assaulted Roe at an off-campus—rather than on-

campus—residence. [*See* Docs. 1 ¶ 86; 85 at 14 and n.14.] The Sexual Misconduct Policy

states that ERAU "reserves the right to act on incidents occurring on-campus ***or off-***

***campus*** when the off-campus conduct could have an on-campus impact or impact on the

educational mission of the University." [Doc. 1-5 at 3, § I (emphasis added).] Based on

the trauma Roe described in her impact statement [*see* Report at ERAU_003948-

ERAU_003949], Plaintiff's rape of Roe "could have" an on-campus impact, bringing it

---

[8] Moreover, between private universities and students, there are no implied contractual provisions arising out of the U.S. Constitution, because private universities are not state actors subject to constitutional limitations. *See, e.g.*, *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1014 (9th Cir. 2020); *Logan v. Bennington Coll. Corp.*, 72 F.3d 1017, 1027-28 (2d Cir. 1995); *Faparusi v. Case W. Reserve Univ.*, 711 F. App'x 269, 275-76 (6th Cir. 2017). The Ninth Circuit recently confirmed that no court had recognized such a claim. *Heineke*, 965 F.3d at 1014 n.4 (collecting cases).

within the Title IX office's jurisdiction. The plain language of the Sexual Misconduct Policy
and Resolution Process permitted ERAU's investigation and Plaintiff's discipline.

### b.    ERAU provided a fundamentally fair process.

Though Plaintiff gripes generally that his disciplinary proceeding was not fair, his
subjective notions of fairness are not implied terms of his contract with ERAU. Nor are any
constitutional safeguards or what he considers "traditional due process-type protections."
[*See* Doc. 85 at 3 n.4.]. As a private university, ERAU was free to design its disciplinary
process however it wanted, free from constitutional judicial review. And Plaintiff was free to
accept or reject those terms. ERAU's Resolution Process did not guarantee him a right to
question witnesses, remain silent, or have his attorney question witnesses or actively
advocate for him. [*See generally* Doc. 1-6.] By enrolling at ERAU and paying tuition, he
agreed to accept these terms—and abide by them. Accordingly, Plaintiff cannot demonstrate
a jury question as to whether ERAU materially breached any provision of the Sexual
Misconduct Policy or Resolution Process.

### ii.    Plaintiff's material breach of the Resolution Process excused any alleged non-performance.

Plaintiff materially breached the Resolution Process by willfully and dishonestly
refusing to produce relevant cell phone evidence during the investigation, excusing ERAU
from its performance obligations. "[U]nder Florida contract law a material breach of a
contract excuses the non-breaching party from his obligation to perform under the
contract." *Acquisition Corp. v. FDIC*, 760 F. Supp. 1558, 1560 (S.D. Fla. 1991).

When Plaintiff dishonestly refused to cooperate in the investigation, he materially
breached the Resolution Process. [Doc. 1-6 at 15.] Plaintiff admitted that when he refused
to turn over the cell phone evidence, he did not cooperate. [Doe Dep. at 219:9-221:1.] He

acknowledged that he thought his and Roe's level of intoxication and the video of Roe were relevant to the investigation. [Doe Dep. at 104:18-105:21.] He knowingly and dishonestly withheld the most critical, relevant, and probative piece of evidence—in direct violation of his obligations under the Resolution Process. [Dammer Decl. ¶¶ 40-45; Meyers-Parker Decl. ¶¶ 10, 14-20; Frost Decl. ¶¶ 19-25; Langston Decl. ¶¶ 31-39.]  He cannot breach his obligation to cooperate with the investigation and later file suit complaining that ERAU did not conduct a proper investigation.

**D.    Plaintiff's unclean hands foreclose any equitable relief.**

The Eleventh Circuit recognizes the "well-worn maxim" that "[h]e who comes into equity must come with clean hands." *Bailey v. TitleMax of Ga., Inc.*, 776 F.3d 797, 801 (11th Cir. 2015). Equitable relief is unavailable to "one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precisions Instrument Mfg. Co. v. Auto. Maintenance Machinery Co.*, 324 U.S. 806, 814 (1945). "To assert an unclean hands defense, a defendant must show that (1) the plaintiff's wrongdoing is directly related to the claim, and (2) the defendant was personally injured by the wrongdoing." *Bailey*, 776 F.3d at 801. The defense applies with full force to federal claims for equitable remedies under federal civil right statutes, such as Title IX. *Cf. McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 361-62 (1995) (ADEA). At the summary judgment stage, a court may decide as a matter of law that the plaintiff's equitable claims are barred by his unclean hands. *Id.* at 355-56.

