UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JOHN DOE,

        Plaintiff,

                              CASE NO. 6:20-cv-01220-WWB-LRH

vs.

EMBRY-RIDDLE AERONAUTICAL
UNIVERSITY, INC.,

        Defendant.

_____/

## DECLARATION OF LINDA DAMMER

I, Linda Dammer, hereby state, under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the factual statements contained herein are made of my personal knowledge and are true and correct.

1.     My name is Linda Dammer. I have personal knowledge of the facts set forth in this Declaration and know them to be true and correct. I am over the age of eighteen and am competent to execute this Declaration.

2.     I give this Declaration for use in the above-styled civil action.

3.     Since 2017, I have served as the Title IX Coordinator at Embry-Riddle Aeronautical University, Inc.'s ("ERAU") campus at Daytona Beach, Florida.

4.     As a Title IX Coordinator, I am personally familiar with ERAU's Civil Rights Equity & Sex/Gender-Based Harassment, Discrimination, & Sexual Misconduct Policy for the 2019-2020 school year (the "Sexual Misconduct Policy"), a true and accurate copy of which is attached to Plaintiff's Complaint as Exhibit 5 (Doc. 1-5). I am also personally familiar with

ERAU's Civil Rights Equity & Sex/Gender-Based Harassment, Discrimination, & Sexual Misconduct Resolution Process for the 2019-2020 school year (the "Resolution Process"), a true and accurate copy of which is attached to Plaintiff's Complaint as Exhibit 6 (Doc. 1-6).

5.      On or about October 28, 2019, the Title IX office received a report from a female ERAU student, Jane Roe, that Plaintiff John Doe had sexually assaulted her during a Halloween party on the night of October 26, 2019. I conducted an intake interview with her to gather facts and information about the alleged incident. Afterward, I began attempting to schedule an intake interview with Plaintiff.

6.      In a subsequent meeting on November 7, 2019, Roe submitted copies of text messages she exchanged with Plaintiff on approximately October 26-27, 2019 (the day before and after the Halloween party).

7.      On or about November 13, 2019, I was able to conduct an intake interview with Plaintiff. His attorney, Brian Lambert, was present during the interview.

8.      During that interview, Plaintiff said he was drunk, but he did not say or otherwise indicate he lacked capacity to consent to sex by virtue of his intoxication. He never said that he was "incapacitated." On the contrary, he was able to recall numerous details about the night and the incident.

9.      I do recall that Plaintiff asked me a question to the effect of, "what's to say I shouldn't file my own claim against her?" When he asked this question, his tone was flippant and indignant, as if the prospect of filing his own report was merely an intellectual exercise.  In response to that question, I told him, "you could do that, but it could be perceived as retaliatory." I did so based because he had not provided me any information indicating that he felt like he was

a victim of sexual misconduct. My purpose was only to advise him that, if he was going to file a report, it had to be in good faith. I never told him that it "would" be considered retaliatory. Nor did I tell him he was prohibited from filing his own report or otherwise discourage him from doing so.

10.     During that intake interview, I also asked Plaintiff to provide the Title IX office with any text messages or cell phone videos he had from the night of the party. In response, he told me he had gotten a new phone and would have to look at his old phone. I was skeptical of that explanation, especially since I had already reviewed the text messages that Roe had provided. In any event, Plaintiff never provided me with any text messages, photos, or videos from his cell phone.

11.     Because of the serious nature of the allegations, I had concerns about the safety of the school community, as well as separating Plaintiff and Roe. Accordingly, ERAU placed Plaintiff on interim suspension from the track team, pending resolution of Roe's report. This was a permissible interim measure under both Sexual Misconduct Policy and Resolution Process. (Doc. 1-5 at 19, § VII; Doc. 1-6 at 9-10.)

12.     While this case was proceeding, I received information indicating that Plaintiff had continued to visit the track facilities, despite his interim suspension. Noncompliance with an interim measure violates ERAU policy and can result in additional sanctions. (Docs. 1-5 at 20; 1-6 at 9.)

13.     Under ERAU's Resolution Process, parties may attempt to address a report of sexual misconduct through an informal resolution process. (Doc. 1-6 at 6-7.) Ordinarily, the Title

3

IX Coordinator or another ERAU designee will attend the meeting for safety concerns. (*Id.*) The

reporting party may terminate that informal process at any time. (*Id.* at 7.)

14.    On or about December 11, 2019, Plaintiff and Roe attempted informal resolution

with ERAU's Chaplain, Reverend Keck. It was not successful.

15.    On or about January 6, 2019, Roe asked me to move forward with a formal

investigation of her complaint against Plaintiff.

