## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

JOHN DOE,

        Plaintiff,

                                  CASE NO. 6:20-cv-01220-WWB-LRH

vs.

EMBRY-RIDDLE AERONAUTICAL
UNIVERSITY, INC.,

        Defendant.

_____/

## DECLARATION OF ELIZABETH FROST

I, Elizabeth Frost, hereby state, under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the factual statements contained herein are made of my personal knowledge and are true and correct.

1.      My name is Elizabeth Frost. I have personal knowledge of the facts set forth in this Declaration and know them to be true and correct. I am over the age of eighteen and am competent to execute this Declaration.

2.      Since 2011, I have served as the Title IX Coordinator at Embry-Riddle Aeronautical University, Inc.'s ("ERAU") campus at Prescott, Arizona.

3.      As a Title IX Coordinator, I am personally familiar with ERAU's Civil Rights Equity & Sex/Gender-Based Harassment, Discrimination, & Sexual Misconduct Policy for the 2019-2020 school year (the "Sexual Misconduct Policy"), a true and accurate copy of which is attached to Plaintiff's Complaint as Exhibit 5 (Doc. 1-5). I am also personally familiar with ERAU's Civil Rights Equity & Sex/Gender-Based Harassment, Discrimination, & Sexual

Misconduct Resolution Process for the 2019-2020 school year (the "Resolution Process"), a true

and accurate copy of which is attached to Plaintiff's Complaint as Exhibit 6 (Doc. 1-6).

4.    On or about October 28, 2019, the Title IX office at ERAU's Daytona Beach,

Florida campus received a report from a female ERAU student, Jane Roe, that Plaintiff John Doe

had sexually assaulted her during a Halloween party on the night of October 26, 2019.

5.    In December 2019, the parties attempted to resolve that report through informal

resolution. The informal resolution was not successful.

6.    Thereafter, on or about January 6, 2020, Roe asked the Daytona Title IX office to

proceed with a formal investigation.

7.    On or about January 8, 2020, ERAU notified Plaintiff that it was proceeding with

the formal investigation.

8.    Two days later, on January 10, 2020, Plaintiff filed an incident report against Roe,

claiming he "fe[lt] like he was too intoxicated to consent to the sexual acts" of Roe. A true and

accurate redacted copy of this complaint is attached to Plaintiff's Complaint as Exhibit 1 (Doc. 1-

1).

9.    ERAU then combined the parties' incident reports into a single incident report, and

Meyers-Parker investigated them as a single incident. There was no need to open up a separate,

duplicative formal investigation into Plaintiff's new complaint against Roe. This decision

promoted efficiency.

10.    Autumn Meyers-Parker, a Title IX Investigator at the Daytona campus, conducted

the formal investigation of the incident on behalf of ERAU.

2

11.     On or about March 24, 2020, Linda Dammer, the Title IX Coordinator at the

Daytona campus, found Plaintiff responsible for engaging in non-consensual sexual intercourse

with Roe and expelled him.

12.     Thereafter, Plaintiff filed a request for reconsideration, which was forwarded to my

attention. (Doc. 1-6 at 12.) As the Title IX Coordinator at the Prescott campus, I review requests

for reconsideration from the Daytona campus. (*Id.*)

13.     There are only three permissible grounds for seeking reconsideration: (1) new

information discovered; (2) evidence of potential bias; (3) a civil rights violation under the Sexual

Misconduct Policy. (*Id.* at 12.) If the reviewing official determines that the requesting party has

made a threshold showing, they will grant reconsideration. (*Id.* at 13.) If reconsideration is granted,

the case may be re-opened for further investigation or reconsideration. (*Id.*)

14.     If a requesting party makes a threshold showing of evidence of potential bias,

ERAU assigns a new investigator "to conduct a review of the investigation." (*Id.*) The reviewing

Title IX Coordinator or designee will then make a decision based on the results of the revised

investigation. (*Id.*)

15.     After reviewing Plaintiff's request for reconsideration, I concluded that he had

made a threshold showing of presenting evidence of potential bias in the Daytona Title IX office's

handling of the case. Importantly, this was not a finding that the Daytona Title IX office had in

fact been biased. Rather, based on some of the evidence Plaintiff highlighted in his request, I had

concerns of potential bias that I thought warranted reconsideration.

16.     Accordingly, on or about April 16, 2020, I granted Plaintiff's request for

reconsideration. A true and accurate redacted copy of my letter granting the request is attached to

Plaintiff's Complaint as Exhibit C (Doc. 1-3). I granted his request for reconsideration because of concerns I had about perceived procedural deviations—not based on any concerns about gender bias. In fact, nothing I reviewed in the record or Plaintiff's request for reconsideration suggested to me that gender bias played a role in the Daytona Title IX office's handling and investigation of the case.

