1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF FLORIDA

3                CASE NO. 6:20-cv-01220-WWB-LRH

4                            - - -

5

6    JOHN DOE,

7    Plaintiff,

8      -vs-

9    EMBRY-RIDDLE AERONAUTICAL UNIVERSITY, INC.,

10   Defendant.

11

12                           - - -

13

14           Deposition of LINDA DAMMER, a witness

15   herein, via Zoom videoconference, taken by the

16   Plaintiff as upon cross-examination and pursuant to

17   the Federal Rules of Civil Procedure and Notice and

18   agreement of counsel as to time and place and

19   stipulations hereinafter set forth, on Tuesday,

20   January 12, 2021, at 10:30 a.m., before Pamela L.

21   Jackson, a Notary Public within and for the State of

22   Ohio.

23

24                           - - -

25

1    Q        I'm sorry. You stated on your
2    training on Page 2682 -- I'm sorry -- 2683, "We need
3    to believe survivors because it is their truth they
4    are speaking." Why did you not believe John Doe?
5    A        I did not do that.
6    Q        Okay. So let's start over so we're
7    clear on the answers.
8             Did you believe John Doe when he
9    submitted this complaint on January 10th, 2020?
10   A        Yes.
11   Q        Did you open up an investigation of
12   his allegations?
13   A        No.
14   Q        Why did you not open up an
15   investigation?
16   A        Because we were already doing an
17   investigation on this very case.
18   Q        Okay. So at some point then I
19   should be able to find a document that says, "This is
20   the allegation John Doe has made and this is my
21   conclusion as a Title IX Coordinator whether Jane Roe
22   is responsible or not"?
23   A        No.
24   Q        Why would I not find that document
25   somewhere?

1    A    Because we basically merged the
2 case.  There were the same allegations just reversed,
3 and so during our investigation we would have -- this
4 would have been uncovered.  I had checked with ATIXA
5 and they recommended that we just merge or hold off
6 and do this after the other case was done.
7    Q    Who did you speak to at ATIXA?
8    A    Saunie Schuster.
9    Q    Okay.  Tell me everything you
10 remember about that conversation?
11    A    I asked her how we should handle a
12 situation of this nature when we were already doing a
13 case that had come in two months prior.
14    Q    So when you did the report is there
15 a specific section that says, "This is the allegation
16 from John Doe against Jane Roe and Jane Roe is
17 responsible or not responsible"?
18    A    No.
19    Q    Why didn't you treat John Doe's
20 allegations the same way you treated Jane Roe's
21 allegations?
22    MS. STAHL:  Object to form.
23    Q    Well, let me back up a second.  In
24 that report there is a section that says, "This is the
25 allegation from Jane Roe and this is my conclusion

1  about whether John Doe is responsible or not"; right?
2      A    Yes.
3      Q    But why didn't you include a same
4  listing of the allegation and conclusion for
5  John Doe's allegations?
6      A    There is nothing uncovered in the
7  investigation.
8      Q    Is there more to that answer or is
9  that it?
10     A    No, that's it.
11     Q    I mean you say "nothing". John Doe
12 told you something; right?
13     A    Yes, but during.
14     Q    That's something; right?
15     And if you believe John Doe doesn't
16 that state a violation of Title IX?
17     A    There were other mitigating
18 factors.
19     Q    Well, let me back up. If what
20 John Doe says on Exhibit 31 is true would that
21 constitute a violation of Title IX?
22     A    Yes.
23     Q    Would the school have an obligation
24 to conduct an investigation of John Doe's allegations?
25     A    In different circumstances, yes.

