## EXPERT REPORT OF M. AYA GRUBER

I have been retained as an expert the Plaintiff in *Doe v. Embry-Riddle Aeronautical University, Inc., Fl. M.D. No. 6:20-cv-01220-WWB-LRH.* I am submitting this Expert Report in accordance with Fed. R. Civ. P. 26.

### Facts or Data Considered

I have reviewed the Embry Riddle Aeronautical University ("ERAU") Sexual Misconduct Policy; the March 24, 2020 Outcome Letter, and the June 10, 2020 Outcome Letter. I have also reviewed the Complaint, Affidavit of John Doe, Affidavit of Bryan Lambert, Investigative Report ("Report"),[1] and various other documents produced in discovery. I intend to review the depositions in this matter. I reserve the right to amend this report and my opinions to the extent that testimony at the depositions impact any of the assumptions set forth, *infra.*, or the facts set forth in the documents I reviewed.

In reaching the conclusions described in this report, I am assuming the following facts to be true: (i) John Doe and Jane Roe both alleged that they were unable to consent to sexual activity because of incapacitation due to alcohol consumption; (ii) ERAU received evidence that both parties consumed alcohol before the sexual activity; and (iii) ERAU investigated and ultimately sustained Jane Roe's claim that she was incapable of consenting to sex with John Doe but did not investigate or render any decision as to John Doe's claim that he was incapable of consenting to sex with Jane Roe.[2] Further, ERAU officials discouraged John Doe from filing or pursuing his

---

[1] Doc#ERAU_002039-002101 [hereinafter Report].

[2] The Report, *supra* note 1, is not always completely clear on the issues being considered, but ultimately the investigator appears to have settled on incapacity as the reason for finding that John Doe ("the Respondent") had violated the school's sexual misconduct policy. The Report contains a significant discussion of Jane Roe's ("the Reporter") alcohol consumption and, on pages 47-48 attempts to calculate her BAC. On page 54-55 of the Report, the Investigator noted as a "rationale" that "[t]he evidence shows that the respondent should have known that the Reporter could not make rational, reasonable decisions and lacked the capacity to give knowing consent."

1

allegations. In other words, I assume that John Doe and Jane Roe were similarly situated in terms of claiming incapacitation during the sexual activity and presenting evidence of intoxication and ERAU chose to pursue only Jane Roe's claim.

## **Statement of Opinions**

There is a substantial likelihood that ERAU acted on the basis of impermissible gender stereotypes in this campus Title IX disciplinary proceeding.  Based on my knowledge, training and experience, my opinion, to a reasonable degree of certainty, is that ERAU acted in a manner consistent with the application of gender stereotypes that men are sexual "pursuers" and women "gatekeepers," also known as "the sexual script," and that men are not victimized when they have sex while highly intoxicated.[3]  The decision of ERAU to not investigate John Doe's claim that he experienced a nonconsensual sexual assault by Jane Roe was consistent with the stereotypical view of men as sexual aggressors and women as passive gatekeepers. The failure to investigate John Doe's claim that he was too incapacitated to consent to sex, despite evidence of his intoxication, is indicative of a presumption that John Doe, a man, could not have been the victim of sexual assault by Roe, that he was "willing and at all times ready for sex,"[4] and that his intoxication did not matter because, regardless of his level of drunkenness, he was a "pursuer" who benefitted from the "achievement" of sexual intercourse.[5]

---

[3] My testimony is grounded in academic study and professional experience not available to the average layperson and, thus, I believe would be helpful to the trier of fact.  I am *not* offering an opinion on the ultimate issue of whether ERAU acted with impermissible gender bias in this case.  Instead, my opinion is limited to whether ERAU acted in a manner consistent with recognized gender stereotyping.

[4] Verna Klein et. al, *Perceptions of Sexual Script Deviation in Women and Men*, 48 ARCH. SEX. BEHAV. 631 (2019).

[5] Michael W. Wiederman, *The Gendered Nature of Sexual Scripts*, 13 FAMILY J. 496 (2005) ("It is the female's role to limit sex, for both participants' own good, so the male is free to focus on outwitting her defenses to the extent necessary to achieve sexual activity. That females' standards typically represent a barrier each male must overcome fits well with the competitive and achievement-oriented aspects of masculine gender roles.").

