

# THE
## 2017
# ATIXA
# WHITEPAPER

### The ATIXA Rubric for Addressing Campus Sexual Misconduct

Nedda Black, J.D., LMSW
Michael Henry, J.D.
W. Scott Lewis, J.D.
Leslee Morris, J.D.
Anna Oppenheim, J.D.
Saundra K. Schuster, J.D.
Brett A. Sokolow, J.D.
Daniel C. Swinton, J.D., Ed.D.



www.atixa.org

# CONTENTS

INTRODUCTION ........................................................................................................... 2
If Everything is Discriminatory, Then Discrimination Means Nothing ........................... 2

TERMINOLOGY .......................................................................................................... 3
Avoid the VAWA Offense Definitions as the Basis for Policy ...................................... 4
Terms Finding Favor in 2017 ...................................................................................... 4

MODELS OF PROOF FOR SEXUAL MISCONDUCT OFFENSES ............................. 5
Non-Consensual Sexual Contact and Non-Consensual Sexual Intercourse .............. 5
    Asking the Right Question ....................................................................................... 5
    Model Policy ............................................................................................................ 6
    Model of Proof ........................................................................................................ 7
    Rubric ...................................................................................................................... 7
    Force ....................................................................................................................... 8
    Incapacitation ........................................................................................................ 15
    Consent ................................................................................................................. 22
    Tying the Three Elements into an Analytic ............................................................ 24

CONCLUSION ......................................................................................................... 26

ABOUT THE AUTHORS .......................................................................................... 27

## INTRODUCTION

We started out writing our annual Whitepaper, and it turned into a book: *The ATIXA Playbook*. We expect that the *Playbook* will become your essential "how to" publication for ensuring that the resolution of sexual misconduct allegations at your college is done right. This Whitepaper gives a taste of what you can expect from the *Playbook*.

## If Everything is Discriminatory, Then Discrimination Means Nothing

This Whitepaper is focused on the theme of offering models of proof for policy, how to apply policy, and how to analyze the complex evidence of an allegation of sexual misconduct to determine by a preponderance of evidence whether policy has been violated. The new professional class of Title IX administrators that is now a fixture in higher education is transformative in many positive ways, but there are also drawbacks. You're likely familiar with the common metaphor: when you're a hammer, everything looks like a nail. To bend that metaphor to the current state of the field, when you're in charge of assuring civil rights on a college, everything can begin to look like discrimination. *But, if everything is discriminatory, then discrimination means nothing.* We believe, and want, discrimination to mean something. We don't want it watered down, honored in the breach, or broadened to the precipice of incoherence. So, coherence on what discrimination in the form of sexual misconduct is, and what it is not, is what this Whitepaper will deliver.

> *We believe, and want, discrimination to mean something. We don't want it watered down, honored in the breach, or broadened to the precipice of incoherence. So, coherence on what discrimination in the form of sexual misconduct is, and what it is not, is what this Whitepaper will deliver.*

In 2005, The NCHERM Group's Whitepaper was entitled, *The Typology of Campus Sexual Misconduct Complaints*. It became the seminal Whitepaper for the field by offering models of proof for the assessment and analysis of allegations of sexual violence. More than ten years later, we are using this Whitepaper to update and expand on our seminal 2005 work. More importantly, *The ATIXA Playbook* brings the same practical, decision-making guidance of that Whitepaper to the broader range of misconduct that now falls within the rubric of Title IX and VAWA Section 304. The *Playbook* offers decision-making rubrics not just for sexual violence, but for sexual harassment, hostile environment/free speech, intimate partner violence, stalking, retaliation, and other forms of sex and gender discrimination. We hope that it will be as seminal to the field as the 2005 original, if not more so. The updated and revised rubric for sexual violence is included in this Whitepaper, and reflects only one of eight decision-making rubrics offered in *The ATIXA Playbook*. The *Playbook* also offers expansive discussions of due process, credibility assessments, cross-claims, and case studies that are omitted in this briefer, Whitepaper format.

## TERMINOLOGY

As part of the mission of serving higher education well, we must revisit the terminology we use on colleges to address the various forms of sex and gender discrimination that occur. In our original 2005 Whitepaper, we popularized the term *sexual misconduct* as a framework that encompassed the offenses of non-consensual sexual intercourse (NCSI), non-consensual sexual contact (NCSC), sexual harassment, and sexual exploitation. We stand by this term. This choice has proven controversial, all the more so as the term has been widely adopted. Some people think it waters down the meaning of rape, or is an effort by colleges to minimize the significance of the misconduct by failing to call it what it really is: rape. But, in a college context, it really is sex or gender discrimination, as we noted above, sometimes in physical form.

Rape is a felony found by a jury beyond a reasonable doubt to have occurred. Sexual misconduct is a policy offense that is determined by college administrators to have been more likely than not to have occurred. We hope that colleges will continue to talk about rape and sexual assault in all literature supporting victims/survivors, and in terms of education and training. But, not as policy. Those who want to shut down the ability of colleges and universities to address sexual violence seek to do so on the premise that these acts are crimes best handled elsewhere. It is our responsibility, in part with the terms we choose, to teach the outside world that colleges are not in the business of addressing crimes, but policy violations. Keeping the terms distinct is one of the best ways to do that. The goal is not to water down the term rape, or cover-up serious sex offenses at colleges. In fact, rather than watering down the act of rape, our definition of it is more expansive than just about any state's criminal definition of the act. It requires more respect and more communication and is clearer about the role of alcohol and other drugs.

Those in the advocacy world have occasionally voiced to us that the terms we have chosen work against the ability of victims/survivors to self-identify or to have their experiences validated. That may be true, but we can't allow the fallacy of perfection to undermine the important work of distinguishing policy from crime. There are no perfect terms, and it really isn't the job of a college to validate that a student has been raped (though we understand why students feel it is important for colleges to do so). We haven't found terms better than those we use, though we readily admit they have drawbacks. They have fewer drawbacks than other alternatives we have considered. Our terms are also less likely to be reversed by judges than the use of criminal terms by colleges that are more and more often subject to defamation claims in court.[1] Paradoxically, while our terms seem to displease some victims/survivors, they make it more likely that a finding of sexual misconduct will be upheld in court, which is very helpful to victims/survivors.

We also acknowledge that the use of policy terms does water down the sting of the offense in another interesting way. Whether we like it or not, tagging someone as a rapist in our society comes along with considerable stigma for those being asked to do the tagging. It shouldn't, but it does. One by-product (not intended by us, but welcomed) of using policy-based terms rather than criminal terms has been that it has become easier for college administrators to apply a label to the acts when making a finding. It's easier to conclude that a student has committed

---

[1]  https://scholar.google.com/scholar_case?case=10981507656681737078&hl=en&as_sdt=6&as_vis=1&oi=scholarr

non-consensual sexual intercourse than it is to state that they have raped someone. We have also found with surveys that policy terms like ours aid in victim self-identification by the clarity of behavior they describe, and have led to a subsequent increase in reporting. We can argue that this "rebranding" process should not be the case in an ideal world, but in the real world, criminal rape allegations in court suffer from low conviction rates, in part for the same reason. Why replicate that problem on colleges if we don't have to?

## Avoid the VAWA Offense Definitions as the Basis for Policy

The Violence Against Women Act (VAWA) § 304 has re-popularized *sexual violence* as a policy term. That's not an umbrella term like sexual misconduct; sexual violence would only encompass sexual assault and rape behaviors as a policy term. We have ambivalent feelings about using sexual violence as a policy term. Many sex offenses are not, in fact, physically violent. We know the word violence is used in the term sexual violence in a broader sense, to connote sexually transgressive acts, but the common understanding is narrow, and we worry about the field applying the term too literally, and thus foreclosing findings on offenses that don't demonstrate use of violence (as opposed to non-consent).

Put another way, we've been trying for more than a generation now in the anti-sexual violence movement to move away from force and resistance constructs and toward consent-based policies and laws. Adopting the term sexual violence now just feels contrary to exactly the progress we've tried to make as a society in accepting that non-consent is enough to prove an offense without any use of violence. Thus, that term wouldn't be an improvement, in our opinions. In a similar vein, we are also very pleased by the effectiveness of the two-tiered offense structure we have popularized, where non-consensual sexual intercourse (NCSI) is the policy correspondent of rape, and non-consensual sexual contact (NCSC) is the policy correspondent of sexual assault. Tiering the offenses has had important and lasting positive benefits for the field, especially in terms of getting tougher on sanctions for the NCSI offense. We suppose you could do that within an umbrella term of sexual violence, but part of our intention all along has been to help the field understand that violence is not the prerequisite of a sex offense; consent is. Why confuse things now?

## Terms Finding Favor in 2017

We offer some additional updates to policy terminology that are important to this publication as the field moves away from resolutions rooted in the student conduct process and toward civil rights terms and resolution formats. We now refer to "allegations" rather than "complaints," as "complaints" may have a pejorative overtone, as if someone is complaining about something. Frankly, the correct legal term is "grievance," but that seems to have a different application on many public college campuses, as a means for employees to grieve discipline, so allegation is now our preferred term. We have shifted away from the terms "charges," "accuser" or "accused," and "accusation," because of the criminal allusions, and have also moved away from the terms "complainant" and "respondent," as these are the terms of civil court proceedings, and invoke the "complaint" term again.

