# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| JOHN DOE, | Case No. 6:20-cv-01220-WWB-LRH |
| Plaintiff, | Judge: BERGER |
| v. | EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER |
| EMBRY-RIDDLE AERONAUTICAL UNIVERSITY, INC. | |
| Defendant | |

Plaintiff John Doe, respectfully submits this Court issue a Temporary Restraining Order. Plaintiff seeks an Order of this Court allowing him to remain a student at Embry Riddle Aeronautical University ("ERAU") while this Court considers the Motion for a Preliminary Injunction.[1] This Motion is presented on an Emergency Basis because classes for the fall semester started on August 30, 2021. (Def. Memo., Doc#111, PageOD#1799.) Accordingly, this Motion is necessary to maintain the *status quo* of Plaintiff being able to continue his studies.

Pursuant to Local Rule 6.01(a)(5) a proposed order accompanies this Motion.

---

[1] Local Rule 3.01(a) statement of the precise relief requested and basis for the request:
Pursuant to Fed. R. Civ. P. 65 and the equitable "judicial power" vested in Article III courts, Plaintiff seeks a temporary restraining order as follows:

> Defendant is prohibited from imposing any disciplinary sanctions against Plaintiff related to the alleged sexual misconduct described in the Complaint. Defendant shall restore Plaintiff as a student in good standing and Plaintiff shall continue to receive any scholarships and/or financial aid he was receiving prior to the imposition of disciplinary sanctions.

1

## MEMORANDUM

A. **Necessity Of Immediate Relief**

Plaintiff originally filed a Motion for Preliminary Injunction on July 9, 2020. (Doc#4.) As a result of a "Status Quo Agreement" between the parties that permitted Plaintiff to attend school on-line, Plaintiff withdrew the Motion. (Doc#36, Doc#41.) The Status Quo Agreement was extended for classes in Spring 2021.

Plaintiff filed a renewed Motion for Preliminary Injunction on March 24, 2021 designed to permit him to attend classes in the fall.[2] (Doc#85.) Plaintiff requested a hearing on this Motion on the same date. (Doc#86.) Plaintiff also submitted substantial evidence in support of the Motion. (Doc#87.) This Motion has been fully briefed and remains pending before the Court.

Cross Motions for summary judgment are also pending before the Court. (Doc#96, Doc#101.)

In the interim, the Court denied Defendant's Motion to Dismiss; in doing so, the Court rejected many of the same arguments Defendant presented in opposition to the Motion to Dismiss. (Doc#128.)

Without immediate relief from the Court, Plaintiff faces immediate irreparable harm from the delay in his education. Courts have found actions delaying or disrupting a claimant's education to present irreparable harm. *Doe v. Rhodes College*, W.D.Tenn. No. 2:16-cv-02308, 2016 U.S. Dist. LEXIS 201165, at *22 (Oct. 25, 2016), *citing Marshall v. Ohio University*, S.D.Ohio No. 2:15-cv-775, 2015 U.S. Dist. LEXIS 31272 (Mar. 13, 2015),

---

[2] As part of the Status Quo Agreement, the parties agreed that "Defendant is precluded from arguing that any delay as a result of this Agreement in seeking injunctive relief from the Court by Plaintiff is evidence that Plaintiff will not suffer irreparable harm…".

at *9 (S.D. Ohio 2015) ("[Plaintiff's] suspension effectively denied him the benefit of the work already performed in the classes this semester and delayed the completion of his degree."); *Doe v. Rector & Visitors of George Mason Univ.*, 179 F. Supp. 3d 583, 587 (E.D.Va.2016) ("there can be no doubt that plaintiff has suffered an irreparable injury… The clock cannot be turned back… to allow plaintiff to resume his course of study on his preferred schedule"); *King v. DePauw Univ.*, S.D. Ind. No. 2:14-cv-70, 2014 U.S. Dist. LEXIS 117075, , at *13 (Aug. 22, 2014) (finding irreparable harm where plaintiff would "forever have either a gap or a senior-year transfer on his record," noting the inevitability of questions by future employers or graduate schools for which "any explanation is unlikely to fully erase the stigma").

