**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| JOHN DOE, | Case No. 6:20-cv-01220-WWB-LRH |
| Plaintiff, | Judge: BERGER |
| v. | PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION *in limine* REGARDING TITLE IX COACHES' TRAINING DOCUMENT |
| EMBRY-RIDDLE AERONAUTICAL UNIVERSITY, INC. | |
| Defendant | |

Plaintiff John Doe respectfully submits this Response to Defendant's Motion *in limine* Regarding Title IX Coaches' Training Document.[1] (Doc#146.)

**MEMORANDUM**

**BACKGROUND FACTS**

Plaintiff John Doe is a student at Embry-Riddle Aeronautical University ("ERAU"). ERAU is a private university in Daytona Beach, Florida. (Verified Complaint, Doc#1, PageID#2.) John Doe is training to be a pilot. He is also a student-athlete who received a scholarship. (Verified Complaint, Doc#1, PageID#1-2.)

ERAU has adopted a "Civil Rights Equity & Sex/Gender Based Harassment, Discrimination, and Sexual Misconduct Policy." (the "Sexual Misconduct Policy"; Doc#1-5.) Allegations of sexual misconduct are reported to and investigated by the school's Title IX Coordinator. (Doc#1-5.) ERAU has also adopted a "Civil Rights Equity & Sex/Gender-

---

[1] In accordance with Judge Berger's Standing Order, this Memorandum is in 12-point Arial typeface and not the typeface described in Revised Local Rule 1.08(a), (b). *In Re: Local Rules Amendments*, Case No: 6:21-mc-3-Orl-78 (January 31, 2021).

1

Based Harassment, Discrimination, and Sexual Misconduct Resolution Process." ("Resolution Process"; Doc#1-6.)  The Resolution Process sets forth procedures ERAU employs to investigate and adjudicate allegations of violations of the Sexual Misconduct Policy.  The Resolution Process provides that allegations of sexual misconduct are handled by what is referred to as the "single investigator model."  The Title IX Coordinator assigns an investigator to interview witnesses, gather evidence, and determine if a violation of the Sexual Misconduct Policy has occurred.  (Doc#1-6, PageID#87-89.)  ERAU promises as "a fundamentally fair resolution" and a decision based solely on evidence presented during the resolution process that is "credible, relevant, based on fact, and without prejudice." (Doc#1-6, PageID#100-101.)  There is no opportunity for a hearing, and no opportunity for students accused of misconduct to question their accusers.   (Dammer Depo., Doc#87-1, PageID#702.)   Many other traditional due process-type protections are not present.  The accused student is not permitted to remain silent and is not presumed innocent.  The investigator and Title IX Coordinator literally serve as the police, judge, and jury in a secret process.  The Resolution Process provides for a limited appeal. (*Id.*)

John Doe was accused of sexual misconduct arising out of events that occurred on October 26-27, 2019 (the "Incident").[2]  John Doe and Jane Roe engaged in sexual

---

[2] John Doe unequivocally denies engaging in any misconduct or violation of the Sexual Misconduct Policy.  But as much as he would like to prove his innocence, Plaintiff recognizes that is irrelevant.  John Doe is *not* asking the Court to issue an opinion on the merits of the allegations against Jane Roe.  John Doe's claims focus on the actions of Defendant and are independent of his underlying "guilt" or "innocence."  *Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 313 (D.R.I. 2016) ("It is not the Court's role to . . . to evaluate whether the Court would have made the same judgment calls on evidence and other issues as [the school] did; or to determine whether the procedure John [Doe] received was optimal.").

activity after drinking at a Halloween party. Both John Doe and Jane Roe claim to have been intoxicated and told the ERAU Title IX Coordinator that they were unable to provide consent to the sexual activity. (*See, generally*, Verified Complaint, Doc#1.) In this litigation, John Doe claims that the decision of ERAU to not investigate his claim is consistent with stereotypical views of gender. (*See, generally,* Expert Report of Aya Gruber, Doc#91-3; Affidavit of Gruber, Doc#4-3.)