In *McKennon*, the U.S. Supreme Court held that a plaintiff was barred from seeking reinstatement or front pay under the ADEA, based on evidence of his unclean hands only acquired *ex post facto* during the course of discovery in the litigation. *Id.* at 361-62. There, the defendant-employer unlawfully terminated the plaintiff-employee based on age-

discrimination. *Id.* at 355. During the plaintiff's deposition, however, the employer learned that, before her termination, the plaintiff had improperly removed and copied some of the employer's confidential financial documents—a fireable offense. *Id.* The defendant took the position that had it known of this misconduct before her termination, "it would have discharged her at once for that reason." *Id.* Under these facts, the district court granted summary judgment to the defendant, reasoning that, notwithstanding the defendant's unlawful discrimination, the plaintiff's unclean hands barred any equitable relief. *Id.* at 355-56. On appeal, the Supreme Court affirmed, reasoning that "[i]t would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event and upon lawful grounds." *Id.* at 361-62.

The same reasoning applies here. The after-acquired evidence of Plaintiff's guilt is overwhelming. During the investigation, he lied to ERAU about having critical evidence demonstrating Roe's incapacitation and his relative sobriety. This evidence shows that he had the wherewithal to document the party with photos, captioned videos, and his own oral commentary. [Dammer Decl. ¶¶ 40-45; Meyers-Parker Decl. ¶¶ 10, 14-20; Frost Decl. ¶¶ 19-25; Langston Decl. ¶¶ 34-36.] He documented Roe's severe intoxication, just before he took her to his room and had sex with her. [Doe Dep. at Ex. 65.] And the day after the party, he deleted several text messages because he correctly recognized that they made him look guilty. [*See* Report at ERAU_003920.] On at least four occasions, he lied about having this cell phone evidence[9]. [Doe Dep. at 95:2-96:23, 96:3-100:6; Meyers-Parker Decl. ¶10; Report at ERAU_003897 n.6 and ERAU_003908 n.16.]

Plaintiff's hands are tainted. He engaged in sexual misconduct, filed a false

---

[9] Even during discovery in this case, Plaintiff continued to fight producing this evidence to ERAU. [Doc. 75.] It ultimately took a court order to force his hand. [Doc. 77.]

complaint against his accuser, and dishonestly withheld the evidence most relevant to his and Roe's allegations. This Court should not indulge his claim that the process was not fair, and it should slam the doors of equity in his face.[10] It would be "both inequitable and pointless" to enjoin Plaintiff's expulsion, thereby forcing ERAU to re-adjudicate his case with a set of facts even more unfavorable to Plaintiff. *See id.* at 361-62.

**E.    Plaintiff's claim for litigation expenses and attorney's fees fails.**

Under the "American Rule," each litigant must pay his own litigation expenses and attorney's fees, "win or lose, unless a statute or contract provides otherwise." *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126 (2015). Under 42 U.S.C. § 1988(b), a prevailing Title IX plaintiff may seek a reasonable attorney's fees. *Farrar v. Hobby*, 506 U.S. 103, 109 (1992). To qualify as a prevailing party, the plaintiff "must obtain at least some relief on the merits of the claim." *Id.* at 111. Here, Plaintiff only seeks attorney's fees under § 1988. [Doc. 1 ¶ 60.] Since Plaintiff's Title IX claim fails, his claim for attorney's fees also fails. *See Farrar*, 506 U.S. at 111.

**IV.    CONCLUSION.**

For the foregoing reasons, ERAU respectfully requests that this Court GRANT its Motion for Summary Judgment.

---

[10] As a corollary, Plaintiff's unclean hands also bar him from seeking specific performance of his alleged contract with ERAU. Under Florida law, before any court of equity may grant specific performance of a contract, it must "consider whether this remedy, based on the facts of the case, would achieve an unfair or unjust result." *Rybovich Boat Works, Inc. v. Atkins*, 585 So.2d 270, 272 (Fla. 1991). If so, specific performance is not available. *Id.* Here, Plaintiff's unclean hands foreclose any claim for specific performance under Florida law. It would be inequitable and unjust for this Court to order some kind of specific performance when Plaintiff dishonestly withheld from ERAU the most relevant evidence.

This 6th day of April, 2021.

/s/ *Shaina Stahl*_____
Shaina Stahl (Florida Bar No. 77643)
(TRIAL COUNSEL)

NELSON MULLINS BROAD & CASSEL
390 N. Orange Avenue, Suite 1400
Orlando, FL 32801
(407) 839-4200
shaina.stahl@nelsonmullins.com

Daniel A. Cohen
*pro hac vice*
Jeffrey R. Daniel
*pro hac vice*
Nelson Mullins Riley & Scarborough LLP
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000
dan.cohen@nelsonmullins.com
jeff.daniel@nelsonmullins.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on April 6, 2021, the foregoing document was filed using the Court's CM/ECF system, which will send a notice of electronic filing to the parties of record in this case.

/s/ Shaina Stahl