16.    At that point, I conducted a comprehensive review of the parties' intake statements,

as well as other supplemental materials and documentary evidence they provided me. Based on

the available information and evidence, including the text message correspondence Roe provided

me, I determined there was reasonable cause to proceed with a formal investigation of the

complaint, pursuant to Section III of the Resolution Process. (Doc. 1-6 at 7, § III.)

17.    I then arranged for Autumn Meyers-Parker, a Title IX investigator at the Daytona

campus, to conduct an independent and impartial formal investigation on behalf of ERAU.

18.    On or about January 8, 2020, ERAU provided Plaintiff with written notice that it

had commenced a formal investigation into Roe's allegations against him.

19.    Two days later, on January 10, 2020, Plaintiff filed an incident report against Roe,

claiming he "fe[lt] like he was too intoxicated to consent to the sexual acts" of Roe. A true and

accurate redacted copy of this complaint is attached to Plaintiff's Complaint as Exhibit 1 (Doc. 1-

1).

20.    At no point previously had Plaintiff told me he lacked capacity to consent to sexual

activity by virtue of his level of intoxication. Nor had he previously expressed a desire to file a

complaint against Roe. In fact, his new contention of diminished capacity was inconsistent with

4

his prior statements to me acknowledging his recollection of the events, as well as statements he made in text messages to Roe on October 27, 2019.

21.     Under the circumstances, I did have concerns that Plaintiff's counter-complaint might be retaliatory, but I never formed such a conclusion. ERAU never charged Plaintiff with retaliation under the Sexual Misconduct Policy.

22.     Accordingly, ERAU combined the parties' incident reports into a single incident report, and Meyers-Parker investigated them as a single incident. There was no need to open up a separate, duplicative formal investigation into Plaintiff's new complaint against Roe. This decision was a matter of efficiency, and neither party's sex or gender factored into it.

23.     Over approximately the next two months, Meyers-Parker conducted the formal investigation into the alleged incident between Plaintiff and Roe. Though Meyers-Parker updated me on her progress, I did not conduct the investigation alongside her. Nor did I give her any direction on any of her evidentiary analysis or credibility assessments.

24.     Throughout the course of the investigation, Plaintiff never provided the Title IX office with any text messages, photos, videos, or other cell phone evidence that ERAU requested.

25.     Meyers-Parker later provided me with a substantially completed draft of the investigative report, with her own analysis of the evidence and credibility assessments. I reviewed the investigative report thoroughly, including all the witness statements Meyers-Parker took and evidence included therein. Based on my assessment, the investigation appeared completed. Meyers-Parker had investigated all sources of evidence and interviewed all witnesses the parties requested.

26.     After considering the evidence gathered during Meyers-Parker's independent investigation, I found it was more likely than not that Plaintiff was responsible for engaging in non-consensual sexual intercourse with Roe.

27.     In particular, I considered Plaintiff's text message correspondence with Roe to be especially compelling evidence, tantamount to an admission that he engaged in the sexual misconduct in question.

28.     Though I reviewed Meyers-Parker's credibility assessments, I did not rely on them. Rather, I assessed the reliability of witnesses' statements based on the substance of the evidentiary record. For instance, I did not rely on any of Meyers-Parker's impressions that any witness appeared to have been "coached," and I did not make any such assumption or inference myself, regardless of whether they had spoken with Plaintiff's attorney.

29.     Though I reviewed Meyers-Parker's evidentiary analysis, I did not rely on it. Rather, I formed my own conclusions based on my own analysis of the evidence.

30.     I also gave little or no weight to some of the evidence she summarized in the report. For instance, I gave no weight to Meyers-Parker's calculated estimate of Roe's blood alcohol concentration ("BAC").

31.     I reviewed the available medical records relating to Roe's SANE examination, but only insofar as they confirmed Roe's statement that she sought medical treatment and testing following the incident. In other words, I did not conclude that the records had any bearing over whether the alleged sexual activity was consensual or whether Roe had capacity to consent.

32.    I also gave no consideration to statements Roe made about her communications with Plaintiff during the informal resolution process with Reverend Keck.[1]

33.    I also drew no inferences about Plaintiff's capacity to consent based on statements about his ability to achieve or maintain an erection or ejaculate. Though I reviewed articles on the subject, including an ATIXA whitepaper and an article Plaintiff's attorney submitted, they played no role in my findings and rationale.