17.    I appointed Jason Langston, a staff member at the Prescott campus, to conduct the reconsideration on behalf of ERAU. I played no role in the reconsideration process.

18.    On or about June 10, 2020, after conducting the reconsideration, Langston found Plaintiff responsible for engaging in non-consensual sexual intercourse and upheld the sanction of expulsion. A true and accurate redacted copy of Langston's outcome letter is attached as Exhibit D to Plaintiff's Complaint (Doc. 1-4). I have no criticisms or concerns about Langston's reconsideration of the case.

19.    On multiple occasions while the case was pending in the Daytona Title IX office, either Dammer or Meyers-Parker asked Plaintiff to provide text messages and cell phone photos and videos from the party. On each occasion, Plaintiff either denied having any such cell phone evidence, or he claimed that he had gotten a new phone and would have to check his old phone. Plaintiff never provided the Title IX office with any text messages, photos, videos, or other cell phone evidence that ERAU requested.

20.    Since the filing of this lawsuit, I have learned that, while the Title IX case was pending, Plaintiff had the same cell phone that he had at the party. I have also learned that Plaintiff had text messages, photos, and videos from that phone that depict Roe and/or the party. I have

since reviewed this cell phone evidence that Plaintiff withheld and lied about having during the course of the Title IX proceeding, as well as his deposition testimony about it.

21.     This evidence shows that, throughout the night in question, Plaintiff documented the party through photos and captioned videos that he posted to his SnapChat profile. He also took a video of Roe from later in the night, showing her in a severely intoxicated state; in contrast, he can be heard coherently and articulately narrating the video.

22.     I consider this evidence to be highly relevant, as it tends to show that Roe lacked capacity to consent to sexual intercourse at or around the time of the incident. In contrast, it tends to show that Plaintiff was lucid, coherent, and aware of his surroundings throughout the night—including at or around the time he engaged in sexual activity with Roe. In other words, the evidence strongly supports Roe's claim that she lacked capacity to consent to sex, but it severely undermines Plaintiff's claim that he also lacked capacity to consent.

23.     Had Plaintiff provided this requested evidence, it would have been the strongest available evidence of the parties' comparative levels of intoxication at or around the time of the underlying incident.

24.     The cell phone evidence could have aided Meyers-Parker's investigation, either through helping her identify other potential witnesses or by providing additional grounds upon which to question witnesses. In particular, the video of Roe appears to conflict with the statements of some witnesses who provided statements on behalf of Plaintiff, including especially Witness 3's statement that Roe "was carrying herself well," "was not slurring her words," and did not "appear to . . . ha[ve] been drinking." The video of Roe raises questions about whether Witness 3 was a reliable historian of the night's events.

25.     As the Title IX Coordinator who reviewed Plaintiff's request for reconsideration in this case, I find it deeply troubling that Plaintiff withheld this highly relevant cell phone evidence and repeatedly lied about its existence. This willful deception severely undermined ERAU's investigative efforts. In my estimation, it also severely undermines the reliability of other statements Plaintiff provided to ERAU.

26.     I also have concerns about whether Plaintiff's report against Roe was retaliatory and made in bad faith. On multiple occasions during the investigation, Plaintiff acknowledged that, at least from his standpoint, the incident of sexual activity between him and Roe was consensual. On or about January 29, 2020, during an interview with Meyers-Parker, in response to questions about his text messages with Roe, he said "he knew in his heart that they both had sex together." And in his impact statement he provided the following month, he said, "The fact of the matter is what happened on that night in October was one I regret very much, but it was one that was consensual between two people." These statements indicate that, at the time of the alleged incident, Plaintiff was not incapacitated, notwithstanding the allegations in his January 10 incident report that he "fe[lt] like he was too intoxicated to consent to the sexual acts" of Roe.

27.     As the Title IX Coordinator who reviewed Plaintiff's request for reconsideration in this case, I think these admissions by Plaintiff constituted reasonable cause to believe that Roe had not violated ERAU's sexual misconduct policy as Plaintiff alleged in his January 10 incident report. (*See* Doc. 1-6 at 12.) In my estimation, based on those admissions alone, Dammer would have been well within her discretion as the Title IX Coordinator to have terminated any investigation into Plaintiff's January 10 incident report—without issuing a formal finding of responsibility on that report—pursuant to Section III, Page 6 of the Resolution Process (Doc. 1-6

6

at 8). Under the facts of this case, I did not—and do not—consider it a material deviation from the

Resolution Process for Dammer not to have issued a notice of investigation, termination letter, or

outcome letter, with respect to Plaintiff's allegations against Roe. I did not grant Plaintiff's request

for reconsideration on that basis.

So sworn this 1st day of April 2021.

ELIZABETH FROST