1      Q      So you're saying the school did not
2  have an obligation to investigate John Doe's
3  allegations here?
4      A      That was going to become uncovered
5  in the investigation that we were already doing.
6      Q      So in that investigation I should
7  be able to open it up and look at it and see, "This is
8  why Jane Roe is responsible or not responsible"?
9      A      Not necessarily.
10     Q      Is there any document out there
11  that indicates a finding about whether Jane Roe was
12  responsible or not responsible?
13     A      No, because in the investigation we
14  found that he was responsible. Therefore, she would
15  not have been responsible.
16     Q      So is it possible for two students
17  to both be responsible for a sexual misconduct?
18     A      Then I wouldn't call it sexual
19  misconduct.
20     Q      Well, if both students are too
21  intoxicated to consent to sexual activity and they
22  engage in sexual activity have they both violated the
23  Embry-Riddle policy?
24            MS. STAHL:  Object to form.
25     Q      You can go ahead and answer.

```
 1         A         Basically if both students were
 2   both responsible for the misconduct then it would not
 3   be misconduct.  It would have been deemed to be
 4   consensual between them.
 5         Q         What if they were both
 6   incapacitated?
 7         A         If they were both incapacitated
 8   then -- You know, if they were both incapacitated then
 9   it's not really a violation.
10         Q         Why is that?  Why isn't it a fact
11   that they both violated it?
12         A         Normally there might be one
13   aggressor.  It's unusual for there to be two people
14   that are incapacitated.
15         Q         It's certainly possible; right?
16         A         It is possible, yes.
17         Q         Okay.  So then it's possible that
18   both people had violated the sexual misconduct policy?
19         A         If both people had been determined
20   to have violated it there would have been a finding of
21   non-responsibility.
22         Q         I'm confused about that.  If both
23   people violated it why wouldn't you find them both
24   responsible?
25         A         To me that's a wording issue.  If
```

1   what she asked for?
2          A         Yes.  Can you scroll down more?  I
3   think it's on the second page.  Yeah, I will have to
4   look.  I am not sure.  I think she came in twice.  I
5   think she signed that form twice, I believe.
6          Q         But in any event she asked you in
7   one of these initial meetings that John Doe be removed
8   from the track team?
9          A         Yes.
10         Q         And you agreed with that request?
11         A         Yes.
12         Q         At the time you agreed to that
13  request had you spoken to John Doe?
14         A         No.
15         Q         Had you spoken to any witnesses?
16         A         No.
17         Q         Had you reviewed any documents?
18         A         Just her Intake Statement.
19         Q         But her Intake Statement, that was
20  a document created by you then; right?
21         A         Yes, based on her statement and she
22  approved.
23         Q         Okay.  So have you done any other
24  investigation at all?
25         A         Not at that point, no.

```
 1          Q         Okay.  So it was simply her request
 2   and you granted it?
 3          A         Yes.
 4          Q         Did John Doe have any ability to
 5   appeal this?
 6          A         No.
 7          Q         Did he have any opportunity to
 8   present you with evidence that suggested his side of
 9   the story?
10          A         He asked to be reinstated or to
11   ███████████████.  However, we did not grant that
12   because he did not adhere to the original suspension
13   and he was hanging out at the track.
14          Q         After this meeting you generated a
15   letter that was sent to John Doe?
16          A         Yes.
17          Q         Okay.  And you informed him of the
18   nature of the allegations against him?
19          A         Yes.
20          Q         So at that point you were aware
21   that he was accused of misconduct by Jane Roe?
22          A         Yes, he was.
23          Q         And all of these letters are
24   documented in the Maxient Report that we marked as
25   Exhibit 32?
```

```
 1          A          I would assume, yes.
 2          Q          And, in fact, there's a separate
 3   Maxient Report under John Doe's name; right?
 4          A          Each person involved with a case
 5   they're under the same number, usually the same case
 6   number, but you can go into the demographics and see
 7   each individual person.
 8          Q          Okay.  In this case it looks like
 9   they have got different case numbers.  One is 26101
10   and one is 26102.
11          A          Okay.  It was probably because he
12   completed that electronic form which probably in and
13   of itself created a new case number.
14          Q          Well, there's a way to check that,
15   right, because he completed that electronic form on
16   January 10th of 2020; right?
17          A          Yes.
18          Q          And it looks like his Maxient case
19   was created on Page 2299 on November 5th of 2019?
20          A          That's what it appears.
21          Q          So correct me if I am wrong, but
22   that means that his Maxient case was created about two
23   months before his report?
24          A          Well, I'd have to look at her --
25   you know, her case number because there are -- there
```

1    the Maxient file.
2         Q      Well, we would expect to see it
3    then -- If the Maxient file was printed out we would
4    expect to see it in some of the documents there;
5    right?
6         A      Not necessarily.  It may have been
7    a conversation that we had with her.
8         Q      Okay.  So if there's a conversation
9    you have with her you would have noted that in the
10   records of that conversation; right?
11        A      More than likely but not
12   absolutely.
13        Q      I mean you have been trained it's
14   important to note all the important details of
15   conversations you have with complainants and
16   respondents; right?
17        A      Yes.
18        Q      And the fact that someone has been
19   accused of misconduct appears to be a very important
20   fact that you would want to note?
21        A      Yes.
22        Q      So if I go back and look at, say,
23   the Investigative Report where it summarizes
24   conversations that were had with her on January 10th,
25   2020, I should see some indication that she was