*Gender Stereotypes*

From the 1970s to today, sociological studies on sexual negotiation and interaction have consistently recognize a culturally ingrained set of gender stereotypes known as "traditional sexual scripts," which govern women and men's behavior during sexual encounters.[6] In these traditional scripts, "men are responsible for initiating and pursuing sexual encounters whereas women are responsible for restricting the level of sexual activity, serving as gate keepers in sexual encounters."[7] In addition to prescribing sex-specific roles to men and women regarding initiating and engaging in sex, these sexual scripts dictate gendered attitudes toward sex, thereby creating a sexual "double standard."  In particular, the stereotype is that men have high sex drives and are "willing and at all times ready for sex" while women have low sex drives and desire sex only within the context of a stable, monogamous relationship.[8]

Thus, within the dominant cultural narrative, men regard sex as an unconditional achievement and women regard it as a concession that risks one's reputation and is made palatable only by the promise of a stable relationship.[9]  These gender-stereotypical "social scripts are communicated through the examples displayed by members of the culture who have already

---

[6] *See* N. Tatiana Masters et al., S*exual Scripts Among Young Heterosexually Active Men and Women: Continuity and Change,* 50 J. SEX RES. 409 (2013) (noting that the "traditional, mainstream cultural sexual script is highly gendered and prescribes specific, often opposite positions for men and women"); Kristen N. Jozkowski & Zoë D. Peterson, *College Students and Sexual Consent: Unique Insights*, 50 J. SEX. RES. 517 (2013); Wiederman, *supra* note 5; Shari L. Dworkin, Lucia O'Sullivan, *Actual Versus Desired Initiation Patterns Among a Sample of College Men: Tapping Disjunctures Within Traditional Male Scripts*. 42 J. SEX. RES. 150 (2005); Emily A. Impett & Letitia A. Peplau. *Sexual Compliance: Gender, Motivational, and Relationship Perspectives*, 40 J. SEX. RES. 87 (2003); Sandra Byers, *How Well Does the Traditional Sexual Script Explain Sexual Coercion? Review of a Program of Research*, 8 J. PSYCH. & HUM. SEX. 7 (1995); Willian Simon & John H. Gagnon, *Sexual Scripts: Permanence and Change*, 15 ARCH. SEX. BEHAV. 97 (1986); John H. Gagnon & William, SEXUAL CONDUCT: THE SOCIAL SOURCES OF HUMAN SEXUALITY (1973).

[7] Martin Pinquart, *Ambivalence in Adolescents' Decisions about Having Their First Sexual Intercourse*, 47 J. SEX. RES. 440, 441 (2010); *see also* Klein et. al, *supra* note 4. Susan E. Hickman & Charlene L. Muehlenhard, By *the Semi-mystical Appearance of a Condom: How Young Women and Men Communicate Sexual Consent in Heterosexual Situations*. 36 J. SEX. RES. 258 (1999); sources cited *supra* notes 4-6.

[8] Klein et. al, *supra* note 4.

[9] *Id.*; Kelly R. Rossetto & Andrew C. Tollison, *Feminist Agency, Sexual Scripts, and Sexual Violence: Developing a Model for Postgendered Family Communication*, 66 FAM. REL. 61 (2005); Wiederman, *supra* note 5.

adopted the scripts as well as through mass media depictions of how people act and react in particular [sexual] situations."[10] They can also be reinforced by campus policies and practices.[11]

These stereotypes are harmful. "The restriction placed on women by this role 'encourages women to think of themselves as victims and objects in the sexual encounter' . . . . This may contribute to women's feelings of being controlled by external factors."[12] The male-aggressor stereotype can cause "men's perceptions of consensual sex [to] be inflated," leading to mismatched expectations.[13] Moreover, fear of the sexual double standard can lead women to be passive in sexual situations and thwart women's sexual agency and ability to seek and find sexual pleasure.[14] Finally, "this presumption [that men cannot be raped] creates an additional barrier that male victims of sexual assault need to overcome to be considered legitimate victims."[15]

In reaching my conclusions, I took into account that ERAU was not acting in a vacuum but on the backdrop of a particular moment in the history of Title IX jurisprudence. Consideration of this historical information is necessary to properly evaluate the conduct of ERAU. In the wake of the Department of Education's 2011 "Dear Colleague" letter, ERAU, like many other colleges and

---

[10] Wiederman, *supra* note 5; see also Dianne M. Morrison et al., "*He Enjoys Giving Her Pleasure": Diversity and Complexity in Young Men's Sexual Scripts,* 44 ARCH. SEX. BEHAV. 655 (2015); Klein et. al, *supra* note 4.