Instead, we now call the parties to an allegation the "reporting party" and the "responding party." We prefer the neutrality of these terms. Some people have shown confusion about what happens if the reporting party did not in fact report the offense, but we call that person the reporting party regardless to show a status in the process, not whether they are the reporter of misconduct. Some colleagues have then asked, "Well, what do we call the person who reports the offense, if that person isn't the reporting party?" We're not sure why we need to call them anything, actually. We just refer to them in records as the person who brought the allegation(s) forward or as a third-party reporter. We are also trying to move away from terms in policy that imply conclusions or adversarial relationships. To that end, we recommend against using the term "victim" in policy, though of course using "victim" and/or "victim/survivor" in victim-services literature and in resource guides is appropriate. Similarly, we avoid the use of the term "perpetrator" in policy for the same reasons. Finally, we recommend against using the term "against" as in "bringing charges against a student" because of the adversarial tone it brings to a non-adversarial, civil rights-based resolution process.

## MODELS OF PROOF FOR SEXUAL MISCONDUCT OFFENSES

Creating a model of proof is simply the process of taking a definition of an offense and breaking it down into its constituent elements – those components that must be proven in order to show a violation by a preponderance of the evidence. Then, you use the checklist as a guide when you analyze a potential policy violation, to ensure that your assessment of the facts tracks precisely with the requirements of your institutional policy.

## Non-Consensual Sexual Contact and Non-Consensual Sexual Intercourse

### Asking the Right Question

Analyzing these types of allegations is frequently vexing for the Investigators and fact-finders who are called upon to do so. Sexual offense allegations can be heart-wrenching, preying on our emotional reasoning, our sexual politics, our gender-role expectations and stereotypes, our basic sense of fair play, and our innate notions of right and wrong. Administrators report to us that these allegations can be brutal for them to resolve, because of the lack of clarity. We may "know" what happened, but we can't "show" what happened, in the sense that evidence to support allegations may not be available. Yet, despite the complexity we attribute to sexual misconduct allegations, decision-making is a fairly straightforward five-step process:

1. Gather the evidence;
2. Evaluate the credibility of the evidence;
3. Assess the evidence against the elements of the policy;
4. Analyze and weigh the sufficiency of the evidence;
5. Render a determination and reduce it to writing.

If the greater weight of the evidence is uncertain, it probably results from one or two factors. First, your skills at feather-hunting and/or feather-weighing may need to be more finely honed,[2] or second (and relatedly), emotional reasoning, sexual politics, gender-role expectations and stereotypes, rape myths, and pressures from the Department of Education's Office for Civil Rights (real or imagined) all too often churn together to give us a muddled result.[3] Here, we offer Investigators and fact-finders a tool for consistent analysis and clear decision-making. These allegations are never easy. But, this rubric has become an industry standard over the last twelve years for its durability and the way it makes tough decisions easier for those called upon to make them.

<u>Model Policy</u>

*Non-Consensual Sexual Contact is:*
- *any intentional sexual touching,*
- *however slight,*
- *with any object,*
- *by a person upon another person,*
- *that is without consent and/or by force.[4]*

*Sexual Contact includes:*
- intentional contact with the breasts, buttock, groin, or genitals, or touching another with any of these body parts, or making another touch you or themselves with or on any of these body parts; or
- any other intentional bodily contact in a sexual manner.

*Non-Consensual Sexual Intercourse is:*
- *any sexual intercourse,*
- *however slight,*
- *with any object,*
- *by a person upon another person,*
- *that is without consent and/or by force.[5]*

*Intercourse includes:*
- *vaginal or anal penetration by a penis, object, tongue, or finger, and oral copulation (mouth to genital contact), no matter how slight the penetration or contact.*

---

[2] And, may we suggest you avail yourselves of the series of highly-evolved and time-tested trainings offered by ATIXA to help you hone your skills: <u>https://atixa.org/events/training-and-certification/</u>

[3] Okay, the case could just be a complete mess, too.

[4] The use of force is not "worse" than the subjective experience of violation of someone who has sex without consent. However, the use of physical force constitutes a stand-alone non-sexual offense as well, as it is our expectation that those who use physical force (restrict, battery, etc.) would face not just sexual misconduct allegations, but allegations under the code for the additional assaultive behavior.

[5] Id.

## Model of Proof

The model of proof for these offenses is the policy itself, because we have written it in element format already. The analysis only varies between them as to whether the contact is sexual touching or sexual intercourse. There is an element of intent in the NCSC definition that is not in the NCSI definition, but the definitions are otherwise identical. You can image a non-intentional sexual contact, such as brushing someone's breast or buttocks in a crowded bar without meaning to, which is not an offense, but it is hard to image someone having sexual intercourse unintentionally. Thus, intent is not a requirement of the NCSI offense. Intersectionally, these offenses have overlap because intercourse is a type of sexual touch, and thus intercourse would be included in NCSC, but only intercourse is included in NCSI, though intercourse is also a type of contact. NCSC is thus the broader offense, and NCSI is narrower, as to the contact each encompasses. Typically, NCSI would pertain to more invasive, and thus more severe conduct, for which suspension, expulsion, or termination would commonly result. NCSC merits a wider range of sanctions, from warning to expulsion, because of the wide range of behaviors covered by that offense.

An example of a question set for the NCSC offense is:

1. Was there sexual contact by one person upon another, no matter how slight, as defined in the policy?  If yes,
2. Was it intentional? If yes,
3. Was it by force? If yes, policy was violated. If no,
4. Was it without consent, as consent is defined in the policy? If yes, there is a policy violation, if no, there is no policy violation.

The set for NCSI is simpler still:

1. Was there sexual intercourse by one person upon another, no matter how slight, as defined in the policy? If yes,
2. Was it by force? If yes, policy was violated. If no,
3. Was it without consent, as consent is defined in the policy? If yes, there is a policy violation, if no, there is no policy violation.

## Rubric

While the basic question rubric above is helpful, there are deeper issues and questions related to force, capacity, and consent that still need to be addressed. The expanded rubric below does so. The rubric for NCSC and NCSI is about ensuring that for each and every allegation, we are asking the right questions. If we ask the right question, we'll have a better chance of getting the right answer. The three questions that should be asked are rooted in policy. All colleges should prohibit sexual activity when it occurs under the following circumstances:

1. When it is forced; or
2. When the reporting party is incapacitated, and that incapacity is known to or should have been known to the responding party; or
3. When it is non-consensual.

It is important to understand that incapacity is a form of non-consent, but our rubric classifies it as incapacity, separate from the consent inquiry, for reasons that will be apparent below. Usually, only one of these constructs will apply to your assessment, in the end, but you should answer each question each time you analyze an allegation, to make sure you don't miss anything. An example would be when a student alleges that they were incapacitated and that they did not consent. In our investigation reports, we would typically then analyze both questions, which may then place the finding on more than one of the grounds of force, consent, and incapacity. Another example would be when someone forces sex on another person, and that person also does not consent. You should analyze both force and consent constructs to determine if policy was violated, whereas in an allegation where force results in consent ("don't hurt me, I'll do what you want"), it is the force analysis that matters, not the consent analysis. This will become clearer as you read on, but the interaction of force and consent is important to understand. Using force to gain sexual access may or may not result in valid consent, but may result in acquiescence or passivity, to avoid or minimize the effects of the violence. Sometimes, force results in consent, as with threats, intimidation, and coercion. Because this consent is not voluntary, it is not valid consent, and the force analysis is the one that matters. Typically, we encourage assessing each of the three constructs in the order they are presented here: force, then incapacity, then consent. It is the most effective approach we have found, and the best way to keep each assessment clean and separate from the others, which is how this rubric is meant to be used.

## Force

Let's start with an analysis of force. Force is a good place to start analyzing because if it is present, then incapacity and consent rarely need to be assessed. It makes sense that if someone is forced into sexual activity, their level of capacity is largely irrelevant. The force is what violates the policy, whether they are fully sober or completely unconscious. The literature of the field tells us that force is fairly uncommon in college investigations, used instrumentally rather than gratuitously, for the most part. Thus, it won't typically be an issue in your investigations, but when it is, it's the only construct that matters. Usually, you can rule it in quickly, and focus on it, or rule it out and move on to the incapacity analysis. That makes for efficient progress through the three questions.