Federal courts have granted preliminary injunctive relief prohibiting private universities from implementing discipline against students accused of sexual misconduct. *See e.g. Doe v. Univ. of Notre Dame*, N.D.Ind. No. 3:17CV298, 2017 U.S. Dist. LEXIS 69645 (May 8, 2017); *Doe v. Middlebury College*, D.Vt. No. 1:15-cv-192-jgm, 2015 U.S. Dist. LEXIS 124540 (Sep. 16, 2015); *King v. DePauw Univ.*, No. 2:14-cv- 70, 2014 U.S. Dist. LEXIS 117075 (S.D. Ind. Aug. 22, 2014). Courts have similarly granted injunctive relief against public colleges and universities, finding that students faced irreparable harm from the imposition of school discipline. *See e.g. Doe v. Rector & Visitors*, W.D.Va. Civil Action No. 3:19CV00038, 2019 U.S. Dist. LEXIS 108990 (June 28, 2019); *Doe v. Univ. of Michigan*, 325 F. Supp. 3d 821, 826 (E.D.Mich. 2018); *Nokes v. Miami Univ.*, S.D.Ohio No. 1:17-cv-482, 2017 U.S. Dist. LEXIS 136880 (Aug. 25, 2017); *Ritter v. Oklahoma*, W.D.Okla. No. CIV-16-043 8-HE, 2016 U.S. Dist. LEXIS 60193 (May 6, 2016); *Doe v. Penn. State Univ.*, M.D.Pa. No. 17-CV-01315, 2017 U.S. Dist. LEXIS 132186 (Aug. 18,

2017); *Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704 (S.D. Ohio 2016), aff'd 872 F.3d 393 (6th Cir. 2017); *Roe v. Adams- Gaston*, S.D.Ohio No. 2:17-cv-945, 2018 U.S. Dist. LEXIS 185697 (Apr. 17, 2018).

**B.     Relevant Facts**

Plaintiff is a student at Embry-Riddle Aeronautical University ("ERAU"). ERAU is a private university in Daytona Beach, Florida. Doe is training to be a pilot. He is also a student-athlete who received a scholarship.

ERAU has adopted a "Civil Rights Equity & Sex / Gender Based Harassment, Discrimination, and Sexual Misconduct Policy." (Doc#1-5.) This is referred to as the "Sexual Misconduct Policy. The Sexual Misconduct Policy states that it was adopted, in part to comply with various guidance from the Department of Education, including the 2011 Dear Colleagues Letter. Allegations of sexual misconduct are reported to and investigated by the school's Title IX Coordinator.[3] ERAU has adopted a "Civil Rights Equity & Sex/Gender-Based Harassment, Discrimination, and Sexual Misconduct Resolution Process." This is referred to as the "Resolution Process." (Doc#1-6.) The Resolution Process sets forth procedures ERAU employs to investigate and adjudicate allegations of violations of the Sexual Misconduct Policy. The Resolution Process provides that allegations of sexual misconduct are handled by what is referred to as the "single investigator model." The Title IX Coordinator assigns an investigator to interview

---

[3] The Sexual Misconduct Policy requires that "there must be clear, knowing, and voluntary consent prior to and during sexual activity." The Sexual Misconduct Policy prohibits sexual activity with "someone you know to be or should know to be incapacitated." The definition of "incapacitated" in the Sexual Misconduct Policy is complicated and confusing but, in regard to alcohol use, provides that "incapacitation is a state beyond drunkenness or intoxication." (Doc#1-5, PageID#50-51)

witnesses, gather evidence, and determine if a violation of the Sexual Misconduct Policy has occurred. (Doc#1-6, PageID#87-89.)  ERAU promises as "a fundamentally fair resolution" and a decision based solely on evidence presented during the resolution process that is "credible, relevant, based on fact, and without prejudice."[4] (Doc#1-6, PageID#100-101.) The Resolution Process provides for a limited appeal.

John Doe was accused of sexual misconduct arising out of events that occurred on October 26-27, 2019 (the "Incident"). Simply: John Doe and Jane Roe engaged in sexual activity after drinking at a Halloween party. Both John Doe and Jane Roe claim to have been intoxicated. Jane Roe submitted a complaint to the ERAU Title IX Office alleging that she was the victim of a sexual assault. (Report (filed under seal) at 4.) The basis for Jane Roe's complaint was, essentially, that she was too intoxicated to consent to sexual activity.[5] (See e.g. Report at 47.) During an initial meeting with the ERAU Title IX Coordinator, John Doe informed the Title IX Coordinator that he was very intoxicated when he engaged in sexual activity with Jane Roe. (Dammer Depo., Doc#87-1 at 78.) The Title IX Coordinator did not act on this statement or initiate an investigation into possible misconduct by Jane Roe. (Doc#4-1, PageID#127-129.) After a 'mediation' was

---

[4] Many traditional due process-type protections are not present. The accused student is not permitted to remain silent and is not presumed innocent. There is no hearing. Students accused of sexual misconduct are not given an opportunity to question their accusers or any adverse witnesses.