On October 19, 2018, Jane Roe submitted a complaint to the ERAU Title IX Office alleging that she was the victim of a sexual assault. (Doc#S-95 at 4.) The factual basis for Jane Roe's complaint regarding the Sexual Misconduct Policy is not initially completely clear. She indicated that she was nervous about drinking that night and John Doe "taking advantage of her." (Doc#S-95 at 7.) (Doc#S-95 at 8.) During the course of the investigation, the basis for Jane Roe's complaint became, essentially, that she was too intoxicated to consent to sexual activity.[3] (*See e.g.* Doc#S-95 at 47.) Jane Roe told the Title IX Coordinator that John Doe was also drunk. (Doc#S-95 at 7.) Jane Roe requested that John Doe be suspended from the track team. The Title IX coordinator, prior to conducting any investigation, agreed to prohibited John Doe from practicing or competing with his team. (Dammer Depo., Doc#87-1, PageID#709 ("Q …So when you imposed the interim measure in this case you had not conducted any investigation; right? A Correct.").

On November 13, 2019, the Title IX Coordinator met with John Doe about Jane Roe's allegations. John Doe informed the Title IX Coordinator that he was very

---

[3] The conclusion of the Report makes clear that incapacitation due to intoxication is the basis for the conclusion that Jane Roe did not consent to sexual activity: "The evidence shows that the respondent should have known that the reporter could not make rational, reasonable decisions and lack the capacity to give knowing consent." (Doc#S-95 at 55.)

3

intoxicated when he engaged in sexual activity with Jane Roe. (Doc#S-95 at 11; Dammer Depo., Doc#87-1, PageID#718.)  John Doe informed the Title IX Coordinator that Jane Roe had initiated some sexual activity and verbally indicated her consent to intercourse. (Doc#S-95 at 11-12.)  The Title IX Coordinator did not act on this statement or initiate an investigation into possible misconduct by Jane Roe.[4]  (Affidavit of John Doe, Doc#4-1, PageID#127-129.)  The Title IX Coordinator discounted John Doe's statements and discouraged John Doe from filing his own complaint against Jane Roe.  (*See* Verified Complaint, Doc#1, PageID#8-9.)

John Doe and Jane Roe attempted to mediate the issue with a campus minister. Prior to this meeting John Doe requested that the Title IX Office not be involved.  He was told that the mediation would be confidential and that statements made in the meeting would not be used in the investigation.  (Verified Complaint, Doc#1, PageID#8; Feb. 11, 2020 Email, Doc#87-8, PageID#884.)

On January 8, 2020, Jane Roe "requested to move forward with a formal Title IX investigation."  (Doc#S-95 at 4-5.)    On January 10, 2020, John Doe submitted a report to the Title IX Office alleging that he, too, was the victim of sexual misconduct.   (Doc#4-1, PageID#129; Jan. 10, 2020 Complaint, Doc#87-7, PageID#883.)  John Doe indicated that on the night of the incident, he was "too intoxicated to consent to the sexual acts of [Jane Roe.]"  (Jan. 10, 2020 Complaint, Doc#87-7, PageID#883.) The Title IX Coordinator acknowledged that the January 10, 2020 report is a complaint by John Doe alleging misconduct by Jane Roe.  (Dammer Depo., Doc#87-1, PageID#736.)  On February 23,

---

[4] The Resolution Process does not require ERAU to wait for a formal complaint to initiate an investigation.  (Doc#1-6, PageID#85 (authorizing investigation "if the University, based on the alleged policy violation(s), wishes to pursue a resolution").)

4

2020 John Doe told the Investigator that he was "drunk" when he engaged in sexual activity with Jane Roe.  (Doc#S-95 at 12-13.)

ERAU did not respond to John Doe's complaint against Jane Roe.  (Aff. of John Doe, Doc#4-1, PageID#129-130; Dammer Depo., Doc#87-1, PageID#712-713.)  Jane Roe was never informed about the allegations against her.  (Dammer Depo., Doc#87-1, PageID#714.)  No investigation of his claims was opened.   (Dammer Depo., Doc#87-1, PageID#712.)  There was no resolution of his allegation or finding about whether John Doe is incapacitated. (Dammer Depo., Doc#87-1, PageID#712, 714; Meyers-Parker Depo., Doc#87-2, PageID#783.)

ERAU conducted an investigation solely into the allegations *against* John Doe. Jane Roe was interviewed on at least two more occasions.  (Doc#S-95 at 8-10.)  During these interviews, Jane Roe provided additional information and identified persons who might be witnesses.  The Investigator did not seek to verify any of the information provided[5] or speak to any of the witnesses mentioned by Jane Roe, even though this information was cited as important to the conclusions.  (Doc#S-95 at 13.)  Te Investigator also discounted the sworn statements supporting his version of events provided by John Doe.  (Doe Aff., Doc#4-2, PageID#133.)