34.    I found it revealing that, on multiple occasions during the investigation, Plaintiff had acknowledged that, at least from his standpoint, the incident of sexual activity between him and Roe was consensual. On or about January 29, 2020, during an interview with Meyers-Parker, in response to questions about his text messages with Roe, he said "he knew in his heart that they both had sex together." And in his impact statement he provided the following month, he said, "The fact of the matter is what happened on that night in October was one I regret very much, but it was one that was consensual between two people." These statements indicate that, at the time of the alleged incident, Plaintiff was not incapacitated, notwithstanding the allegations in the January 10 incident report that he "fe[lt] like he was too intoxicated to consent to the sexual acts" of Roe.

---

[1] I note, however, that it would not have been procedurally improper for me to have done so. During an informal resolution process, ERAU encourages parties to maintain the confidentiality of any communications during the process. During the course of an investigation, ERAU does not solicit any such information, either from the parties or the Title IX designee who facilitates the process. The process, however, is not a formal mediation subject to a confidentiality agreement. And ERAU has no means of compelling parties to maintain the confidentiality of those communications, or preventing their disclosure. In this case, Roe volunteered the information, without Meyers-Parker or any other ERAU official soliciting it. The Resolution Process does not prohibit a Title IX Coordinator from considering such evidence in the event of an unsolicited disclosure by one of the parties. Regardless, I did not do so in this case.

35.     Under ERAU's Sexual Misconduct Policy, Plaintiff's voluntary consumption of alcohol would "never function to excuse any behavior that violates th[e] policy." (Doc. 1-5 at 6.) In other words, voluntary intoxication is not a defense to sexual misconduct. Nevertheless, if respondents are incapacitated at the time they engage in sexual misconduct, there is a possibility I might take that into account when determining an appropriate sanction. In this case, however, Plaintiff's admissions, coupled with his ability to recall various details throughout the night, demonstrated that he had capacity, even if he was intoxicated.

36.     Based on available evidence and constellation of circumstances, I determined that, given the serious nature of the misconduct, expulsion was an appropriate sanction.

37.     I then prepared my written portions of the report, setting forth a non-exhaustive summary of my findings and rationale. Neither party's sex or gender factored into my findings or rationale with respect to Roe's complaint against Plaintiff.

38.     On or about March 16, 2020, Meyers-Parker and I finalized the investigative report.

39.     I also prepared an outcome letter setting forth a non-exhaustive summary of my findings and rationale. On or about May 24, 2020, ERAU provided Plaintiff with that outcome letter, a true and accurate redacted copy of which is attached to Plaintiff's Complaint as Exhibit B (Doc. 1-2).

40.     Since the filing of this lawsuit, I have learned that, while the Title IX case was pending, Plaintiff had the same cell phone that he had at the party. I have also learned that Plaintiff had text messages, photos, and videos from that phone that depict Roe and/or the party. I have since reviewed this cell phone evidence that Plaintiff withheld and lied about having during the course of the Title IX proceeding, as well as his deposition testimony about it.

41.     This evidence shows that, throughout the night in question, Plaintiff documented the party through photos and captioned videos that he posted to his SnapChat profile. He also took a video of Roe from later in the night, showing her in a severely intoxicated state; in contrast, he can be heard coherently and articulately narrating the video.

42.     I consider this evidence to be highly relevant, as it tends to show that Roe lacked capacity to consent to sexual intercourse at or around the time of the incident. In contrast, it tends to show that Plaintiff was lucid, coherent, and aware of his surroundings throughout the night—including at or around the time he engaged in sexual activity with Roe. In other words, the evidence strongly supports Roe's claim that she lacked capacity to consent to sex, but it severely undermines Plaintiff's claim that he also lacked capacity to consent.

43.     Had Plaintiff provided this requested evidence, it would have been the strongest available evidence of the parties' comparative levels of intoxication at or around the time of the underlying incident.

44.     The cell phone evidence could have aided Meyers-Parker's investigation, either through helping her identify other potential witnesses or by providing additional grounds upon which to question witnesses. In particular, the video of Roe appears to conflict with the statements of some witnesses who provided statements on behalf of Plaintiff, including especially Witness 3's statement that Roe "was carrying herself well," "was not slurring her words," and did not "appear to . . . ha[ve] been drinking." The video of Roe raises questions about whether Witness 3 was a reliable historian of the night's events.

45.     As the Title IX Coordinator overseeing this case, I find it deeply troubling that Plaintiff withheld this highly relevant cell phone evidence and repeatedly lied about its existence.

This willful deception severely undermined ERAU's investigative efforts. In my estimation, it also

severely undermines the reliability of other statements Plaintiff provided to ERAU.

So sworn this 2nd day of April 2021.

_Linda Dammer_
LINDA DAMMER