1  informed that John Doe had filed a complaint against
2  her?
3          A       I would have to go back and study
4  that part.  That would have been something that
5  probably Autumn would have as the investigator brought
6  up to her.
7          Q       Well, there should also be a
8  document saying, "Hey, I just want to let you know
9  there's been a complaint filed against you"?
10         A       Again we were working this as one
11 case.  It was the same information that we were going
12 to uncover.  We did not feel it necessary to do a
13 duplicate investigation.
14         Q       Or wasn't it just the fact that you
15 decided you didn't think his complaint had any merit
16 and you were just going to ignore it?
17         A       No, that is incorrect.
18         Q       Well, what evidence will I see in
19 the Maxient files here that you didn't just ignore his
20 January 10th, 2020, complaint?
21         A       I am not saying that we did
22 document it.  We had a conversation and I am sure we
23 had a conversation with him as well.
24         Q       What documents do you possess that
25 support your claim that you did not just simply ignore

1  his complaint?
2          A       I don't know that I have any
3  documentation because I did not ignore his complaint.
4          Q       Well, do you have any piece of
5  paper that shows that you investigated his complaint?
6          A       Throughout the whole investigation
7  everything that he -- every statement he made was
8  evaluated.  He read his statement.  He got to comment
9  on his statement.  She got to see his statement.
10         Q       Isn't that what you would have done
11 just based on her complaint?  Where would I find, for
12 example, a piece of paper showing me that John -- that
13 Jane Roe was informed that John Doe had filed a
14 complaint against her?
15         A       I don't know that we did.  I don't
16 know.
17         Q       Where would I find documentation of
18 the conversation that you had when you would have
19 informed Jane Roe the complaint was filed against her?
20         A       I imagine that it would be in our
21 note section of Maxient.
22         Q       Okay.  And if it's not there what
23 conclusion could you draw?
24         A       That maybe it was missed writing
25 down that notation.

```
1         Q         Now, shortly after she filed her
2    complaint John Doe and Jane Roe my understanding is
3    had a meeting with Reverend Keck?
4         A         Yes.
5         Q         What was the purpose of that
6    meeting?
7         A         We wanted to have it trying to
8    settle the situation in an informal manner to come up
9    to a resolution they both agreed upon.
10        Q         How did that meeting come to take
11   place?
12        A         ▮▮▮▮ had originally asked for an
13   informal.  We explained that normally in sexual
14   assault cases informals were not something that we
15   ordinarily did.  We offered to -- And then ▮▮▮▮
16   reached out to ▮▮▮▮ requesting to meet him alone.
17   We offered --
18        Q         Let's try to use John Doe and
19   Jane Roe to the extent we can.  I don't mean to
20   interrupt you.
21        A         Well, it's difficult for me to do
22   that, so I am going to use their names.
23                  ▮▮▮▮ reached out to ▮▮▮▮ in a
24   text saying she wanted to meet with him to try to get
25   a resolution and I offered to have that resolution
```

```
 1                    C E R T I F I C A T E
 2     STATE OF OHIO        :
                                SS:
 3     COUNTY OF BUTLER      :

 4          I, Pamela L. Jackson, a duly qualified and
 5     commissioned notary public in and for the State of
 6     Ohio, do hereby certify that prior to the giving of
 7     her deposition, the within named LINDA DAMMER, was by
 8     me first duly sworn to testify to the truth, the whole
 9     truth, and nothing but the truth; that the foregoing
10     pages constitute a true and correct transcript of
11     testimony given at said time and place by said
12     deponent; that said deposition was taken by me in
13     stenotypy and transcribed under my supervision; that I
14     am neither a relative of nor attorney for any of the
15     parties to this litigation, nor relative of nor
16     employee of any of their counsel, have no interest
17     whatsoever in the result of this litigation, and am
18     not, nor is the court reporting firm for which I am
19     affiliated, under a contract as defined in Civil Rule
20     28(D).
21                 IN WITNESS WHEREOF, I hereunto set my
22     hand and official seal of office at Hamilton, Ohio,
23     this 9th day of February, 2021.
24     Commission Expires:            /s/Pamela L. Jackson
       11/17/2023                       Pamela L. Jackson
25
```