[11] See Kristen N. Jozkowski, Tiffany L. Marcantonio, and Mary E. Hunt, *College Students' Sexual Consent Communication and Perceptions of Sexual Double Standards: A Qualitative Investigation*, 49 PERSPECTIVES ON SEX. & REPRO. HEALTH, 237 (2017) (observing that on campuses, "consent promotion initiatives may, whether intentionally or not, perpetuate a sexual double standard and women's gatekeeper status"); Janet Halley, *The Move to Affirmative Consent*, 42 SIGNS: JOURNAL OF WOMEN IN CULTURE AND SOCIETY 257 (2016) (observing that the affirmative consent standard on college campuses is "socially conservative in its enforcement of traditional gender roles.")

[12] Elizabeth Grauerholz & Richard T. Serpe, *Initiation and Response: The Dynamics of Sexual Interaction*, 12 SEX ROLES 1041, 1057 (1985) (quoting Hillary M. Lips, WOMEN, MEN, AND THE PSYCHOLOGY OF POWER (1981)).

[13] Rossetto & Tollison, *supra* note 9; *see also* Brandie Pugh and Patricia Becker, *Exploring Definitions and Prevalence of Verbal Sexual Coercion and Its Relationship to Consent to Unwanted Sex: Implications for Affirmative Consent Standards on College Campuses*, 6 BEHAV. SCI. 69 (2018) (observing that sexual assault "behavior is influenced by the heterosexual script that contends men are the ones to seek sex and women are the gatekeepers").

[14] *Id.;* Grauerholtz & Serpe, *supra* note 12; Wiederman, *supra* note 5.; Janell C. Fetterolf & Diana T. Sanchez, *The Costs and Benefits of Perceived Sexual Agency for Men and Women*, 44 ARCH. SEX. BEHAV. 961 (2015).

[15] Siegmund Fuchs, *Male Sexual Assault: Issues of Arousal and Consent*, 51 CLEV. ST. L. REV. 93 (2004). *See also* Ronald E. Smith, Charles J. Pine & Mark E. Hawley, *Social Cognitions about Adult Male Victims of Female Sexual Assault*, 24 J. SEX. RES. 101 (discussing study where respondent were more likely to believe that male victims of sexual assault by female assailants encouraged and enjoyed the assault).

universities, worked to address sexual assaults on campus and comply with its obligations under

Title IX.[16]  After the Dear Colleague Letter, many schools changed their sexual assault and sexual

harassment policies and procedures in a manner that prioritized reporters' interests in summary,

non-traumatic proceedings over respondents' due process interests.[17] Importantly, it would make

it much more difficult to be "pro-survivor," if schools entertained the notion that the men accused

of having sex with female reporters could themselves be incapacitated victims of nonconsensual

sex. Accordingly, schools' adherence to the entrenched gender stereotypes described above

enabled them to respond to reports of incapacitated sex in a mutual intoxication situation by

regarding only the male respondents as perpetrators because the man is necessarily a sexual pursuer

responsible for obtaining sober consent and the woman is necessarily a passive gatekeeper. The

stereotypes thus aligned with ERAU's interest in avoiding federal investigation and sanction.

### *The Investigative Report Supports This Conclusion*

Aspects of the Investigative Report are consistent with gender stereotypes. They evidence

ERAU's presumption that where both parties are intoxicated during a sexual encounter, the man

must be the perpetrator and cannot be a victim. The Report states that Title IX coordinator Dammer

reacted to John Doe's claim that he was too intoxicated to consent to sexual activity by warning

him that filing a complaint could be considered prohibited retaliation.[18] This warning, according

to the Report, was based on Dammer's predetermination that there was no merit to Doe's

---

[16] LETTER FROM OFFICE FOR CIVIL RIGHTS, U.S. DEP'T OF EDUC. (April 11, 2011).