### Kink

The primary wrinkle in the force analysis is that kink is becoming more and more common in students' sexual lives, and thus in the reports of sexual misconduct we receive. Perhaps inspired by *Fifty Shades of Grey*, Bondage and Discipline, Dominance and Submission, or Sadism and Masochism (BDSM) relationships, safe words, and dominant/submissive behaviors are more common than when we wrote the original Whitepaper twelve years ago. To understand how this impacts our force analysis, we must realize that not all force or violence is non-consensual. In fact, kink relationships tend to value consent very highly, and there is a lot of communication about it, far more so than in many non-kink sexual interactions. We talked above about an analysis where force results in consent (perhaps as the result of a threat), which is a policy violation. But, in kink interactions, consent can result in force, and this is usually not a policy violation. Thus, the force analysis below explicitly pertains to non-consented-to use of force, and not

to kink. In kink interactions and relationships, the key to proper analysis is assessing whether consent existed, or whether use of force exceeded that which was agreed upon (also a consent analysis), or whether force continued despite the exercise of an agreed upon safe word or other negotiated boundaries. These would be policy violations. Your personal approval or disapproval of kink is irrelevant. Even if someone is harmed in the sexual interaction, as long as they explicitly consented to being harmed, you have no basis to second-guess their sexual mores any more than they have a right to question yours.[6]

Outside of kink interactions, the force paradigm is one where if sexual contact is forcible, violent, and/or against the will of the reporting party, it is a violation of policy. Some antiquated policies still speak to resistance by the reporting party, and this too is part of the force paradigm, as resistance may be shown in the face of force. It may also be used to prove non-consent. In the ATIXA model, force can take four forms: physical violence, threats, intimidation, and/or coercion.

### Physical Violence

Physical violence is the most obvious force construct, equated with violence or the use of a weapon. No matter how slight, any intentional physical violence upon another, use of physical restraint, or the presence of a weapon to gain sexual access will constitute the use of force. To be clear, not all physical pressure eliminates consent. If someone is hit, held down, pushed, restrained, or otherwise acted upon violently, that evidences the use of force. However, an analysis of force must account for the nature of sexual intimacy, which often has some physical elements to it. For example, if a person uses physical pressure (not physical violence) to help facilitate a change in positions, places their hands on a person's head during oral sex, or is simply pressing down upon a person while in the missionary position, this does not typically constitute physical force. The key question is whether the physical violence enabled the person's ability to gain sexual access. Some versions of Feminist theory advance the idea that the act of penetration itself is enough to constitute force, but that construct is not used in the ATIXA model policy[7] because the consent construct more effectively protects bodily autonomy.

### Threats

The law defines a threat narrowly: as a direct threat of death or grave bodily injury. "If you don't have sex with me, I will kill you." If a threat is used to obtain sex, force is present (the law calls it forcible compulsion). We give a much broader interpretation than the law does regarding what constitutes a threat. For us, any threat that causes someone to do something they would not have done absent the threat could be enough to prove force. This is especially true when coupled with evidence that the threatened individual reasonably believed the threatener had the will and capacity to carry out the threat. While this is not a strict legal interpretation, it certainly is useful for college policies, if not taken to an extreme. For context, please see the section on distinguishing coercion and negotiation below, because the same analysis can be applied to threats. While it is true that if I threaten you with a negative consequence, and that threat causes you to acquiesce in sexual activity, force is present, and sexual misconduct has occurred, it is also true that the

---

[6]  Obviously, religiously-affiliated institutions are free to take a more restrictive stance, but if so, we recommend you are clear about that in policy.

[7]  https://atixa.org/resources/model-policies/

construct is meant to apply to the kinds of threats listed below, and not to negotiations over sex. While we may not want people to exert power or leverage in sexual situations, not all such exertions are threats that are tantamount to the use of force. While this may seem a little nebulous, it is up to each college community to determine how much of a threat is an actionable threat, as a community standard.

- "If you do not have sex with me, I will harm someone close to you."
- "If you do not have sex with me, I will tell people you raped me."
- "If you do not have sex with me, I will hurt you."
- "If you do not sleep with me, I will fail you in my course."

### Intimidation

Are threats and intimidation different from one another, and if so, how? This is a difficult question to answer, and for colleges whose policies prohibit both, they are often interpreted as synonyms. But, they are not entirely synonymous. We define intimidation as an implied threat, whereas threats are clear and overt. For example, we have recognized that "If you don't sleep with me, I will fail you" is a threat. Yet, many of us would agree that it would be just as inappropriate for a professor to say "If you have sex with me, you'll get an A in my class." But, would that be a threat? No. A threat has to have a negative condition attached. This example "threatens" a benefit. We would argue that could be intimidation, rather than a threat.[8] If the student agrees to sex, is it because the faculty member is in a position of power and authority over her? What is offered here, the A grade, is overt. What is implied is what the professor might do to the student if she does not comply with his request.

We do not mean to suggest that just having power or authority over someone is inherently intimidating. When we talk about intimidation as a type of force, it describes a situation when someone uses their power or authority to influence someone else. For example, a female student once explained that she "was intimidated" by her date because he was bigger than she was. When asked if he menaced her, or used his size to make her feel that she was in jeopardy, she said no. She may have felt intimidated, but that does not mean that he intimidated her. Like sexual harassment, there are subjective and objective requirements to the proof of intimidation. Subjectively, the reporting party must have felt intimidated, but objectively, we must be able to say that the actions would have been intimidating to a reasonable person, as well. If he had pinned her into a corner, and had used his size to menace her or block her exit, we would find this to be intimidation equating to the use of force, even if he never touched her. Otherwise, any woman could argue that a sexual overture by any man larger than she was inherently intimidating. The average-sized man is bigger than the average-sized woman, so size alone cannot be enough to establish intimidation.

### Coercion

Finally, the fourth element of force is coercion. Coercion includes elements of pressure, duress, cajoling, and compulsion. Coercion is the type of force most likely to be present in college sex-

---

[8]  It is, of course, also a form of *quid pro quo* harassment, but if the student goes through with it, an allegation of NCSI should also be investigated.

ual misconduct allegations. In a sexual context, coercion is an *unreasonable* amount of pressure to engage in sexual activity. What is unreasonable is a matter of community standards. Sometimes, it is helpful to identify coercion by contrasting it with seduction, and all Investigators and fact-finders need to be able to elucidate this distinction. Society defines seduction as reasonable, and coercion as unreasonable. Both involve convincing someone to do something you want them to do, so how do they truly differ? The distinction is in whether the person who is the object of the pressure wants or does not want to be convinced. In seduction, the sexual advances are ultimately welcome. You want to do some convincing, and the person who is the object of your sexual attention wants to be convinced. Seek to persuade them, and they are willing to go along. Two people are playing the same game.

> *In a sexual context, coercion is an unreasonable amount of pressure to engage in sexual activity. What is unreasonable is a matter of community standards. Sometimes, it is helpful to identify coercion by contrasting it with seduction, and all Investigators and fact-finders need to be able to elucidate this distinction.*

Coercion is different because you want to convince someone, but they make it clear that they do not want to be convinced. They do not want to play along. They do not want to be persuaded. And the coercion begins not when you make the sexual advance, but when you realize they do not want to be convinced, and you push past that point. Seduction can become coercion. Yet, coercion is a matter of degree, rather than being an on/off-switch the minute you push past the point where the pressure is unwelcome. Bright-line thresholds in this arena are rare, as context matters. Some amount of pressure is reasonable and socially acceptable, but too much pressure crosses the line. That line begins when someone makes it clear that pressure is unwelcome, and for some communities, any additional pressure is unacceptable. This is a very intolerant threshold. Other communities ask what amount of pressure is unreasonable, beyond the indication that pressure is unwelcome. For these communities, determining what is unreasonable should be a function of four things: duration, frequency, isolation, and intensity.

Let's say I approached you at a crowded bar, and started to come on to you. If I pressure you for sex for five minutes, will I get very far? What if I have 30 minutes to pressure you, or three hours? I have a better chance of success if I have a longer duration in which to pressure you, so the duration of the pressure is something Investigators and fact-finders need to consider to assess whether the amount of pressure applied is reasonable or unreasonable. Let's look at frequency. If I have 30 minutes, and I ask you for sex two or three times, would that be less successful than if I asked you 30 times in that 30-minute timeframe? Of course. Frequency can enhance the coercive effect. The duration of the pressure is also something Investigators and fact-finders need to look to in assessing whether the amount of pressure applied is reasonable or unreasonable. The same is true of isolation. What if we weren't at a bar? Would my pressure be more or less effective if we were together in my room on campus, with no one else present? My coercion will likely be more effective if I isolate you. Isolation is something Investigators and

fact-finders need to consider to assess whether the amount of pressure applied is reasonable or unreasonable.

Finally, intensity can impact my coercive effect, probably more so than the other three factors. We're at the bar, and I'm trying to convince you to have sex with me. I spend a half-hour telling you all the reasons why you should have sex with me. I'm really doing a great sell job, as I know my product better than anyone. I tell you that I'm the best lover you'll ever have. I challenge you to ask any woman in the bar, knowing they will vouch for my prowess. I tell you you owe it to yourself to fly Air Brett. I tell you this is one roller-coaster ride you just don't want to miss. I give you my best Lounge Lizard act. Not buying it? I know why. The problem isn't me. Any reasonable person would jump on the experience I am offering, literally. The problem, I see now, is YOU. So, I change tactics. "You come into a bar, dressed to kill, flirt with me, and then think you can tease me and say no? You're just a tease. You like to lead men on and then let them dangle. You're probably frigid. You should take a chance, you might just like it. What are you, some sort of religious freak? God won't know if we do it just once. I won't tell him. What are you, the last virgin in captivity? Everyone is doing it. Come on. Virginity is way overrated. Are you afraid your parents are going to find out? I won't tell them, I promise. Loosen up. Relax."