[5] The conclusion of the Report makes clear that incapacitation due to intoxication is the basis for the conclusion that she did not consent to sexual activity:

> The evidence shows that the respondent should have known that the reportercould not make rational, reasonable decisions and lack the capacity to give knowing consent.

(Report at 55.)

unsuccessful, on January 8, 2020, John Doe was informed that Jane Roe had "requested to move forward with a formal Title IX investigation." (Report at 4-5.)

On January 10, 2020, John Doe submitted a report to the Title IX Office alleging that he, too, was the victim of sexual misconduct. In this report, John Doe indicated that on the night of the incident, he was "too intoxicated to consent to the sexual acts of [Jane Roe.]" (Doc#4-1, PageID#129; January 10, 2020 Complaint.) ERAU did not respond to John Doe's complaint against Jane Roe. (Doc#4-1, PageID#129-130; Dammer Depo., Doc#87-1, at 54-58.) Instead, ERAU conducted an investigation solely into the allegations against John Doe. During the investigation, John Doe again indicated that he was too intoxicated to engage in consensual sexual activity with Jane Roe. John Doe also provided the investigator with sworn statements supporting his version of events. (Doc#4-2, PageID#133.)

On March 24, 2020, John Doe was informed that the Title IX investigation was completed and that he had been found responsible for "Non-Consensual Sexual Intercourse" because Jane Roe was incapacitated when she consented to sexual activity with John Doe. The Outcome Letter did not address John Doe's claim that he was a victim of sexual misconduct because he, too, was intoxicated. (Doc#1-2.)

On April 1, 2020 John Doe submitted an appeal, referred to by ERAU as a "Request for Reconsideration." John Doe noted that he had submitted a claim that he was a victim of sexual misconduct which had not been addressed. John Doe also noted various procedural irregularities. (Doc#87-11.) The Appeal was reviewed by the Associate Dean of Students & Title IX Coordinator for the ERAU campus in Arizona. She identified concerns about bias, granted John Doe's appeal, and ordered that case to be reviewed

6

by a new investigator. (Doc#1-3.) The new investigator only read the report -- he did not conduct any new investigative work or speak to any witnesses. On June 10, 2020 the new investigator issued an Outcome Letter. This letter is substantially similar to the Outcome Letter and summarily dismissed John Doe's claim that he was also incapacitated. (Doc#1-4.) John Doe was dismissed from ERAU. He faces, inter alia, damage to his academic and professional reputations. He will be limited in his ability to enroll at other institutions of higher education and to pursue a career. (Doc#4-1, PageID#130-131.)

**C.     Standard**

The standard of review for a temporary restraining order is the same as that for a preliminary injunction. *Viera v. Major League Baseball Ents.*, M.D.Fla. No. 8:01-CV-1037, 2001 U.S. Dist. LEXIS 26155, at *4 fn 2 (June 4, 2001), *citing United States v. Metropolitan Dade County*, 815 F. Supp. 1475, 1477 (S.D. Fla. 1993).  To justify a preliminary injunction the movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Clewiston Commons Ltd. Liab. Co. v. City of Clewiston*, M.D.Fla. No. 2:18-cv-339, 2019 U.S. Dist. LEXIS 19923, at *7 (Feb. 7, 2019), *quoting Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

**D.     Plaintiff Has A Substantial Likelihood of Success**

    **1.     Selective Enforcement Claim**

To prevail on a Title IX Selective Enforcement claim, Plaintiff must demonstrate that a similarly-situated member of the opposite sex was treated more favorably. *Doe v.*

*Embry-Riddle Aeronautical Univ.*, M.D.Fla. No. 6:20-cv-1220, 2021 U.S. Dist. LEXIS 128761 (May 28, 2021);  Doe v. Cummins, 662 F. App'x 437, 452 (6th Cir. 2016).  In a selective enforcement claim, a plaintiff alleges that the decision to initiate proceedings or the penalty imposed was affected by plaintiff's gender. Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994). Plaintiff succeeds if he can demonstrate that a person of the opposite sex was in similar circumstances and was treated more favorably. *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 756 (E.D. Tenn. 2009).