On March 24, 2020, John Doe was informed that the Title IX investigation was completed and that he had been found responsible for "Non-Consensual Sexual Intercourse" because Jane Roe was incapacitated when she consented to sexual activity

---

[5] For example: The Title IX Coordinator concluded that Jane Roe was credible, in part, because she "sought out and received counseling services" after the Incident.  (Doc#S-95 at 55.)  Nobody requested these records or made any effort to verify this claim. (Dammer Depo., Doc#87-1, PageID#726.)

5

with John Doe.  (March 24, 2020 Letter, Doc#87-9).  The Outcome Letter did not address John Doe's claim that he was a victim of sexual misconduct because he, too, was intoxicated.  (*Id*.)   No similar letter was sent describing the outcome of the investigation into John Doe's complaint.  (Dammer Depo., Doc#87-1, PageID#724.)

On April 1, 2020 John Doe submitted an appeal, referred to by ERAU as a "Request for Reconsideration."  (Appeal, Doc#87-11.)  John Doe noted that he had submitted a claim that he was a victim of sexual misconduct which had not been addressed.  John Doe also noted various procedural irregularities.  (*Id.* at PageID#891-893.)  The Appeal was reviewed by the Associate Dean of Students & Title IX Coordinator for the ERAU campus in Arizona.  She identified concerns about bias, granted John Doe's appeal, and ordered that case to be reviewed by a new investigator.  (April 16, 2020 Letter., Doc#1-3, PageID#40.)   The new investigator only read the report; he did not conduct any new investigative work or, even, speak to John Doe, Jane Roe, or any witnesses.  (Langston Depo. at 35-36.)

On June 10, 2020 the new investigator issued an Outcome Letter.  This letter is substantially similar to the Outcome Letter and summarily dismissed John Doe's claim that he was also incapacitated.  (Doc#1-4.)  John Doe was dismissed from ERAU.  He faces, *inter alia,* damage to his academic and professional reputations.  He will be limited in his ability to enroll at other institutions of higher education and to pursue a career. (Doc#4-1, PageID#130-131.)

This litigation followed.

**ARGUMENT**

**A.      Standard**

Defendant brings this Motion under Evidence Rules 401 and 403.

Regarding the admissibility of evidence, Rule 402 provides that "[r]elevant evidence is admissible" except as otherwise provided by "the United States Constitution; a federal statute; [the Federal Rules of Evidence]; or other rules prescribed by the Supreme Court. Irrelevant evidence is not admissible." Fed. R. Evid. 402.

Rule 401 provides that "evidence is relevant" if "it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R. Evid. 401. "Rule 401 defines relevant evidence in broad terms." *United States v. McCoy*, S.D.Fla. No. 08-14020-CR, 2008 U.S. Dist. LEXIS 133287, at *7 (Aug. 21, 2008). *See also* See *Conway v. Chem. Leaman Tank Lines, Inc.*, 525 F.2d 927, 930 (5th Cir. 1976) ("The policy of the [Federal Rules of Evidence] is one of broad admissibility…"); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587 (1993) ("[Rule 401's] basic standard of relevance… is a liberal one.").

Rule 403 sets forth the following balancing test for relevant evidence: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Rule 403 is 'an extraordinary remedy which should be applied sparingly.'" *Jones v. Carnival Corp.*, S.D.Fla. No. 04-20407-CIV, 2006 U.S. Dist. LEXIS 100633, at *2 (Jan. 11, 2006), *quoting United States v. Sawyer*, 799 F.2d 1494, 1506 (11th Cir. 1986)

("Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing.").

**B.     The Training Presentations Are Relevant**

Plaintiff has asserted a Title IX Selective enforcement claim.  To prevail on a Title IX Selective Enforcement claim, Plaintiff must demonstrate that a similarly-situated member of the opposite sex was treated more favorably. *Rollins College*, 352 F. Supp. 3d at 1211, *citing Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016); *Mallory v. Ohio Univ.*, 76 F. App'x 634, 641 (6th Cir. 2003).  In a selective enforcement claim, a plaintiff alleges that the decision to initiate proceedings or the penalty imposed was affected by plaintiff's gender. . *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994).[6]

Evidence that school administrators possessed outdated, stereotypical, and discriminatory views of gender and sexuality can support an inference of gender bias because "these views would have naturally infected the outcome of [a] Title IX disciplinary proceedings."  Marymount Univ., 297 F. Supp. 3d at 586.  In this case, the training materials are relevant evidence of discriminatory views.  The Title IX Coordinator provided training to others at ERAU on multiple occasions to multiple audiences – the coaches were just one example.  During these trainings, she said, "We need to believe survivors because it is their truth they are speaking."[7]  (Training, Doc#87-5, PageID#866.)