[17] *See* Samantha Harris & K.C. Johnson, *Campus Courts in Court: The Rise in Judicial Involvement in Campus Sexual Misconduct Adjudications*, 22 N.Y.U. J. LEGIS. & PUB. POL'Y 49 (2019) (discussing litigation). *See also* Caroline Kitchens, *Overreaching on Campus Rape,* NAT'L REVIEW (May 13, 2014) ("Because of the inadequacy of campus courts and lack of procedural safeguards in place to protect students, this has grave consequences for due process"); Emily Yoffe*, The College Rape Overreaction*, SLATE, Dec. 7, 2014 ("Colleges, encouraged by federal officials, are instituting solutions to sexual violence against women that abrogate the civil rights" of accused students).

[18] Report p. 12.

incapacitation claim because "if a *man* is able to engage in and complete the act of sexual intercourse, he is not incapacitated."[19] After performing her own research, the Investigator concurred with Dammer's analysis. Later, the Investigator used the fact that Doe had an "erection" and was able to "penetrate" and "ejaculate" as a ground to discredit him.[20]

One of the most prevalent myths regarding male victims is that an erection or ejaculation means that the sex was not assaultive.[21] The gender stereotype is that the man who ejaculates must have "enjoyed it," rendering the sex "consensual."[22]  Experts have shown that male rape victims, like female victims whose bodies showed signs of arousal, can and do become aroused and ejaculate during assaults.[23]  In this case, ERAU presumed that Doe's erection and ability to engage in intercourse was *presumptively* incompatible with incapacity. There was no such consideration of Roe's ability to perform sexual activities—much less than her physiological reactions—in gauging her level of incapacitation. In addition, an experienced sexual misconduct investigator, instead of relying on stereotypes about male arousal, should have known that extreme intoxication is in fact compatible with completed sexual intercourse. In a sampling of young men, researchers found that "high-dosage alcohol had confined and generally modest effects on erectile responding," confirming that "there is little basis here to view alcohol as necessarily interfering with sexual response."[24] Arousal can indeed occur during a state of unconsciousness like sleep.

---

[19] Report p. 12 (emphasis added).

[20] Report p. 52.

[21] *See* Fuchs, *supra* note 15; MICHAEL SCARCE, MALE ON MALE RAPE: THE HIDDEN TOLL OF STIGMA AND SHAME 60-61 (1997); Phillips M. Sarrel & William H. Masters, *Sexual Molestation of Men by Women*, 11 Archives of Sex. Behav. 118, 118 (1982).

[22] Fuchs, *supra* note 15 (quoting Caroline White, *I'm Male, 55 and Overweight. Why Rape Me?*, THE INDEPENDENT (Aug. 20, 1991), at 15, *reprinted in* CONFRONTING RAPE AND SEXUAL ASSAULTS 83 (Mary E. Odem & Jody Clay-Warner eds., 1998)).

[23] Sarrel & Masters, *supra* note 21.

[24] *See e.g.* Rebecca L. Schacht, Susan A. Stoner, and Kelly F. Kajumulo, *Alcohol and Erectile Response: The Effects of High Dosage in the Context of Demands to Maximize Sexual Arousal*, 14 EXP. CLIN. PSYCHOPHARMACOL. 461 (2006) ("Although drinking is often associated with men's sexual activity, basic questions about alcohol's effects on men's sexual arousal remain unanswered. Inconsistencies in findings from studies examining subjective and

The Investigator relied upon a 2017 ATIXA Whitepaper that claims, "The courts operate on the presumption that if a man is able to engage in and complete the act of sexual intercourse, he is not incapacitated."[25] In support, Whitepaper the cited only an unpublished Sixth Circuit opinion, *Mallory v. Ohio University*, which says not one word about the relationship between incapacitation and erection or intercourse completion.[26]

Elsewhere, the Whitepaper makes clear that if a person is incapacitated, any apparently consensual behavior, including initiation, is irrelevant:

> An incapacitated person could be stark naked, demanding sex, but if they are incapacitated at the time, and that is known or should be known to the responding party, any sexual activity that takes place is misconduct, and any factual consent that may have been expressed is IRRELEVANT.[27]

If this directive is to be gender neutral, it means that a woman is also responsible for sexual misconduct when she has sex with an extremely intoxicated man, even if the man is "stark naked" and "demanding sex." Later, when discussing men's claims of incapacitation, the Whitepaper intimates that one should ask, "who initiated what?"[28] To the extent that the Whitepaper implies

---

physiological effects on erectile functioning suggest that alcohol's effects are context specific, e.g., dependent on whether one wants to maximize or suppress his arousal.")