Do you see the intensity difference? I can talk myself up to you until I am blue in the face, and I have a First Amendment right to tell you how great I am in the sack. It's not coercive, it's obnoxious. But, if I turn on you, and start to attack you, rather than sell myself, there is a qualitative difference. If I assail your core values, your morals, your religion, I very well may be transgressing the community standard on intensity.

In summary, once you draw a line indicating that you don't want to play my game, and I pressure you beyond that point, seduction will become coercive. What amount of pressure is acceptable is a function of the frequency, intensity, isolation, and duration of my pressure. Once your community standard is exceeded, it is appropriate for you to label my coercion as force. In investigations, we often find that coercion results in consent, but it is not sincere, positive, or enthusiastic consent. It's more like, "Fine, then just get it over with." That's a useful telltale as Investigators and fact-finders are looking to determine whether the amount of pressure was reasonable or unreasonable.

Since we (well, since Brett wrote it, considering he used himself as the hypothetical Lounge Lizard) wrote this section in 2005, much has changed. Today, at many colleges, coercion is becoming a tool of the sex police. Take the following statement from one college as an example:

> Coercion is the use of emotional manipulation to persuade someone to do something they may not want to do — like being sexual or performing certain sexual acts.  Examples of some coercive statements include: "If you love me, you would have sex with me,""If you don't have sex with me, I will find someone who will," and "I'm not sure I can be with someone who doesn't want to have sex with me."[9]

---

[9]  Citation omitted so as not to call out any specific school. This could happen anywhere.

And, look at these recent statements from another university:

> Coercion can also take the form of, "If you don't have sex with me, I'm breaking up with you," even if it's not explicit like that, but if your relationship has created that type of coercion where you feel like you have to have sex with them to keep them in that relationship, that could definitely be a form of coercion where we would say you're not giving consent…under university policy, consensual unwanted sex would not be considered consensual sex and a student could go through a formal sexual misconduct case.

This type of irrationality, and that's exactly what this is, is gripping more than just these two colleges. These kinds of institutions are establishing a zero tolerance standard for negotiation in sexual relationships. That's not The NCHERM Way. There is such as thing as unwanted consensual sex, but as the descriptor indicates, it is consensual. This is important. It is not sexual misconduct by any construction of our policies or beliefs about best practices. While we're glad we're not in college today, that is little help to students caught in this Kafka-esque sexual funhouse where up is down and down is up.

In every generation, there has been a term for behaviors that don't cross the line of sexual misconduct, but are still disrespectful. Additionally, an individual may reflect on a sexual encounter and wish they had acted differently or may be embarrassed by their own prior conduct. This does not, without additional factors, meet the elements of NCSI or NCSC. Students have called it "gray rape," "regretted sex," "rapey," and now "unwanted consensual sex." College administrators must be the rational arbiters of walking this admittedly fine line, and woe be to the administrators at places like these colleges when it comes time to prove in court that they are not biased on the basis of gender. *Remember, if everything is discriminatory, then discrimination means nothing*. When the assessment of boundary-crossing behavior honors the subjective perceptions of the reporting party over the objective assessment of a reasonable person, we start down a slippery slope of utopian sex. However, it is the objective standard that matters.

*When the assessment of boundary-crossing behavior honors the subjective perceptions of the reporting party over the objective assessment of a reasonable person, we start down a slippery slope of utopian sex.*

An operative understanding for this discussion is that coercion = sexual misconduct. That shouldn't be up for debate. The debate is about what constitutes coercion, right? Perhaps you take the position that everyone has a right to say no, should not have to repeatedly say no, negotiate (about their body), or make some concessions for the sake of peace or to keep a relationship. We agree, but the question is, if one of your students does so, does that make it sexual misconduct? Can we or should we distinguish between sexual misconduct and "less than ideal sex?" Does it diminish what sexual misconduct is to deem that "sex for the sake of peace" is sexual misconduct?

Let's say in my relationship that I want sex (could be oral/anal/vaginal) and I am not getting sex or the sex I want. If I say to my partner, "In order for me to be happy, I need to be in a relationship with a partner who wants sex (oral/anal/vaginal) with me. I'd like that to be with you, but if not, I respect your boundaries but need to find someone who will have sex (oral/anal/vaginal) with me. The choice is yours…." If my partner then decides to do the acts I want so that I can be happy in the relationship (and implicit is that they are "equally" free to act and that they decide there is something they want in being in a relationship with me that makes it worth it to them to compromise their boundary), have they been coerced?

Have I just sugarcoated a threat? Isn't this just a nice way of saying "If you won't have (oral) sex with me, I'll break up with you or I won't date you?" Is it not sexual misconduct if I sugarcoat it, but sexual misconduct if I just lay the threat out there bluntly? Do I have a right to ask this? Does my partner have a right to refuse? Have I crossed the line if I ask with this condition and I get consent? Some colleges and administrators are blurring the line between teaching sexual ethics and preventing illegal sex discrimination. Is that what we, as educators, should be doing? Are we creating a no-negotiation college bubble that is going to fail our students when they eventually get out into the real world and realize that people negotiate sex in relationships all the time, and they won't know how to do so?

On a fairness level, if your college doesn't believe that negotiation is an acceptable word (because you believe that what is really happening is coercion), or something acceptable to do in sexual dynamics, then we need to be fair to students by telling them clearly in policy and education as soon as they arrive that, "on this campus, you can't negotiate for sex. If you do, we'll sanction you." Some truth in advertising could go a long way here if that is your college philosophy, but we really hope it isn't. The current political environment isn't the right time to become militant about consent or coercion, if there ever is a right time. There will be a backlash, so be careful what you wish for. Yes, there are waves of students across colleges that want us to redefine sex offenses to align with their sexual mores, and they want "rapey," "gray," "regretted sex" to be considered policy violations. When they are college administrators someday, that will be their prerogative. Until then, we feel strongly that today's administrators must resist this push, and maintain objective standards for sex offenses. We also acknowledge the legitimacy of feelings of trespass, even trauma, such students might endure after such an experience. Just because behavior does not cross a line does not mean it is not harmful, a betrayal of trust, or emotionally painful. We trust that colleges will afford resources, counseling, and support to such students, regardless of whether their allegations factually cross the line or not.

Can colleges that subscribe to the no-negotiation philosophy honestly say that they are making it clear to students what their interpretation of the coercion policy will be? The college above publishes it in pretty clear examples on its website, right? Now, the above-referenced article means that university's community knows how its administrators interpret coercion. But, what about before that article was published? Those administrators gave those quotes because they clearly want students to know how they interpret policy. Is that enough? Maybe those standards are taught in other ways on these colleges (and others like them) as well? We hope so.

Maybe we should be telling prospective students about this in admissions materials even before they arrive, so that they can make an informed choice about the college they want to enroll in, and the rules under which they wish to live? What do you think of that as a recruitment tool? We think this is another manifestation of the very real tension between consent utopians and consent realists. So, which kind of college is yours? Overreaching on coercion is just another way of being the sex police. We've stated before that's not our philosophy. For those who argue that stricter approaches are their prerogative, they may be, but when higher education gets away from the golden mean, Congress or state legislatures tend to push through more regulation or rigid laws sooner or later. The next four years may not be especially hospitable to zealous sexual correctness.

## Incapacitation

Let's start the section with an important point. Your institutional sexual misconduct policy needs to be based on incapacity. Not intoxication. Not impairment. Not inebriation. Not being under the influence. Not being too drunk to consent. If you choose any other basis than incapacity, it is going to run you into trouble under Title IX. And, frankly, unless you have religious or moral reasons, there is no reason that you should have a problem with drunk sex, legally. If two people want to go out, get drunk, and hook up, why are we trying to police that? As long as they are okay with what they did, it's none of our business. Distinguishing between drunkenness and incapacity is a main goal of this section, along with providing tools for assessing incapacity. Here is what the ATIXA model policy says about incapacity:

- *Sexual activity with someone you know to be or should know to be incapacitated constitutes a violation of this policy.*
  - *Incapacitation can occur mentally or physically, from developmental disability, by alcohol or other drug use, or blackout.[10]*
  - *The question of what the responding party should have known is objectively based on what a reasonable person in the place of the responding party – sober and exercising good judgment – would have known about the condition of the reporting party.*
  - *Incapacitation is a state where someone cannot make rational, reasonable decisions because they lack the capacity to give knowing consent (e.g., to understand the "who, what, when, where, why, or how" of their sexual interaction).*
  - *This policy also covers a person whose incapacity results from mental disability, sleep, unconsciousness, involuntary physical restraint, or from the taking of rape drugs.*

Here are some critical understandings that we should all have about incapacity. First, there are two forms of incapacity, mental and physical. Mental incapacity results from cognitive impairment, such as developmental disability. Temporary mental incapacity can result from conditions

---

[10] Blackout, as it is used in scholarly literature, refers to a period where memory formation is blocked. A period of consistent memory loss is termed a blackout, whereas periods where memory is both lost and formed intermittently can be referred to in the literature as a brownout. Neither state of blackout nor brownout automatically indicates incapacitation, but factual context can establish that a blackout or a brownout is occurring in an individual who is incapacitated (where incapacity is defined as an inability to make rational, reasonable decisions or judgments). It is a mistake to automatically associate memory loss with incapacitation; they are often coupled, but not always (*see* e.g.: Mundt & Wetherill – 2012; NIH 2004).

such as epilepsy, panic attacks, and flashbacks. Physical incapacity results from a physical state or condition, such as sleep or alcohol or other drug consumption. As we build knowledge of trauma, and its impact on the body during a perceived threat event, we can add to the body of incapacity knowledge. During trauma, the body's autonomic responses include fight, flight, and freeze. For some reason, these three seem to fall into a pattern in our experience, where fight is most common when facing intimate partner violence, flight is most common in stalking incidents, and freeze is most common to sex offenses. Of course, any of the three reactions can occur with any perceived threat, but the key point to take away here is that freeze as a response can be a form of physical incapacity.