On January 10, 2020 John Doe submitted a Complaint of Misconduct against Jane Roe. (January 10, 2020 Complaint, Doc#87-7.) Jane Roe was not investigated for violating the sexual misconduct policy after John Doe's complaint.  Jane Roe was never even informedabout the allegation. (Dammer Depo., Doc#87-1 at 88.) No outcome letter was ever produced. The Title IX Coordinator admitted in her deposition that there should have been a clear and unambiguous finding in the Report on John Doe's complaint:

> Q …Would that report include a clear statement of the allegation by the – by the complainant?
> A full report, yes.
> Q And would that report then include a finding about whether the accused student was responsible or not responsible for that allegation?
> A Yes.
> Q Okay. In other words, there shouldn't be any ambiguity? If there's a complaint there should be some document out there that says, "This is the allegation that Embry-Riddle looked at. This is the result of our investigation"?
> A Yes.

(Dammer Depo., Doc#87-1 at 46-47 (objection omitted).)[6]  The   Report   does   not

---

[6] The Title IX Coordinator claimed in her deposition that the school "basically merged the case." No documentation supports this claim. (*See e.g.* Dammer Depo., Doc#87-1, at 91.) The Title IX Coordinator lied about this. She said she "checked with" a representative of an organization that provides advice and training to schools on Title IX matters about this issue. This representative, according to her deposition testimony, "recommended that we

8

contain such astatement describing the result of John Doe's complaint.

John Doe's claim fits squarely within existing case law. Courts have held that a student states a viable Title IX Selective Enforcement claim where the school only investigates one party when both allege that they engaged in sexual activity while intoxicated. "An accused student and his or her accuser can be compared to show selective enforcement if the parties allege misconduct against each other." *Rossley v. Drake Univ.*, 342 F. Supp. 3d 904, 933 (S.D.Iowa 2018), *citing Stenzel v. Peterson,* D.Minn. No. 17-580, 2017 U.S. Dist. LEXIS 148467 (Sep. 13, 2017). In *Rossley*, a court found that a viable Title IX claim existed where the male student, as in this case, told a school official he might be the victim of a sexual assault.[8] The school official declined to initiate an investigation into the allegations of the female student. Notably, in *Rossley,* the knowledge of the school officials alone was sufficient to create an inference that sexwas a motivating factor in a school's decision to discipline a student.  The court said,

> Although Defendants claim Plaintiff cannot allege facts to show any possible disparate treatment was motivated by gender, the disputed facts themselves—whether an arguably similarly situated man and woman were treated differently—raise the specter of gender bias…

*Rossley*, 342 F. Supp. 3d at 934-935.

John Doe and Jane Roe are similarly situated in that their conduct was nearly identical: (i) they both engaged in the exact same sexual conduct; (ii) they both admitted to drinking; (iii) they both claimed the other initiated sexual activity; and (iii) they both

---

just merge or hold off" on the investigation of John Doe's allegations "and do this after the other case was done." (Dammer Depo., Doc#87-1 at 55.) The representative has submitted an Affidavit denying that she provided advice to ERAU and stating, further, that she would have advised the school that the claim by John Doe could not be summarily rejected and ignored.  (Affidavit of Sandra Shuster, Doc#87-12.)

submitted formal complaints alleging that they were incapable of providing consent. (*See e.g.* Doc#4-1, PageID#129.) They both should have received the same initial treatment or, at a minimum, be subject to investigation.[9] Tellingly, John Doe was suspended from his athletics team on the basis of only an allegation prior to any investigation; Jane Roe was not suspended from her athletics team after John Doe lodged a similar accusation.[7] (*Id.*) This type of disparate treatment, courts have recognized, demonstrates gender bias and a selective enforcement violation under Title IX. In *Doe v. Brown Univ.*, 327 F. Supp. 3d 397 (D.R.I. 2018), the court indicated that this was sufficient to create a Title IX selective enforcement issue. The court said:

> Both [the male student] and [the female student] were students at Brown. Both brought complaints of sexual assault. Both complaints of sexual assault occurred, at most, within six months of each other. Brown investigated [the female student's] complaint; it ignored [the male student's] complaint. While the two are not exactly identical, the allegations as pleaded present [the male student] and [the female student] as similarly situated.