---

[6] In *Doe v. Valencia Coll.*, 903 F.3d 1220, 1236 (11th Cir. 2018), the Eleventh Circuit recognized the impact of *Yusuf* in establishing a framework to analyze Title IX claims. *See also Jia v. Univ. of Miami*, S.D.Fla. No. 17-cv-20018, 2019 U.S. Dist. LEXIS 23587, at *13 (Feb. 12, 2019) (following *Yusuf* test); *Doe v. Univ. of S. Alabama*, S.D.Ala. No. 17-0394, 2020 U.S. Dist. LEXIS 25961, at *39 (Feb. 14, 2020) (same); *Lynn Univ.*, , 224 F. Supp.3d at 1291 (same).

[7] If there is any doubt this is bias, the Court should note that the previous slide, titled "What to say to a respondent," does not contain similar language.  (Training, Doc#87-5, PageID#865.)  This is in the context of a policy that does not have any provision indicting

Defendant's suggests that the training presentation applies only to coaches – and is not representative of how the school responds to Title IX matters – is incorrect. Def. Memo. at PageID#2506. Defendant, elsewhere, argues that the training "applies only to coaches' reporting obligations" and does "not discuss the responsibilities of the Title IX Investigator or Coordinator…" *Id.* BUT THIS IS NOT TRUE. The training is a standard presentation given to many audiences. The same statements/slides appeared in a training for new and returning resident assistants, for example. (Trainings, Doc#125-1, PageID#2272-2273.) The author of the PowerPoint testified at her deposition that the training presents "an accurate statement of how Title IX operates at Embry-Riddle." (Dammer Depo., Doc#87-1, PageID#710.)

Defendant further argues that the training "does not suggest that the Title IX office subscribes to that philosophy in its administration, handling, and resolution of the case after it receives the report." Def. Memo. at PageIOD#2506. BUT THIS IS ALSO NOT TRUE. These training materials explicitly describe the philosophy and approach of the ERAU Title IX Office. When asked about these training materials, the Title IX Coordinator testified in her deposition that this is representative of how she approaches cases:

> Q On [PageID#866] it indicates that, "We need to believe survivors because it is their truth they are speaking." *Is that an accurate statement of how you operate?*
> A *Yes.* At that time when somebody comes in I'm going to take it that they are telling me the truth as they know.
> Q So you're going to believe them when they say -- If someone comes in and says, "I'm a victim," you're going to believe them?
> A At that time, yes.

---

that an accused student is presumed innocent until proven 'guilty.' (*See* Meyers-Parker Depo., Doc#87-2, PageID#787 (witness unable to identify portion of policy indicating presumption of innocence).)

(Dammer Depo., Doc#87-1, PageID#711 (objections omitted, emphasis supplied).) And this is not an isolated claim. Previously in her deposition the Title IX Coordinator testified, "when [alleged victims] come in and make a statement I am going to believe what they're telling me is the truth…" (Dammer Depo., Doc#87-1, PageID#709.)

The statements in the training are relevant because they are "circumstantial evidence… concerning… discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Under Eleventh Circuit precedents, in comparable Title VII cases,[8] Plaintiff may present "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019). Plaintiff's expert specifically tied the "believe survivors" language in *this* training to gender bias.

> It appears that, consistent with gender stereotypes, the Investigator adopted the predisposition of believing the female Jane Roe, presumed to be a survivor, and disbelieved the male John Doe, presumed to be a perpetrator, and then interpreted the evidence in a way that confirmed the initial belief of Roe's victimhood and Doe's guilt. Training materials at ERAU used by the Title IX Coordinator and the Investigator state, "We need to believe survivors because it is their truth they are speaking." Discovery materials demonstrate that every case investigated by ERAU involved a female student alleging misconduct by a male respondent. ERAU's predisposition to believe survivors became a predisposition of disbelief when Doe, a man, reported being incapacitated during sex. Subsequently, the Investigator pursued the case and interpreted the evidence she obtained—witness statements, intoxication levels, and physical evidence—in a manner consistent with her desire to "believe" (female) survivors. Much of the Report's analyses and conclusions read as though the investigator examined the allegations in the light most favorable to the (female) Reporter.

(Gruber Report, Doc#91-3, PageID#994-995.)