[25] NEDDA BLACK ET AL., THE 2017 ATIXA WHITEPAPER 20.

[26] After performing several searches on Westlaw, I could find no caselaw supporting a legal presumption that an erection or ejaculation defeats a claim of incapacity. Nor, as noted above, is there scientific support for such a presumption. A few cases have addressed this issue in other contexts, and they have not accepted the Investigator's presumption. In *S.F. v. State ex rel. T.M.*, 695 So.2d 1186, 1188 (Ala. Civ. App. 1996), a court permitted expert testimony on this issue in a paternity case. The expert testified "that it was her medical opinion that a man who is intoxicated to the point of losing consciousness is physically capable of having an erection and ejaculation…" In *People v. Mischley*, No. 206296, 1999 WL 33454915 (Mich. Ct. App. Feb. 9, 1999) (unpublished opinion), the court of appeals approved the trial court's refusal to permit a defendant charged with rape to present testimony from his ex-wife that he could not achieve an erection when intoxicated. The court said, "Defendant and his ex-wife had separated three years before the assault and had been divorced for two years. During the offer of proof, she stated that she knew from observation that defendant could not achieve an erection when intoxicated. However, there was no evidence that she knew whether defendant's problem with erections had worsened or improved over the ensuing years since their divorce."

[27] WHITEPAPER, *supra* note 25, at 16

[28] WHITEPAPER, *supra* note 25, at 20.

7

that it is improper to consider who initiated sex when a woman claims to be an incapacitated victim but proper when a man claims victimhood, the Whitepaper is itself gender biased in that respect.

Not only does the investigator concentrate on Doe's apparently consensual actions rather that the level of his intoxication,[29] she also emphasizes his post-sex self-blame as evidence that he was the real perpetrator. It is, however, well documented that victims of rape, especially incapacitated victims who were voluntarily intoxicated and participated in the harmful sex, engage in self-blame.[30] Moreover, whether a sexual incident is misconduct must be determined by the conduct and circumstances *at the time* of the incident, not the parties feelings' about the incident afterward. Although Doe's motive to protect himself against Roe's misconduct claims is relevant to his credibility, there was ample other evidence that he was incapacitated during the sex to provide grounds to investigate.

It appears that, consistent with gender stereotypes, the Investigator adopted the predisposition of believing the female Jane Roe, presumed to be a survivor, and disbelieved the male John Doe, presumed to be a perpetrator, and then interpreted the evidence in a way that confirmed the initial belief of Roe's victimhood and Doe's guilt. Training materials at ERAU used by the Title IX Coordinator and the Investigator state, "We need to believe survivors because it is their truth they are speaking."[31] Discovery materials demonstrate that *every* case investigated by ERAU involved a female student alleging misconduct by a male respondent.[32] ERAU's predisposition to believe survivors became a predisposition of disbelief when Doe, a man, reported

---

[29] The investigator concluded that Doe initiated and pursued the sexual encounter consistent with gender stereotypes. She discounted Doe's statement that it was Roe who initiated and directed the sexual activity on the presumption that because "the Reporter was a virgin, it seems unlikely that she would have been giving Respondent sexual instructions." Report, p. 46. Stereotypes about the behavioral traits of chaste and unchaste women have played a nefarious role in rape law for centuries.

[30] *See* Patricia A. Frazier, *Victim Attributions and Post-rape Trauma*, 59 J. PERSONALITY & SOC. PSYCH. 298 (1990).

[31] Doc#ERAU_2683.