The most common form of incapacity is alcohol-induced incapacitation. Yet, it is often confused with what we call the "i-words" that often are applied to alcohol use. There are five i-words: (under the) influence, impairment, intoxication, inebriation, and incapacitation. They are not synonymous, and are more-or-less listed in order of severity of alcohol effect. One becomes under the influence of alcohol as soon as one has anything to drink. Impairment begins as soon as alcohol enters the bloodstream, and increases with consumption. Intoxication and inebriation are synonyms, as is drunkenness, and corresponds to a .08 blood alcohol concentration under most state laws. Incapacitation is a state beyond drunkenness or intoxication. What is confusing about incapacity is that it may have nothing to do with an amount of alcohol or a specific blood alcohol concentration. In fact, some drunk people will be incapacitated, and some will not. Incapacity can be defined with respect to how the alcohol consumed impacts on someone's decision-making capacity, awareness of consequences, and ability to make fully-informed judgments. The most obvious form of incapacity is sleep or unconsciousness. A sleeping or unconscious person can't make informed judgments about sex, and neither can a person whose incapacity from alcohol is equivalent to being asleep.

*Incapacity Defined*

So, incapacitation is a state beyond intoxication, where decision-making faculties are dysfunctional. In order to consent to sexual activity, you must be able to understand Who, What, When, Where, Why, and How with respect to that sexual activity. This is another way of stating the law's expectation that consent be informed, and any time it is not, consent cannot be effective. Where someone lacks the ability to make rational, reasonable judgments (for any reason, but commonly as a result of alcohol or other drug consumption), they are incapacitated. An incapacitated person could be stark naked, demanding sex, but if they are incapacitated at the time, and that is known or should be known to the responding party, any sexual activity that takes place is misconduct, and any factual consent that may have been expressed is IRRELEVANT. For example, a blacked-out person may say "yes" when asked if they want to have sex but, if incapacitated, they will not know they are saying it. Another way to think about incapacity is as a period of temporary disability.

Blackouts

It is important to understand what we now know about how "blackouts" may be related to, yet are distinct from, incapacitation. A previous version of this Whitepaper equated blackout with incapacity, but research conducted since that Whitepaper was published has caused us to

retract that equivalence. Unfortunately, decoupling blackout from incapacity makes it harder to assess these kinds of allegations, but we cannot ignore the empirical research for the sake of convenient analysis. Students may use the term "blacked out" to describe their physical reaction to excessive alcohol or drug use, but what does that term actually mean? The term "blackout" refers to a situation when a person is awake and functioning, but is unable to create memories for events and actions. "Blackout" thus refers to amnesia for places a person went or things they did while intoxicated. Not all blackouts are the same. An individual may experience an *en bloc* blackout, where large chunks of time are missing from their memory, often spanning hours or more.

More common is the *fragmentary* blackout, often referred to as a brownout or greyout, where memory may be spotty. Blacking out is distinct from passing out, where a person is asleep or unconscious from excessive alcohol consumption. Comparatively, blackouts do not involve a loss of consciousness, although a blackout could precede passing out or losing consciousness. In understanding the phenomenon of blackouts, the following description from the National Institute on Alcohol Abuse and Alcoholism may be helpful: "Blackouts are periods of amnesia during which a person actively engages in behaviors like walking and talking, but does not create memories for these events as they transpire. This results in missing periods of time in the person's autobiographical record."[11] Someone experiencing a blackout may, while in the blackout state, be able to recall events that happened earlier in the evening or in the past, and may be able to do the same activities they could do under normal circumstances, but they are not creating memories for the events that occur during the blackout. To others, they may appear to be fully functional.

The ability to effectively consent to sexual activity is tied to *capacity*, or more precisely, to incapacity. Someone experiencing a blackout, a brownout, or a greyout, may or may not be incapacitated. Lacking memory after an incident does not automatically mean they lacked decision-making capacity for an act as it transpired. For this reason, policy language should be precise and not conflate terminology. The most straight-forward way to compose a policy on incapacity is with the following language:

> Having sex with someone whom you know to be, or should know to be, incapacitated (mentally or physically) is a violation of the sexual misconduct policy.

You may choose to define incapacitation in your policy, as well. We prefer the following common sense definition: Incapacitation is defined as a state where someone cannot make rational, reasonable decisions because they lack the capacity to give knowing/informed consent (e.g., to understand the "who, what, when, where, why, or how" of their sexual interaction).

## Assessing Incapacity

Physical incapacities are sometimes quite overt, and other times more subtle. Incapacitation is usually a subjective determination that you will make after the incident, in light of all the facts available. Rarely is there objective evidence of incapacity, though increased use of video and

---

[11]  National Institute on Alcohol Abuse and Alcoholism (June 2014). *Shining a Light on Alcohol Blackouts*, NIAAA Spectrum, Vol. 6, Iss. 2. Access at https://www.spectrum.niaaa.nih.gov/archives/V6I2Jun2014/features/light.html

social media is changing that to some extent. Incapacitation is subjective because people reach incapacitation in different ways and as the result of different stimuli. Individuals exhibit incapacity in different ways. Incapacity is dependent on some or all of the following factors:

- Body weight, height, and size;
- Tolerance for alcohol and other drugs;
- Amount, pace, and type of alcohol or other drugs consumed;
- Amount of food intake prior to consumption;
- Voluntariness of consumption;
- Vomiting;
- Propensity for blacking out (mentally or physically);
- Genetics.

Evidence of incapacity can come from a combination of context clues, such as:

- A witness or the responding party may know how much the other party has consumed;
- Slurred speech;
- Bloodshot eyes;
- The smell of alcohol on the breath;
- Shaky equilibrium;
- Vomiting;
- Outrageous or unusual behavior;
- Unconsciousness.

None of these facts, except for the last, may constitute – in and of themselves – incapacitation. But, the process of finding someone responsible for a violation of the sexual misconduct policy involves an accretion of evidence, amounting to a sufficient or insufficient meeting of the standard of proof. A preponderance may be met with some combination of the first seven, or all eight factors. For example, it might be met if someone is passing in and out of consciousness, and there is a high probability they could pass out again. Or, it might be met if someone is vomiting so violently and so often that they are simply in such bad shape that they cannot be said to have capacity.

## Sexual Politics

One of the factors that leads to clouded judgment on the issue of incapacity is the very sexual context of the issue. Each of us has sexual politics, whether we admit it or not. Our sexual politics derive from our morals, religious values, open- or close-mindedness, sexual histories, role models, and culture, amongst other factors. They play into our decisions on sexual misconduct, especially with respect to incapacity. "She was asking for it." "She brought him to her room." "She got herself drunk." "Well, he was drinking too. Maybe she raped him." These rape myths have adherents because of sexual politics. The best way to address the myths of incapacity is with a story, believe it or not, about a Mercedes™. You have to remove incapacity from the sexual context to truly understand it, so please indulge this fantastical exploration from a different tangent.

## Can a Mercedes™ be a Sexual Metaphor?

Let's suppose that I like Mercedes-Benzes™ and I have always wanted one. You know the one I mean, right? The red one. The convertible. The $100,000 one. So, one night I go out drinking with my buddies. We down a few beers, and somehow, the car comes up in conversation. They tell me, "You know, Brett, you deserve that Mercedes™. You work hard, you should have it." We have some more to drink. I begin to think I do deserve it. Finally, by the end of the night, I'm in my cups (pretty drunk). They're egging me on now. "Just lease it. You don't have to have $100k now. Pay later." I'm sufficiently drunk that I start to believe them. I work hard. I deserve that car. I stumble out of the bar, and march right down to my local all-night, drive-thru Mercedes™ dealership. I pull up to the window, and the salesman greets me. I tell him I want that red convertible. Sure, he says, noting that I'm obviously drunk to the point of incapacity. Just sign right here. He even manages to tack on extra for the floor mats and undercoating. No one pays for undercoating. But, I sign, and drive off in my dream car. The next morning, I wake up next to my wife. "Honey, I had the best dream last night. I dreamt I bought that Mercedes™ I've always wanted." She looks out the window and points. "I don't think it was a dream." Whoops. I look out. There it is, in the driveway. The signed lease is sitting on my nightstand, too. $1,500 a month. Not a mortgage, a lease. My wife takes one look, and in the way only my wife can, tells me to take it back. "I can't," I say, "I signed a lease." She doesn't care. I have to take it back.