227 F. Supp. 3d at 413. Other courts have reached a similar conclusion. *See Doe v. Syracuse Univ.*, N.D.N.Y. No. 5:17-cv-787 (TJM/ATB), 2020 U.S. Dist. LEXIS 75995, at *33-35 (Apr. 30, 2020) (denying cross motions for summary judgment where both male

---

[7] Jane Roe requested that John Doe be suspended form his athletics team; the Title IX Coordinator agreed even though there has been no investigation. (Doe Aff. ¶3; Dammer Depo., Doc#87-1 at 84-85.) John Doe's faculty advisor believed this was evidence of bias. She testified at her deposition:

> One of the things that John Doe brought up in every meeting that I attended was his request for clarification as to why he had been removed from the track team and he was not allowed to train with the team, and he had -- he requested clarification on that and he had offered several potential options or solutions that would allow himself and the Reporter to train where they would not overlap or other options, and the Title IX Coordinator's responses to these requests just didn't seem authentic.

(Steinhauer Depo., Doc#87-3 at 49.)

and female engaged in sexual activity when intoxicated; "there are questions of fact about whether gender bias motivated the fact that [the male student] received a penalty for the incident and [the female student] did not."); *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 223 (D. Mass. 2017) ("when the College learned [the female student] may have initiated sexual activity with [plaintiff] while he was... incapable of consenting, the College did not encourage him to file a complaint, consider the information, or otherwise investigate").

ERAU's conduct demonstrates favoritism toward women and shows that ERAU operates according to a stereotypical view of males as sexual aggressors and females as passive, a view that men are responsible for obtaining consent from women but not the other way around.[11] This gender stereotype, sometimes known as "traditional sexual scripts," governs women and men's behavior during sexual encounters. According to this stereotype, men are perceived as "willing and at all times ready for sex" while womenare perceived to desire sex only within the context of a stable, monogamous relationship.The failure of ERAU to conduct an investigation into Jane Roe, thus, is not accidental. Professor Gruber, an expert in the relationship between gender stereotypes and the legal rules, principles, and practices governing gender violence, has examined the facts of this case. She explains the influence of gender stereotypes and sexual scripts on ERAU's actions:

> …ERAU acted in a manner consistent with the application of the traditional sexual script and the gender stereotypes therein. The decision of ERAU to notinvestigate John Doe's claim that he was experienced a nonconsensual sexualassault by Jane Roe was consistent with the stereotypical view of men as sexual aggressors and women as passive gatekeepers. The failure to investigate John Doe's claim that he was too incapacitated to consent to sex, despite evidence of his intoxication, is indicative of a presumption that John Doe, a man, could not have been the victim of sexual assault by Jane Roe, thathe was "willing and at all times able" to have sex, and that his intoxication did not matter because, regardless of his level of drunkenness,

he was a pursuer who benefitted from the "achievement" of sexual intercourse.

(Doc#4-3, PageID#140-141.)[8]  ERAU, it may be inferred, adopted this stereotyped view in response to pressure from the Department of Education. *Purdue Univ.*, 928 F.3d at 668; *Miami Univ.*, 882 F.3d at 594; *Univ. of the Sciences*, 961 F.3d at 210; *Doe v. Regents of the Univ. of Minnesota*, 999 F.3d 571, 578 (8th Cir. 2021).  These decisions accept that pressure from the Department of Education ushered in a more rigorous approach to campus sexual misconduct allegations and found that alleged university overreaction is relevant to alleging a plausible Title IX discrimination claim.

The ERAU investigation also relied on other stereotypes.  The ERAU investigation relied on the stereotypical claim that a man cannot be incapacitated if he is able to maintain an erection and engage in intercourse. (Report at 52.) However: the Title IX Coordinator and Investigator admitted in their depositions that this stereotype is not accurate. (Dammer Depo. at 62; Meyers-Parker Depo. at 70-71.) Even worse: the investigative file contained a medical paper indicating that this was untrue – but this was

---

[8] ERAU's Sexual Misconduct Policy acknowledges that it was adopted to comply with directives from the Department of Education. Professor Gruber explains that this likely encouraged ERAU to rely upon gender stereotypes in reaching a conclusion in this case:

> ERAU like other schools nationwide faced the risk that a process favorable to the respondent or a finding of nonresponsibility would invite federal investigation and sanction, which could result in loss of eligibility for federal funding. Importantly, adherence to the entrenched gender stereotypes… generally makes it easier to find male respondents responsible for incapacitated and nonconsensual sex in a mutual intoxication situation because the man is necessarily the sexual pursuer responsible for obtaining sober consent and the woman is necessarily the passive gatekeeper. The stereotypes thus aligned with ERAU's interest in avoiding federal investigationand sanction.