---

[8] Courts "have borrowed from Title VII cases to inform their approach to Title IX…" J.*F.K. v. Troup Cty. School Dist.*, N.D.Ga. No. 3:09-CV-0142, 2011 U.S. Dist. LEXIS 162754, at *5 n. 2 (June 21, 2011). *See also Saville v. Houston County Healthcare Auth.*, 852 F. Supp. 1512, 1521 (M.D. Ala. 1994) (applying standards of Title VII to Title IX claims)

10

In Title IX cases, evidence of gender bias may be inferred from statements or trainings conducted by school administrators.[9]  In *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019), for example, the Seventh Circuit held that gender stereotypes could be inferred when a university center posted an article insinuating that men were "the cause of campus sexual assault."  In *Doe v. Washington & Lee Univ.*, W.D.Va. No. 6:19-cv-00023, 2021 U.S. Dist. LEXIS 74222 (Apr. 17, 2021), a court held that "gender bias could be inferred" from the Title IX Coordinator's hosting a presentation containing statements that could be interpreted as biased.  2015 U.S. Dist. LEXIS 102426 at *10.  Defendant cites no cases supporting its position, much less any cases to the contrary.

## C.     The Training Is Not Unduly Prejudicial

Defendant suggests that the training PowerPoint is confusing, and that Defendant's personnel would have to be questioned "about what the document says, what it does not say, and what the document applies to."  Def. Memo. at PageID#2507.  Defendant cites no authority to support its argument beyond summarizing the standard.  That is likely because this is not a reason for exclusion under Rule 403 but, instead, a reason for a trial.  The training suggests that the persons in charge of conducting

---

[9] The fact that the presentation was gender neutral and could be described as merely "pro victim" does not make the presentation irrelevant for Title IX purposes under the most recent court of appeals decisions.  *See Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 948 (9th Cir. 2020) ("Sex discrimination need not be the only plausible explanation or even the most plausible explanation for a Title IX claim to proceed."); *Doe v. Regents of the Univ. of Minnesota*, 999 F.3d 571, 579 (8th Cir. 2021) (a school's possible bias in favor of the victims of sexual assault does not precludes a reasonable inference of bias against male students); *Doe v. Univ. of Denver*, 1 F.4th 822, 835-836 (10th Cir. 2021) ("Title IX plaintiffs challenging the outcome of a sexual-misconduct proceeding will rarely have direct evidence or even strong circumstantial evidence sufficient to overcome a school's 'anti-respondent, not anti-male' argument.").

investigations and making determinations about violations of Defendant's rules had pre-decided the matter from the beginning. The evidence will "confuse" the jury only if the Court accepts – incorrectly – that casting doubt on the claims by Defendant's witnesses that they acted in a manner that was fair, unbiased, and free of gender stereotypes equates to creating impermissible confusion. *See United States v. Collorafi*, 876 F.2d 303, 306 (2d Cir. 1989) (explaining that "[a] mere statement that evidence would be confusing is not enough" to justify exclusion on Rule 403 grounds because "factual controversy breeds confusion"); *United States v. Evans*, 728 F.3d 953, 966 (9th Cir. 2013) (observing that an "increased . . . chance[] that the jury would acquit" cannot be attributed to jury confusion without "prejudg[ing] the 'correct' outcome of the trial before it occurs").

Defendant simply does not want THIS testimony before the jury because it is compelling evidence of an unfair and biased process. True, the training materials increase the chances that the jury will find for Plaintiff, but that is not a proper Rule 403 objection. *United States v. Evans*, 728 F.3d 953, 966 (9th Cir. 2013) ( "[S]uch a result could not be attributed to the jury being confused or misled; to find otherwise would be to pre-judge the 'correct' outcome of the trial before it occurs.")

## CONCLUSION

The Motion should be denied.

FOR PLAINTIFF:

/s/ Joshua Engel
JOSHUA ADAM ENGEL (OH 0075769)
    (TRIAL COUNSEL)
    *Pro hac vice*
ANNE TAMASHASKY (OH 0064393)
    *Pro hac vice*
ENGEL AND MARTIN, LLC
4660 Duke Drive, Ste. 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

Lori A. Sochin (FL 013048)
LUBELL | ROSEN
1 Alhambra Plaza, Suite 1410
Coral Gables, FL 33134
(305) 655-3425
(305) 442-9047
las@lubellrosen.com

## CERTIFICATE OF SERVICE

    This certifies that the foregoing was filed electronically on October 13, 2021. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

        /s/ Joshua Engel
Joshua Adam Engel (Ohio No. 0075769)
    *pro hac vice*