[32] Answer to Interrogatory No. 6.

being incapacitated during sex. Subsequently, the Investigator pursued the case and interpreted the evidence she obtained—witness statements, intoxication levels, and physical evidence—in a manner consistent with her desire to "believe" (female) survivors. Much of the Report's analyses and conclusions read as though the investigator examined the allegations in the light most favorable to the (female) Reporter.[33]

For example, the Investigator put a heavy emphasis on the SANE examination, despite never speaking with the treating medical attendant, which is not consistent with best practices. The Investigator noted that the physician took photographs and noted "tearing on the outside of the vagina," consistent with assault or sex with a virgin.[34] The Investigator then relied on the nature of Roe's injuries to conclude that it was more likely than not that sexual assault occurred.[35] However, an experienced and well trained sexual misconduct investigator would know that tearing and other injuries can be consistent with consensual sexual activity.[36]  For this reason, medical professionals warn that "the presence or absence of genital injury should not be used to render an opinion regarding consent to sexual intercourse"[37] Moreover, in a footnote, the investigator acknowledged that "we only have … a verbal summary of the exam from the" alleged victim.  The "tearing" does not appear in the medical record, and no photographs were provided.

---

[33] The Investigator uses the witnesses intoxication as reasons to discount their credibility significantly, but does not discount the credibility of Roe's statements on the basis of her intoxication. The Investigator also extensively questioned Doe and his witnesses about misconduct and even illegal behavior tangential at best to the issue of sexual consent.

[34] Report, p. 10.

[35] Report, p. 52.

[36] *See e.g.* Sarah Anderson, Natalie McClain, Ralph J. Riviello,  *Genital Findings of Women After Consensual and Nonconsensual Intercourse*, 2 J. FORENSIC NURSING (2006)  ("Currently, many experts and laypersons alike believe that if women do not consent to intercourse, they are more likely to have injuries to their genital area. Based on the findings of this study and several other studies, there is evidence to suggest that injuries can be identified on examination after both nonconsensual and consensual intercourse.").

[37] Jocelyn C Anderson , Daniel J Sheridan, *Female Genital Injury Following Consensual and Nonconsensual Sex: State of the Science,* 38 J. EMERGENCY NURSING, 38 518 (2012).

Instead, the Report relied on the medical record notation categorizing the exam "sexual assault of adult, initial encounter."[38] On page 55 of the Report, which discusses Roe's credibility, the Investigator characterized the record notation as a "medical diagnosis" of sexual assault.   In a later email, the investigator defended this decision, stating that this was "an official medical diagnosis provided by the physician who performed" the SANE examination.[39] However, medical professionals do not diagnose people with "sexual assault."[40] A well trained and experienced sexual assault investigator would know that a SANE examination is an investigative tool designed to gather forensic evidence and would recognize that a SANE examiner is not qualified to offer an opinion about whether a sexual assault occurred because the SANE examiner does not conduct an investigation. Such has been recognized by the organization that provided training to the ERAU Investigator and Title IX Coordinator:

> The value of the [SANE examination] is having the SANE testify as to what the results mean.  The [SANE examination] itself is going to be of very limited value to most Hearing Officers as the current level of training common in the field.  In fact. The results are likely more susceptible to mis-interpretation than being helpful.  Still, if someone wats to submit the results, you need to consider them.  This will likely require you to engage a medical consultant or expert of some kind to help you interpret what you are seeing. [41]

Finally, the Investigator appeared to base her finding of nonconsent in part on Doe's failure to meet a standard of conduct not imposed by ERAU's misconduct code and not applied to Jane Roe. On Page 55 of the Report, the Investigator writes, "While the Respondent may not have intended to have non-consensual sexual intercourse, the Respondent never states that he asked the

---

[38] Doc#ERAU_001938,

[39] Doc#ERAU_002477.

[40] *See e.g.* Sung Hoon Song, John R. Fernandes, *Comparison of Injury Patterns In Consensual and Nonconsensual Sex: Is It Possible to Determine If Consent Was Given?,* 7 ACAD. FORENSIC PATHOL. 619 (2017) ("medicolegal personnel should be aware that sexual assault victims can present with a wide range of physical trauma and should avoid relying on physical trauma alone to conclude whether consent was present");  Anderson & Sheridan, *supra* note 27.

[41] ATIXA TIP OF THE WEEK NEWSLETTER (March 14, 2019).