> *You care because an agreement to have sex is a contract. Just like buying a car, buying a house, getting married, and any number of personal transactions. All parties to the contract must have a full understanding of all the terms of the agreement, and must accept them.*

I drive back to the dealership, and there is the guy from last night. I tell him he needs to take the car back. He laughs. I tell him I was drunk. I didn't know what I was doing. Yes, you sure were, he agrees. But, once you buy a prize, it's yours to keep. I insist. He refuses. I sue him (after all, I am a lawyer).

So, what is the judge going to do? Will I win? Does the dealer have to take the car back and cancel the lease? It may surprise you to know that the answer is yes. We formed an agreement, but in order for a contract to be legally valid, there must be a meeting of the minds. All parties to the contract must have a full understanding of all the terms of the agreement, and must accept them. Simply, we must understand Who, What, When, Where, Why, and How. If any material term of the agreement is missing, there is no contract. The agreement is invalid. The court will require the dealer to take the car back and cancel the lease if I was incapacitated, did not know what I was doing, and my state was known to the dealer, or he should have known.

Why do you care about a Mercedes™? You care because an agreement to have sex is a contract. Just like buying a car, buying a house, getting married, and any number of personal transactions. This story helps to cut the through the mythology and the politics. I wanted the car (sex). I came to your dealership (room). I signed the deal (consented). But, I did not understand any

of the terms and conditions, so no sale (sexual misconduct). I think we would all agree that the dealer took advantage of a beyond-drunken customer, regardless of whether I made it easier for him to do so. The law protects us from being taken advantage of by unscrupulous dealers and opportunistic sexual aggressors. Incapacity is a broad legal concept. Applying it to sex is just one narrow window of its applicability. (For the record, I neither own nor lease a red, $100,000 Mercedes™ convertible.)

### But, I Was Drunk Too, So She Raped Me

What if the responding party's defense is "Well, I was drinking too. Maybe she raped me." How does that hold up to the Mercedes™ analogy? Let's assume the salesman at the drive-thru window is incapacitated, too. Now, both people on either side of the transaction are unable to appreciate Who, What, When, Where, Why, and How. Doesn't that just make an already invalid transaction all the more invalid? Sure, it does. Arguing that "he was drunk too" doesn't function to excuse the misconduct, especially since it is almost always disingenuous. If he really felt victimized, why didn't he make an allegation? Let's be more specific. Most of the time, when someone argues they were drunk too, this is inadmissible evidence. We must remember that almost all colleges have a rule that being drunk does not excuse a policy violation, and even if you don't have that rule spelled out (you should), being drunk does not excuse the violation of a policy, or the trespass on another human being. What often occurs is a situation where the reporting party is incapacitated, and the responding party is merely drunk. In theory, a mutual incapacity could exist, but let's not jump to that conclusion too readily.

### Jumping to Conclusions

In all of the combined years of your authors' practice, we have NEVER seen a true case of mutual incapacity. We don't doubt it could exist, but it's a unicorn. We have seen plenty of cases where two people were drunk, but that is not a policy violation at most colleges. But, mutual incapacity? How would two genuinely incapacitated people have the physical coordination necessary for sexual intercourse? And if they did, how would they remember it? The courts operate on the presumption that if a man is able to engage in and complete the act of sexual intercourse, he is not incapacitated.[12] We have heard stories of students using Cialis™ to counteract what they call "beer dick," and if you have that factual situation, you'll have to piece through whether the evidence indicates intentional predation, or whether the mutual incapacity makes it impossible, from an evidentiary perspective, to determine who did what to whom. Of course, heterosexual sexual intercourse isn't the only way to have sex. Incapacity might make it difficult to achieve penetration by a penis, but lots of sex doesn't involve penetration. Or penises. So, this example is heteronormative. Perhaps in a non-penetrative interaction, mutual incapacitation could be likelier? It could be, but then we'd still have the issue of proof. How would incapacitated people prove incapacity? Maybe we'd find independent corroboration. But, who initiated what? Who is the reporting party and who is the responding party? There is a strong likelihood that we could not find a preponderance to establish a violation in such a case.

---

[12] *Mallory v. Ohio University*, 76 Fed. Appx. 634 (6th Cir. 2003).

## Self-Incapacitation

There is another issue with respect to incapacitation. Many Investigators and fact-finders get hung up on the distinction between allegations where the responding party incapacitates the reporting party, and allegations in which the reporting party self-incapacitates. For purposes of a resolution under Title IX, whether the reporting party self-incapacitates or not should not impact the finding. The question under the policy is whether the reporting party was incapacitated, not how they became incapacitated. While self-incapacitation may not impact the finding, it may have an impact on the sanction. It would be perfectly reasonable for a fact-finder to consider a harsher sanction to a student accused of deliberately and surreptitiously plying someone with spiked punch or a rape drug[13] than it would in a fact pattern where the reporting party had self-incapacitated.

## Poor Judgment by the Responding Party

An interesting question we are often asked is the following: If the policy asks not only whether the reporting party was incapacitated, but also if the responding party knew that or should have known it, what should the responding party have known when they themselves have been drinking? The "should have known" part of the policy – what lawyers call constructive knowledge – can be misleading. It is not a subjective question of what the responding party should have known. It is an objective question that might be better phrased as "what would a reasonable person, in the position of the responding party, have known?" And, of course, a reasonable person under the law is assumed to be sober and using good judgment. That's what reasonable people do.

## Poor Judgment by the Reporting Party

At no point is it appropriate to excuse a violation of policy by the responding party because of poor judgment or a lack of responsibility by the reporting party. Two wrongs do not make a right. To blame the reporting party for irresponsible decisions confuses the difference between responsibility and culpability. The question in a college resolution is whether the responding party is culpable for a violation, not whether the reporting party was irresponsible (though they may have been). It is also inappropriate to hold the reporting party accountable for any minor policy violation they may have engaged in during the incident.[14] Further, allowing a responding party to file an unfounded counter-claim against the reporting party could make the institution a party to retaliation under Title IX. Where a counter-claim is valid, it ought to be addressed in a separate resolution process, in most circumstances.

---

[13]  By the way, since we wrote the original Whitepaper, rape drug cases have become something of a unicorn as well, at least in our practice. There are plenty of allegations of rape drugs, but their use is rarely, if ever, proven by evidence. We do have a ton of students who don't know how to drink, and who are surprised by how alcohol impacts them. But, this is inexperience, not a drugging. This trend away from using rape drugs on campuses may be in part because it is relatively easy for a predator to find a self-incapacitated person than to take the risk of incapacitating someone with a drug. As we always teach our students, alcohol is the rape drug of choice on college campuses.

[14]  For additional reading, see ATIXA's Position Statement in Favor of Amnesty Policies at https://atixa.org/wordpress/wp-content/uploads/2017/02/2017February-Final-ATIXA-Position-Statement-in-Favor-of-Amnesty-Policies.pdf

## Consent

Consent is the third of the three constructs discussed, and "affirmative" consent is a political hot potato as of this writing. Fortunately, consent isn't really controversial amongst students right now. They've embraced it. This generation of students owns consent, and that is a positive shift that was even underway twelve years ago when we published the original Whitepaper. So, why did we place quote marks around the term "affirmative" above? Because we don't use the term. Using the modifier "affirmative" belies a misunderstanding of what consent is, as if there is some other kind of consent. So, for the record, consent is affirmative, by definition. Consent in sex is simply clear permission by word or action for specific sexual activity. The ATIXA model policy is consent-based, it frames consent positively (by its presence, not its absence), and it is a pure-consent construct. That means that the policy is violated by non-consent, without any other requirements of proof, such as force or resistance.

Consent as a concept is one whose time has come because of the resonant way in which the idea of consent ratifies the right we all have to bodily autonomy. We all have the right not to be acted upon by someone else unless and until we give permission for it. Consent is a requirement for mutual respect, and the need to communicate that respect by word or action. Ideally, consent is neither given nor received, but exchanged. Bodily autonomy is key here, because other than defining sex offenses by consent, the only other two choices are to define it by force or by resistance. But, it is not true that someone's autonomy is only violated if they are forced, or if they resist the act. Autonomy is not respected any time something is taken from someone without their consent.

There are those, however, who believe that consent-based policies are unfair. They've conveniently linked affirmative consent to a due process failure, but that is just sleight-of-hand because they don't want to be seen as simply opposing the concept of consent, outright, which is what they are actually doing. Still, part of the goal of this publication is to ensure that you are using the consent construct correctly, so this must be briefly addressed for any of you who might misunderstand or misapply it.