(Doc4-3, PageID#141.)

also ignored. (Dammer Depo., Doc#87-1 at 66-67.) John Doe, thus, has a substantial likelihood of success on his claim that he was unfairly investigated or disciplined where a similarly- situated female, Jane Roe, was not.[13] *Cf. Rolph v. Hobart & William Smith Colleges*, 271 F. Supp. 3d 386, 402 (W.D.N.Y. 2017) (student alleged gender bias, in part, on the fact that school "panel questioned him extensively about whether he was intoxicated… but failed to question her about whether he appeared intoxicated; this, according to Plaintiff, 'is consistent with a view of men as predators and women as guardians of virtue'").

### 2. Breach of Contract Claim

A student and a private university in Florida have a contractual relationship. *John B. Stetson Univ. v. Hunt*, 88 Fla. 510, 102 So. 637 (1924); *Sharick v. Southeastern University of Health Sciences, Inc.*, 780 So.2d 136, 138 (Fla. 3rd DCA 2000). The terms of this relationship are generally set forth in university catalogs, student manuals, student handbooks, and other university policies and procedures. *Ali v. Stetson Univ., Inc.*, 340 F.Supp.2d 1320, 1328 (M.D. Fla. 2004), *quoting Univ. of Miami v. Militana*, 184 So.2d 701, 704 (Fla. 3d DCA 1966).

#### a. The Conduct Occurred Off Campus

The Sexual Misconduct Policy cannot be applied to John Doe's alleged conduct. The Sexual Misconduct Policy unambiguously states that the "jurisdiction" of the policy is limited to "activities on University owned and or operated property." (Doc#1-5, PageID#49.) The alleged conduct in this case occurred at a private party at private house off campus. (Doc#4-1, PageID#128.) As a result, the school did not act in accordance with the express terms and conditions of its policy.

13

### b.     ERAU Did Not Provide A Fair Process

The Sexual Misconduct Policy and Resolution Process contain a number of guarantees of fundamental fairness. The Resolution Process provides that "all investigations will be thorough, reliable, and impartial" and that a Responding Party has the "right to a fundamentally fair resolution, as defined in these processes." (Doc#1-6.) For purposes of this Motion, the Court should consider three violations of this guarantee. *See Doe v. Rollins College,* 352 F. Supp. 3d 1205, 1212 (M.D.Fla. 2019) (denying motion to dismiss where student "identified specific provisions of the Sexual Misconduct Policy that Rollins purportedly breached and facts alleging how the breach occurred").

<u>First</u>, the Report contained significant errors. The most notable example is that the Report improperly relied upon medical records provided by Jane Roe. The investigator credited a claim by Jane Roe that she had genital tearing – yet the medical records do not show this. (Meyers-Parker Depo., Doc#87-2 at 163.) The investigator also credited an alleged "diagnosis" in the report of sexual assault – but this was just a reason given by Jane Roe for the examination, and not a conclusion by the medical personnel. The ERAU employee who granted the appeal explained the error:

> Q So why was it problematic that the medical records were used in this particular case?
> A The medical records that were utilized came from a center that typically advocates for the complainant. Therefore, the diagnosis on the medical documentation was not necessarily a medical diagnosis but what the complainant went in to see the medical provider for.

(Frost Depo. Doc#87-4 at 51,)  The ERAU employee added, "I would say that there's concerns about potential bias for using the [medical] report." (Frost Depo. Doc#87-4 at 52.)

<u>Second</u>, the ERAU Title IX Coordinator and Investigator were biased. The ERAU employee who granted the appeal indicated her belief that the Report was biased, in part,

14

based on gender. (Frost Depo., Doc#87-4 at 44.) She set forth five different sources of error/bias in an April 14, 2020 email and testified about her concerns "about failure to follow procedures." (Frost Depo., Doc#87-4 at 50-52, 81; April 14, 2020 Email, Doc#87-10.) John Doe's faculty advisor initially claimed that the process was fair and unbiased. However, she later admitted that she told Plaintiff "there was bias in some of what I saw." (Steinhauer Depo., Doc#87-3 at 46. *See also Id.* at 49 ("the Coordinator was showing some bias").)