Reporter at any time for consent or if she was ok with what they were doing." This is important for two reasons. First, the Investigator did not similarly examine Roe's lack indication that she "asked" Doe for consent. Second, the ERAU policy does not in fact require a student to "ask" for consent, but indicates that consent can be provided through "mutually understandable affirmative words or behavior."[42]

### Qualifications

I am a professor at the University of Colorado. I received my B.A. in philosophy from U.C. Berkeley, *summa cum laude*. I received a law degree *magna cum laude* from Harvard University Law School where I was an editor on the Harvard Women's Law Journal and Harvard International Law Journal. I clerked for U.S. District Court judge James L. King in Miami, Florida and then served as a felony trial attorney with the Public Defender Service in Washington, D.C. and the Federal Public Defender in Miami.

I have been a law professor since 2002. I received tenure and became a full professor in 2009. In addition to the University of Colorado Law School, I have taught at Florida International University Law School, University of Iowa College of Law, and Harvard Law School. I currently teach first-year Criminal Law, upper-level Criminal Procedure: Investigation, and a seminar, Criminal Law in Context. I incorporate discussions of Title IX sexual assault cases into my Criminal Law course and my seminar. For over two decades, I have researched and written on legal reforms that address violence against women. More specifically, my scholarship examines how these legal reforms impact victims, shape women's status in society, and intersect with other social hierarchies, such as those involving race and socioeconomic status. I have published 24

---

[42] ERAU, CIVIL RIGHTS EQUITY & SEX / GENDER BASED HARASSMENT, DISCRIMINATION, AND SEXUAL MISCONDUCT POLICY 2019- 2020, at 4.

11

articles and book chapters and several popular and online writings in this area. In 2020, I published *The Feminist War on Crime: The Unexpected Role of Women Liberation in Mass Incarceration* (UC Press), the first monograph to explore the historical and current relationship between American feminism and criminal law and policy in the United States. I have presented my work hundreds of times at law schools throughout the U.S., including at Harvard, Stanford, and Yale, and at national and international conferences. I am in the top 10% of authors on the Social Science Research Network, with over 7000 downloads, and I am a top cited author on the Colorado Law faculty, which is ranked 29th out of all law faculties for citations on Leiter Reports.

As part of my research, I examine the relationship between gender stereotypes and the legal rules, principles, and practices governing gender violence. In particular, I have analyzed how substantive constructions of sexual assault (versus lawful sexual activity) and associated practices in criminal law and university discipline reflect and reinforce, or alternatively counter, sexist stereotypes and patriarchal norms. In formulating my analysis, I draw on historical works, scientific research, legal scholarship, and feminist theory. Several of these publications discuss the Title IX sexual assault investigation and adjudication process specifically.[43]

In addition to my teaching and scholarship, I am familiar with campus sexual assault adjudications through my roles as a member of Boulder Faculty Assembly and vice chair of the University of Colorado Grievance Committee. In these capacities, I have investigated high-profile campus sexual assault and harassment allegations.  I have been an adviser to the Model Penal Code sexual assault project since 2012.

---

[43] My publications that discuss sexual assault law and policy and sex stereotyping include: *The Feminist War on Crime* (2020); *Sex Wars as Proxy Wars* (2019); *The Complexity of College Consent* (2019); *Consent Confusion* (2017); *Anti-Rape Culture* (2016); *Rape Law Revisited* (2016); Not *Affirmative Consent* (2016); *A "Neo-feminist" Assessment of Rape and Domestic Violence Law Reform* (2012); *Rape, Feminism, and the War on Crime* (2009);  *Pink Elephants in the Rape Trial: The Problem of Tort-type Defenses in the Criminal Law of Rape* (1997).

A copy of my CV accompanies this Report.  This CV includes all of my publications over
the past ten years.

## Prior Expert Testimony

During the previous 4 years, I testified as an expert at trial or by deposition for the following
cases: *John Doe v. Colgate University et al.*, 5:15-cv-01069 (N.D. NY); *John Doe v. Denver
University et al.*, 1:16-cv-00152-PAB-STV (D. Colo.)

## Compensation

My compensation is $500/hour.

_____

M. Aya Gruber

13