The assessment of consent is a determination by the institution, not something proved by the reporting party or the responding party. The college determines whether its policy was violated, and has the burden to do so. The college does not place the burden on the reporting party to prove non-consent, and it does not place the burden on the responding party to prove consent. The concept of the presumption of innocence is based in criminal law, and really doesn't apply to college processes in a linear legal fashion.[15] However, it is important to state that while colleges don't really presume anything, because presumptions are a criminal construct, we certainly cannot presume that a responding party is in violation of our policies unless and until he[16] can prove he obtained consent. It is not the burden of the responding party to show consent, but the burden of the college to prove non-consent.

Put another way for simplicity, if the parties are equally persuasive as to their assertions of

---

[15]  Mostly because the Fifth Amendment does not strictly apply to college processes in the way it does to criminal proceedings.

[16]  He or she or they or other terms that recognize fluid or non-binary identities.

consent and non-consent, the college has not met its burden and the responding party cannot be found in violation of the sexual misconduct policy. The opponents of consent insist that "affirmative" consent is burden-shifting by design, and that the shift in burden is a violation of due process and unconstitutional. Precision is important here. By design, consent shifts the burden to a sexual initiator or actor to obtain consent, from a policy perspective, but it does not shift the burden to them to prove that consent if sexual misconduct is alleged. Put succinctly, it shifts the burden in the bedroom, but not in the college "courtroom."

Due process hawks won't agree, and will continue to insist that the consent construct offends the U.S. Constitution, but we consider ourselves due process hawks, and we have a question: If "affirmative" consent is unconstitutional, why then isn't the burden-shifting in robbery unconstitutional, too? You see, if someone takes something from you without your permission, it's a robbery. But, if they take it from you with your permission, it is borrowing, or a gift. Thus, property crimes like robbery, theft, and larceny are consent crimes. Take the property without consent and you have committed a crime. Take the property with consent and you have a brand new bicycle. If it isn't unconstitutional burden-shifting to undergird property crimes with consent, it isn't a due process issue to do it with sexual misconduct, either, as long as you don't misapply it by placing a burden of proof on the responding party that a consent-based policy does not require. Another analogy might be to fighting. Do it on the street, without the other person's okay, and you could be arrested for assault or battery. Do it in a ring, with the other person on board, we'll call it boxing, and you could be paid for it. Or at least get a good workout. Consent. It turns a crime into a sport, and it's a perfectly viable and constitutional legal concept.

Colleges differ in how they define consent. Here are the rules related to consent from the ATIXA model policy:

> *Consent is:*
> - *clear, and*
> - *knowing, and*
> - *voluntary,*
>   - *words or actions,*
>   - *that give permission for specific sexual activity.*
>
> *Additional clarification:*
> - *Consent is active, not passive.*
> - *Silence, in and of itself, cannot be interpreted as consent.*
> - *Consent can be given by words or actions, as long as those words or actions create mutually understandable permission regarding willingness to engage in (and the conditions of) sexual activity.*
>   - *Consent to any one form of sexual activity cannot automatically imply consent to any other forms of sexual activity.*
>   - *Previous relationships or prior consent cannot imply consent to future sexual acts.*

- *Consent can be withdrawn once given, as long as that withdrawal is clearly communicated. Once consent is withdrawn, sexual activity must stop reasonably immediately.*
- *In order to give consent, one must be of legal age.*

<u>Tying the Three Elements into an Analytic</u>

Now that we have a comprehensive understanding of force, incapacity, and consent, we can weave them into a coherent rubric. The rubric is a three-question progression that can be applied to any NCSC and/or NCSI allegations. The order in which we ask our questions is important because if the answer to the first question is yes, you don't need to progress to questions two and three. If the answer to the second question is yes, you don't need to progress to question three. The first question is:

***Is there evidence that force was used to gain sexual access (as force is defined under college policy)?***

<u>If the answer is yes, you are done (unless there is a kink interaction, as discussed earlier)</u>. Find the responding party in violation of your policy, and sanction proportionally to the severity of the violation. Do not pay any attention to issues of consent or incapacity that may be present in the allegations once you find that force was used. They are irrelevant if force was present. Force, in and of itself, establishes a policy violation. Inquiring about consent is a distraction. For example, I threaten you: "If you don't have sex with me, I'll kill you." You respond "Do whatever you want, just don't kill me." You just consented. If we engage in a consent-based inquiry, the answer is yes, there was consent. Again, if you ask the wrong question, you get the wrong answer. If the answer to the question of whether force was used is no, then we have to inquire into incapacity as the second question. Incapacity is a smart second question from an efficiency perspective, because it can be quickly ruled out in any allegation in which alcohol, sleep, or other incapacitating conditions are not alleged. And, asking about consent before incapacity may lead you to the wrong outcome; some incapacitated people do consent, in fact, but that consent is not valid. The incapacity question, as above, is:

***Was the reporting party incapacitated, and did the responding party know that, or should they have known it?***

You will only engage in inquiry on this second question if there is evidence that the reporting party was developmentally disabled, asleep, using alcohol or other drugs, or has any condition that might produce blackouts, loss of consciousness, or similar temporary incapacities. We already know that force is not an issue, because you have ruled it out with the first question in the rubric. The critical competency here is to make sure you do not indulge in a consent-based inquiry. Just like it is within a force-based inquiry, a consent-based inquiry is irrelevant here. Even if the reporting party verbally consented, or signed a contract, they cannot validly consent if they are incapacitated. THERE IS NOTHING AN INCAPACITATED PERSON CAN DO OR SAY TO MEANINGFULLY, VALIDLY CONSENT TO SEX. Too many incapacity inquiries become mired

in "but she came on to him." It does not matter. If the evidence shows, by a preponderance, that the reporting party was incapacitated, move on to the below sub-questions about the responding party's knowledge. If the evidence does not show incapacity, move on to the third question in this analytic (consent).

Does the evidence show that the responding party knew – as a fact[17] – that the reporting party was experiencing this incapacity? If so, find the responding party in violation of your policy, and sanction proportionally to the severity of the violation. If not, ask the next question.

Should a reasonable person, in the position of the responding party, have known of the reporting party's incapacity? If so, find the responding party in violation of your policy, and sanction proportionally to the severity of the violation. If not, you have determined that this allegation cannot be resolved using an incapacity construct. Move on to the third question in this rubric, the consent question:

**What words (or actions) by the reporting party gave the responding party permission for the specific sexual activities that took place?**

This is a pin-down question directed to the responding party.

*If the light is yellow, that's still a violation. It's reckless and risky to run yellow lights. For example, if the responding party argues "I asked her, and she did not respond (by word or action), so I thought it was okay," you are done. No consent was communicated by word or action. Consent cannot be assumed through silence alone, and this is a violation of policy. You thought you were going to get through the intersection in time, but you caused a collision.*

If the evidence shows words or actions that are reasonable indications of consent, you are done. There is no violation of policy. But, if the evidence does not show words or actions that are reasonable indications of consent, find the responding party in violation of your policy, and sanction proportionally to the severity of the violation. Consent is the primary inquiry you will need to assess allegations today, though in 2005, the incapacity construct was used more frequently than the consent analysis. The answer to the consent question is either a green light, a yellow light, or a red light. If green, go. There is no violation. If red, you likely have a predatory offender on your hands. If the light is yellow, that's still a violation. It's reckless and risky to run yellow lights. For example, if the responding party argues "I asked her, and she did not respond (by word or action), so I thought it was okay," you are done. No consent was communicated by word or action. Consent cannot be assumed through silence alone, and this is a violation of policy. You thought you were going to get through the intersection in time, but you caused a collision.

---

[17] Factual evidence of knowledge of incapacity is relatively rare. It might appear in cases where the responding party admits to a witness that she knew, or where it is stated in a text message or on video, or by admission. But, practically speaking, almost all incapacity analysis hinges on the "should have known" element of constructive knowledge.

In rare cases, you may need a few other consent-based inquiries. For example, you may need to ask whether the reporting party was of legal age. Or, if the reporting party agrees that he did consent, you may need to ask whether he withdrew that consent. If he did, and that withdrawal was clearly communicated to the responding party and the responding party did not stop reasonably immediately, that is sexual misconduct. One of the benefits of this analytic is that it will help you to more effectively control inflammatory evidence, such as evidence about the sexual character of the parties. When you are asking only these three questions, it becomes more difficult to see how information about sexual history or character can help to answer any of these questions. Sexual character is usually a way for sexual politics to seep into the inquiry, and the rubric is designed to screen them out. Of course, sexual character isn't always irrelevant. When a party puts their own character into evidence, you have a right to inquire into it. And, when you are investigating a predatory pattern, character evidence can help you to establish a pattern.

## CONCLUSION

If you ask these three questions, in this order, it will impose discipline on your decision-making process. At many colleges, we have so embraced the concept of consent that we tend to over-apply it to all sexual misconduct allegations. This leads to flawed analyses. Hopefully, the message that has emerged from this is about when and how to apply the consent construct, and when the force and/or incapacity constructs should be used, to the exclusion of consent-based inquiries. Where you find the other inquiries seeping into the question you are analyzing, you will have to challenge whether those inquiries aid in your decision, or confuse the issue you are trying to isolate. We think you will find this rubric to be of great aid in the vast majority of allegations you encounter.