Discovery revealed that the source of this bias was a desire by the Investigator and Title IX Coordinator to "believe the victim." Training materials produced by ERAU indicate that the Title IX Coordinator and Investigator teach others in the ERAU community that "We need to believe survivors *because it is their truth* they are speaking." (Training at ERAU_002683 (emphasis in original).)[18] The Title IX Coordinator testified to this her deposition. (Dammer Depo., Doc#87-1 at 44.) Yet, when John Doe submitted a complaint, he was not treated as a victim. Instead, Dammer admitted she "did not believe him." (Dammer Depo., Doc#87-1 at 53.) Bryan Lambert, an experienced attorney who served as John Doe's advisor, confirms this disparate treatment:

> I believe that ERAU officials were biased against John Doe. I have been involved in numerous investigations of sexual misconduct and, as a result, I believe that I can tell when an investigator has reached a conclusion before theinvestigation even started. This is how ERAU treated John Doe.

(Doc#4-2, PageID#132-133.)

Perhaps the most egregious example of bias is the fact that ERAU declined to consider sworn statements provided by John Doe to the Investigator. John Doe's counsel writes:

> I assisted John Doe in obtaining sworn statements from witnesses who supported John Doe's version of events and undermined the credibility of

15

> Jane Roe. ERAU officials initially declined to accept the statements, then, upon John Doe's objection, relented…

(Doc#4-2, PageID#133.) Disturbingly, the Report explains that the statements would not be given full consideration, in part, because they came from an attorney; the investigator then falsely accused John Doe and his counsel of "coaching the witnesses." All witnesses specifically denied being coached, yet the Report states:

> Since [the witnesses] had met with the attorney and his staff before they came to meet the title IX Investigator, it is likely they had been coached or told what to focus on in their statements by either the attorney or the respondent.

(Report at 51.) *This impertinent accusation was based on zero evidence;* the Investigator admitted at her deposition that she could not support this claim! (Meyers-Parker Depo, Doc#87-2. at 195-203.) Finally, when confronted with the seriousness of the accusation, she admitted her error: "I do not think I should have used the term 'likely.'" (Meyers-Parker Depo. at 203.) The Title IX Coordinator also testified that she was not aware of any such coaching. (Dammer Depo., Doc#87-1 at 129.)

**E.    Plaintiff Will Suffer Irreparable Harm**

The Affidavit of John Doe describes the irreparable harm Plaintiff will suffer if a temporary restraining order and preliminary injunction are not granted. (Doc#4-1; PageID#130-131.) The imposition of discipline by ERAU would deny Plaintiff the benefits of education at his chosen school, would damage his academic and professional reputation, would prevent him from competing athletically, and would result in the loss of a scholarship. The discipline also may affect his ability to enroll at other institutions of higher education and to pursue a career. This has been found to constitute irreparable harm. In *Doe v. Univ. of Cincinnati,* the Sixth Circuit observed that a suspended student would "suffer reputational harm both on and off campus based on a finding rendered after

16

an unfair hearing." 872 F.3d 393 at *29. The Fifth Circuit in *Plummer* observed that sanctions imposed by a university could have a "substantial lasting impact on [students'] personal lives, educational and employment opportunities, and reputations in the community." 860 F.3d at 773, *citing Doe v. Cummins*, 662 F. App'x 437, 446 (6th Cir. 2016). Another court observes that this satisfies the irreparable harm prong of the preliminary injunction inquiry:

> The court concludes plaintiff has also demonstrated that he will suffer irreparable harm if the injunction is denied. The loss of educational and career opportunities he will encounter if not reinstated and allowed to graduate is not readily compensable in money damages.

*Ritter*, 2016 U.S. Dist. LEXIS 60193, at *8.

Plaintiff's claims cannot be fully compensated with money damages. *Doe v. Univ. of Michigan*, 325 F. Supp. 3d at 829 ("Money damages cannot compensate Plaintiff for thereputational harm he has already suffered and will continue to suffer as a consequence of sexual assault allegations."); *Haney v. W. Chester Univ.*, E.D.Pa. No. 18-02456, 2018 U.S. Dist. LEXIS 138639, at *28 (Aug. 16, 2018) ("Expulsion also is likely to affect Plaintiff's ability to enroll at other institutions of higher education and to pursue a career. Neither money damages nor any other legal remedy can compensate for these injuries.").