This Whitepaper is adapted from the 120-page publication, *The ATIXA Playbook: Best Practices for the Post-Regulatory Era*, a comprehensive guide to addressing the resolution of sexual misconduct allegations on college campuses. Visit https://atixa.org/resources/playbook for more information and to learn how you have access the *Playbook* today. Additionally, information on The NCHERM Group companion Whitepaper, *Due Process and the Sex Police*, can be found at https://www.ncherm.org/.

*Founded in 2011, ATIXA is the nation's only membership association dedicated solely to compliance with Title IX and the support of our more than 3,500 administrator members who hold Title IX responsibilities in schools and colleges. ATIXA is the leading provider of Title IX training and certification, having certified more than 3,000 Title IX Coordinators and more than 8,000 Title IX Investigators since 2011. For more information, visit www.atixa.org.*

©2017 ATIXA. ALL RIGHTS RESERVED.

## ABOUT THE AUTHORS

**Nedda Black, J.D., LMSW** has been working in a variety of capacities within higher education since 2012, having assumed significant responsibility for Title IX policies, education, and implementation at the University of California, Hastings College of the Law, not long after the Office for Civil Rights released its 2011 Dear Colleague Letter.  Over the last several years, Black has played a central role in Title IX implementation, including: ensuring Title IX compliance on a number of fronts; conducting Title IX training and serving as the institution's Title IX investigator; and drafting Annual Security Reports, Memoranda of Understanding, Codes of Conduct, and the College's new Title IX policy. Prior to law school, Black worked as a licensed master social worker in New York City, with special focus on trauma, including survivors and perpetrators of domestic violence, gang violence, prison violence, sexual violence, sexual assault, and child abuse, neglect, and molestation. She has continued to fulfill her passion for direct services through extensive volunteer work with the homeless and for a variety of social justice causes. Black is a graduate of the University of California Hastings College of the Law, New York University, and California State University.  She is licensed to practice law in the state of California and the District of Columbia.

**Michael Henry, J.D.** serves as The NCHERM Group's Lead Investigator, performing external investigations for K-12 and higher education clients across the country. Prior to joining The NCHERM Group, Henry served as the Deputy Title IX Coordinator, Lead Title IX Investigator, and Director of the Office for Student Rights & Resolution at Texas Tech University. While at Texas Tech, Henry investigated and adjudicated employee and student cases of discrimination, harassment, and gender-based violence, as well as incidents of hazing and other forms of organizational misconduct within the university's Greek community. Henry authored and revised extensive portions of the university's conduct policy and procedure, trained University Discipline Committees, and developed institutional and system-wide operating policies related to discrimination, harassment, and Title IX. Henry has worked extensively with both university and municipal police departments, developing MOUs and joint interview protocols for Title IX investigations, and has provided education and prevention programming for faculty, staff, and students. Henry is a graduate of the Texas Tech University School of Law and has experience in civil litigation, as well as having worked in the Appellate Division of the Lubbock District Attorney's Office. Henry has presented at the Association for Student Conduct Administration (ASCA) National Conference, served as a Faculty Fellow at the Gehring Academy, and has trained Title IX Coordinators and Investigators as a faculty member for ATIXA.

**W. Scott Lewis, J.D.** is a Partner with The NCHERM Group, LLC. He served as the 2013-2014 President of the National Behavioral Intervention Team Association (NaBITA) and is a founder and Advisory Board member of ATIXA. Previously, he served as Special Advisor to Saint Mary's College in South Bend, IN and as Assistant Vice Provost at the University of South Carolina, where he was also on the faculty, teaching courses in Education, Law, Political Science, and Business. He has worked with the Department of Justice's Office of Violence Against Women as a trainer and consultant, as well as a consultant to the Office of the Vice President and the White House Task Force on issues of sexual misconduct and Title IX. Additionally, he serves as a consultant to the U.S. Olympic Committee in areas around sexual misconduct and equity. Lewis brings over 20 years of experience as a student affairs admin-

istrator, faculty member, and consultant in higher education. He completed his undergraduate work in Psychology and his graduate work in Higher Education Administration at Texas A&M University and received his law degree and mediation training from the University of Houston. He lives in Denver, Colorado.

**Leslee Morris, J.D.** is a Title IX Investigator for the San Diego Community College District. She was previously an Associate Attorney with The NCHERM Group, LLC and a member of the Advisory Board of ATIXA. She received her law degree and mediation training from the University of Colorado (CU) School of Law. She was admitted to the Colorado bar in 2000 and served as an associate in the Office of University Counsel at CU, specializing in employment discrimination cases. She also served for nine years as an investigator in the Student Conduct Office at CU, specializing in civil rights-based grievances, and as the Title IX Compliance and Grievances Coordinator for National University in La Jolla, California. Prior to law school, Morris was a Policy Analyst for a nonprofit organization in New York City where she specialized in child welfare and juvenile justice issues.

**Anna Oppenheim, J.D.** is an Associate Attorney with The NCHERM Group, LLC. She advises colleges and universities on ongoing misconduct investigations and often serves as an external investigator for issues of complex sexual misconduct as well as employment matters, retaliation, and harassment. Oppenheim also is responsible for drafting policies and best practices for educational institutions on a wide range of matters, in addition to assisting with policy implementation. Prior to joining The NCHERM Group, LLC, she worked as a civil rights attorney at a boutique plaintiff's employment discrimination firm in Center City, Philadelphia, where she focused on advising current employees on issues involving sexual harassment. Oppenheim also served as an investigator for the Office of the Inspector General in Philadelphia, where she specialized in cases involving sexual misconduct by government employees. She has experience conducting mediations and other forms of alternate dispute resolution, and has developed and presented seminars and trainings related to complex employment matters, ethical obstacles in the workplace, and gender and diversity issues, both in the United States and internationally. A Philadelphia native, Oppenheim received her law degree from Temple University and her Bachelor of Arts from Dartmouth College.

**Saundra K. Schuster, J.D.** is a Partner with The NCHERM Group, LLC. She is a founder of ATIXA and a member of its Advisory Board. She was formerly General Counsel for Sinclair Community College in Dayton, Ohio and Senior Assistant Attorney General for the State of Ohio in the Higher Education Section. Schuster is a recognized expert in preventive law for education, notably in the fields of sexual misconduct, First Amendment, risk management, student discipline, campus conduct, intellectual property, and employment Issues. Prior to practicing law, Schuster served as the Associate Dean of Students at The Ohio State University. Schuster has more than 25 years of experience in college administration and teaching. She frequently presents nationally on legal issues in higher education. Schuster holds Masters degrees in Counseling and Higher Education Administration from Miami University, completed her coursework for her Ph.D. at The Ohio State University, and was awarded her law degree from the Moritz College of Law, The Ohio State University. She is a past President of the National Behavioral Intervention Team Association (NaBITA).

**Brett A. Sokolow, J.D.** is a higher education attorney who specializes in high-risk campus health and safety issues. He is recognized as a national leader on campus sexual violence prevention, response, and remediation. He is the founder, President, and CEO of The NCHERM Group, LLC, which serves as legal counsel to over 70 colleges and universities. The NCHERM Group has consulted with more than 3,000 college campuses. Sokolow is the Executive Director of ATIXA. He frequently serves as an expert witness on sexual assault and harassment cases, and he has authored twelve books and more than 50 articles on campus safety and sexual assault. He has provided strategic prevention programs to students at more than 2,000 college and university campuses on sexual misconduct and alcohol. He has authored the conduct codes of more than 75 colleges and universities. The ATIXA Model Sexual Misconduct policy serves as the basis for policies at hundreds of colleges and universities across the country. The NCHERM Group has trained the members of more than 700 conduct hearing boards at colleges and universities in North America. ATIXA has certified more than 8,400 school and campus Title IX Coordinators and civil rights investigators. Additionally, Sokolow is the Founder and Past President of the National Behavioral Intervention Team Association (NaBITA), and is a Directorate Body member of the American College Personnel Association – College Student Educators International (ACPA) Commission on Student Conduct and Legal Issues. Sokolow is a 1993 graduate of the College of William and Mary and a 1997 graduate of the Villanova University School of Law.

**Daniel Swinton, J.D., Ed.D.** is Managing Partner of The NCHERM Group, LLC and Senior Associate Executive Director of ATIXA. Prior to that, he served as Assistant Dean and Director of Student Conduct and Academic Integrity at Vanderbilt University. Swinton received his Bachelor's degree from Brigham Young University, his law degree from the J. Reuben Clark Law School at BYU, and a doctorate in higher education leadership and policy from Vanderbilt University's Peabody College. He is a member of the Tennessee State Bar. Swinton has presented nationally on issues such as sexual misconduct on college campuses, legal issues in student affairs and higher education, student conduct policies and procedures, mediation, and behavioral intervention teams. Swinton also served as President of the Association for Student Conduct Administration (ASCA) in 2011-2012.





www.atixa.org

© 2017 ATIXA | All rights reserved