**F.    No Harm To Third Parties And A TRO Is In The Public Interest**

An injunction will not cause any harm to third parties or Defendant. Defendant remains able to enforce its rules and regulations in a manner consistent with its policies and student handbook. On the other hand, the failure to grant an injunction would harm the public because it would permit Defendant to ignore both Title IX and its policies with respect to all current and future students on an ongoing basis while this case is resolved, which necessarily would cause substantial, irreparable harm to those students.

Plaintiff has a substantial likelihood of success on his Title IX claim. *See supra*. Courts have observed that the enforcement of Title IX, like other civil rights statutes, is in the public interest. *Dodds v. United States Dept. of Edn.*, 845 F.3d 217, 222 (6th Cir. 2016) ("The district court issued the injunction to protect Doe's… civil rights [under Title IX], a purpose that is always in the public interest."), *citing Cohen v. Brown Univ.*, 991 F.2d 888, 906 (1st Cir.1993) ("the overriding public interest lay in the firm enforcement of Title IX").

Plaintiff also has a substantial likelihood of success on his breach of contract claim. *See supra*. Enforcement of contracts is in the public interest, generally – but more so when there is a disparity in power and resources between students and an educational institution. *See Talk Fusion, Inc. v. Ulrich,* M.D.Fla. No. 8:11-CV-1134, 2011 U.S. Dist. LEXIS 74549, at *16 (June 21, 2011) ("a preliminary injunction would affirmatively serve the public interest by… upholding the terms of enforceable contracts"); *Internatl. Hair & Beauty Sys., LLC v. Simply Organic, Inc.*, M.D.Fla. No. 8:11-cv-1883, 2011 U.S. Dist. LEXIS 127336, at *29 (Sep. 26, 2011) ("a preliminary injunction would affirmatively serve the public interest by preserving faith in the contractual agreements that businesses routinely make with their employees [and] by upholding the terms of enforceable contracts…"); *TRO. Variable Annuity Life Ins. Co. v. Antoniadis*, M.D.Fla. No. 8:12-cv-1980, 2012 U.S. Dist. LEXIS 124200, at *3 (Aug. 31, 2012) (same).

**G.     Nominal Bond Should Be Imposed**

Federal R. Civ. P. 65(C) provides that "The court may issue a preliminary injunction. . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined

or restrained." Defendant is an educational institution. Accordingly, because money is not an issue for Defendant and the school is not likely to suffer any potential losses if an injunction is granted, this Court should set surety in the nominal amount of $1. *See Doe v. Cincinnati*, 223 F. Supp. 3d 704 ("The Court sets a bond in the nominal amount of $1."); *Ponce v. Socorro Indep. Sch. Dist.,* 432 F. Supp. 2d 682, 707 (W.D. Tex. 2006) (setting a nominal bond of one hundred dollars because the evidence indicates that Defendant will suffer little, if any, damage by the issuance of the preliminary injunction), *rev'd on other grounds* 508 F.3d 765 (5th Cir. 2007).

## CONCLUSION

This Court should issue a Temporary Restraining Order allowing Plaintiff to remain a student at Embry Riddle Aeronautical University ("ERAU") while this Court considers the Motion for a Preliminary Injunction.

FOR PLAINTIFF:

/s/ Joshua Engel
JOSHUA ADAM ENGEL (OH 0075769)
    (TRIAL COUNSEL)
    *Pro hac vice*
ANNE TAMASHASKY (OH 0064393)
    *Pro hac vice*
ENGEL AND MARTIN, LLC
4660 Duke Drive, Ste. 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

Lori A. Sochin (FL 013048)
LUBELL | ROSEN
1 Alhambra Plaza, Suite 1410
Coral Gables, FL 33134
(305) 655-3425
(305) 442-9047
las@lubellrosen.com

## CERTIFICATE OF SERVICE

This certifies that the foregoing was filed electronically on August 31, 2021. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

_____/s/ Joshua Engel_____
Joshua Adam Engel (Ohio No. 0075769)
*pro hac vice*

## CERTIFICATION OF COUNSEL

Pursuant to the Court's January 13, 2021 Standing Order, this document is in 12-point Arial typeface, including all indented quotations, footnotes, and endnotes.

Pursuant to Local Rule 3.01(g), the undersigned counsel certifies that before filing this Motion counsel DID NOT confer with counsel for the opposing party in a good faith effort to resolve the issues raised by the motion and obtain the relief sought without court action. This Motion seeks injunctive relief and therefore is exempt from the applicable Rule.

_____/s/ Joshua Engel_____
Joshua Adam Engel (Ohio No. 0075769)
*pro hac vice*
